IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN GANLEY,

      Plaintiff,

v.                                     No. 1:17-cv-00432 JB-SMV

ERIC JOJOLA in his
individual capacity, and THE
CITY OF ALBUQUERQUE,

      Defendants.

### PLAINTIFF'S RESPONSE TO DEFENDANTS ERIC JOJOLA AND THE CITY OF ALBUQUERQUE'S MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY AND OTHER GROUNDS

COMES NOW Plaintiff John Ganley, by and through his attorneys of record, Nicole W. Moss and Marshall Ray, and submits his Response to Defendants Eric Jojola and the City of Albuquerque's Motion for Summary Judgment on Qualified Immunity and Other Grounds (Doc. 32). There are genuine issues of material fact that preclude summary judgment on the claims brought pursuant to 42 U.S.C. § 1983 and the New Mexico Tort Claims Act. Regarding the 42 U.S.C. § 1983 claims, the evidence in the record shows that Defendant Jojola acted with deliberate indifference and with intent to violate Plaintiff's civil rights. He knew at the time that he made the statements under oath in the arrest affidavit that he had no probable cause believe that Mr. Ganley was anything other than the victim of identity theft. His defense is essentially that Plaintiff and the proper suspect looked alike because they were the same race, and that two fully different looking people are close enough for probable as long as they are the same race and sex. He also glides by the very troubling fact that he advised he would run a finger print (which would have conclusively excluded Plaintiff as a suspect), but never did. The evidence in the record also

demonstrates that Defendant Jojola likely did not personally run a comparison of Mr. Ganley's Motor Vehicles Division ("MVD"), though he claims multiple times under oath that he did. The state law claims are also not subject to dismissal. The New Mexico Supreme Court has articulated broad duties for law enforcement officers and has subject them to liability for negligence. Here, in particular, Defendant Jojola's conduct caused an enumerated tort—a false arrest. The New Mexico Tort Claims Act ("NMTCA") waives immunity for such an action. Moreover, malicious abuse of process is as well established allowable cause of action against law enforcement officers under the NMTCA.

## I.      RESPONSE TO DEFENDANTS STATEMENT OF UNDISPUTED MATERIAL FACTS.

1.   In response to Defendants' UMF # 1, Plaintiff admits that he has sued Defendant Jojola pursuant to 42 U.S.C. § 1983 for Defendant Jojola's cumulative actions resulting in the willful and deliberate acts of Defendant Jojola, and the malicious prosecution and false arrest and imprisonment (twice) of Plaintiff.

2.   In response to Defendants' UMF #2, Plaintiff admits that he has sued Defendant the City of Albuquerque because of customs, policies, or practices of the City of Albuquerque that caused and encouraged the civil rights violations that Plaintiff experienced, and has sued Defendants pursuant to the New Mexico Tort Claims Act because of Defendant Jojola's actions leading to the false arrest of Plaintiff.

3.   Plaintiff admits Defendants' UMF #3.

4.   Plaintiff disputes Defendants' UMF #4. Defendant Jojola's Criminal Complaint-Warrant Affidavit States: "Brad [Specht] informed me he received information from investigator Steve Torbett, that he had a check cashed by a male suspect John Ganley on September 4, 2015. Brad explained the check John cased was stolen back sometime from July 2015 to September 2015 from

the mail[.]" Defendants' Exhibit A (Criminal Complaint-Warrant Affidavit of Detective Eric Jojola) (Doc. 32-1). In his report, however, Defendant Jojola incorporated the following statement of Officer Kelly Burt:

> On 9-21-15 I was dispatched to 9200 seagull late NE reference [sic] to a forgery. Upon arrival I contacted Alicia Meiring who stated that possibly 8 to 10 checks/mail were possibly stolen from the mail box with in the last several months. Ms [sic] Meiring stated there have been checks showing up that have been altered with other persons [sic] names on the checks. Names of Nikita Sosa, Jennifer Aragon, Mary Chavez and John Ganley were added to the original payees and the checks were cashed by a check cashing business. It is unknown if they are offenders or victim [sic] of identity theft. Brad Specht, US Postal Inspection Service arrived and advised he would be following up on the case.

**Plaintiff's Exhibit 1** (Incident Report by Officer Kelly Burt, dated September 21, 2015) (emphasis added). In other words, Defendant Jojola was already on alert, based on information he incorporated into his own report, that the names added as payees to the altered checks in question, including the name of John Ganley, may have belonged to victims of identity theft. The information Defendant Jojola had was that Mr. Ganley's name had been used as the payee of a check—not that John Ganley had cashed a check.

5. Plaintiff disputes Defendants' UMF # 5. It is undisputed that John Ganley did not cash the check at issue. *See* **Plaintiff's Exhibit 2** (Supplemental Report of Defendant Jojola, dated October 19, 2016)("John not the likely suspect."). Furthermore, Defendants offer no admissible evidence concerning what Postal Inspector Specht told Defendant Jojola, but rather present the self-serving hearsay of Defendant Jojola.

6. Plaintiff disputes Defendants' UMF # 6. It is undisputed that John Ganley did not cash the check at issue. *See* **Plaintiff's Exhibit 2**. Plaintiff does not have any information to dispute that Steve Torbett provided a copy of the forged check to Defendant Jojola.

7. In response to Defendants' UMF # 7, Plaintiff states that he has no information to dispute that Mr. Torbett provided still photographs of the transaction involving the altered check. It is

3

undisputed that Defendant Jojola had multiple still photographs of the transaction showing different sides of the suspect's face, in addition to the suspect's physical build, and showing a Caucasian male with short hair and, otherwise, no resemblance to Plaintiff.  *See* Defendant's Exhibit E to Motion for Summary Judgment ("Driver's License Photograph of Plaintiff) and Defendant's Exhibit D (Still Photographs of the transaction).  The subjects bear no resemblance to one another aside from being Caucasian males.

8.   Plaintiff admits Defendants' UMF # 8.  In addition, Plaintiff states that Defendant Jojola also learned that the fingerprint of the individual cashing the check was captured on the check.  *See* Defendants' Exhibit A (Criminal Complaint-Warrant Affidavit) ("It also appears that John's fingerprint was obtained on the day of the transaction and imprinted on the front of the check.").  Defendant Jojola swore in his Warrant-Affidavit: "[A] forensic comparison will be ordered to match the fingerprint on the check to John's fingerprint.  At this time an arrest warrant will be obtained for John on aforementioned facts and information."  *Id*.  Despite swearing that a forensic fingerprint comparison would be obtained before seeking a warrant, Defendant Jojola took no action with respect to the fingerprint on the check and instead misled the judicial officer into believing such analysis had been conducted to verify the identity of the suspect.

9.   Plaintiff does not have information to dispute Defendants' UMF # 9.

10. Plaintiff admits that the driver's license number on the check was his.

11. Plaintiff admits Defendants' UMF # 11.

12. Plaintiff admits that Defendant Jojola had detailed photographs of the individual passing the forged check, and that he had or should have had a close-up photograph of Plaintiff.  The photographic evidence makes clear that the two subjects share almost no similarities in appearance other than their race and sex.  Defendant Jojola, at most, saw "white male with short hair."  *See* Defendants' Exhibits D and E to Motion for Summary Judgment (Docs. 32-4 and 32-5).

4

13. Plaintiff disputes Defendants' UMF # 13.  The individual depicted passing the forged check was, at the time, approximately 29 years old, while Plaintiff was 39.  Plaintiff's date of birth was visible on the MVD record upon which Mr. Jojola states he relied to issue the warrant.  *See* Doc. 32-5.  *See also* **Plaintiff's Exhibit 2**.  Many other discrepancies exist.  The MVD information listed Plaintiff as weighing over 200 pounds and being 6' 02''.  The booking sheet from Bernalillo County Detention Center also notes that Plaintiff is "very large."  Furthermore, the booking sheet indicates that John Ganley has no identifying markings such as tattoos.  **Plaintiff's Exhibit 3**.  It is not clear when Defendant saw the booking sheet, but statements made by his attorney suggest it was before the case was dismissed.  The booking sheet is dated May 25, 2016.  *See id.*[1]

14. Plaintiff admits that the MVD photograph does not show Plaintiff's arms, but states that his face and that of the correct suspect are so different that it was objectively unreasonable for Defendant Jojola to consider them to be the same person.

15. Plaintiff disputes Defendants' UMF # 15.  It is well known by now that Defendant Jojola could not have "verified that John Ganley cashed the check" because everyone admits that John Ganley did not cash the check.  Defendant's insistence on swearing this fact is defamatory and perpetuates the falsehood that Mr. Ganley was anything other than a victim of identity theft.

16. Plaintiff disputes Defendants' UMF #16.  It is beyond dispute that John Ganley did not cash the check at issue and was not involved with that check in any way.  It is confusing that, even now, Defendants are making statements in court pleadings accusing Mr. Ganley of cashing the forged check when they know he did nothing of the kind.

---

[11] At the June 4, 2018 hearing, Plaintiff's Counsel represented that, at the fingerprinting session, Defendant Jojola made some statement upon seeing Plaintiff that he knew it was the wrong person.  Plaintiff's counsel does not now recall where or who made that statement and does not include it for consideration in his response to the Motion for Summary Judgment.  Plaintiff states only that the point in time when Defendant recognized his error, if not from the very beginning, is something that is material to this case and Plaintiff has not had the opportunity to explore it in discovery because of the stay.

17. Plaintiff does not have information to dispute Defendants' UMF #17.

18. Plaintiff disputes Defendants' UMF #18.  There is no evidence submitted to show that Defendant Jojola knew what John Ganley's signature looked like, such that he could state that it appeared that John Ganley signed the back of the check.  What Detective Jojola saw was a signature on the back of the check.

19. Plaintiff admits Defendants' UMF #19.

20. Plaintiff has no information to dispute Defendants' UMF #20, but states that it would not be surprising that a judicial officer signed an affidavit claiming to have "verified" the identity of the suspect and asserted that a fingerprint was found and would be run.  *See* Doc. 32-1.  After all, how could the parties trusting Defendant Jojola's sworn statements know that the statements contained material falsehoods that defeated probable cause?

21. Plaintiff has no information to dispute Defendants' UMF #21, but states that it would not be surprising that a judicial officer issued a warrant supported by an affidavit claiming to have "verified" the identity of the suspect and asserted that a fingerprint was found and would be run. *See* Doc. 32-1.  After all, how could the parties trusting Defendant Jojola's sworn statements know that the statements contained material falsehoods that defeated probable cause?  *See* Docs. 32-1 and 32-5.

22. Plaintiff does not have information to dispute Defendant's UMF # 22.

23. Plaintiff admits that he was not the appropriate suspect but disputes that Defendant learned that information on October 19, 2016.  Although the Court did not permit Plaintiff to conduct discovery because of the qualified-immunity-based stay, Defense counsel represented at the June 4, 2018 hearing that Defendant Jojola suspected before that date that he had the wrong person. Plaintiff has not been permitted to take Defendant Jojola's deposition to confirm this under oath.

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (a).  The Court "review[s] the evidence in the light most favorable to the nonmoving party."  *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007).  Furthermore, when qualified immunity is raised, the plaintiff must establish 1) that the defendant violated a constitutional or statutory right, and 2) that the right was clearly established at the time of the defendant's conduct.  *Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013).  When deciding whether a right is clearly established, the Tenth Circuit has explained:

> A plaintiff . . . need not cite a factually identical case to demonstrate the law was clearly established. . . . A plaintiff may therefore carry the burden of demonstrating a right is clearly established by citing cases that have a sufficient degree of factual correspondence to enable a reasonable officer to know that the officer's acts violated the plaintiff's constitutional or statutory rights.

*Maresca v. Bernalillo County*., 804 F.3d 1301, 1308 (10th Cir. 2015) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d at 1257 n.9)).  Further, "[a] plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015). Or "the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id*. (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)). "[T]he plaintiff need not locate a perfectly on-point case. ... '[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.' " *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

III.    **DEFENDANT WILLFULLY MISREPRESENTED MATERIAL FACTS TO SECURE AN ARREST WARRANT OF A PERSON WHO WAS CLEARLY NOT THE CORRECT SUSPECT.**

At the June 4, 2018 hearing, the Court indicated its inclination to find that qualified immunity is warranted under the circumstances of this case.  Plaintiff submits, however, that the sort of aggressive puffery that Defendant Jojola displayed in his criminal complaint and warrant affidavit were unreasonable and constituted knowing false statements, the absence of which would have vitiated probable cause.  It is difficult to imagine a judicial officer signing this warrant if it had contained the truth (i.e., the Detective observed several color pictures of the suspect cashing the check, he pulled the driver's license number and name written on the forged check, saw that it was another white male with short hair, chose not to run a finger print even though one was present on the check, and had been advised that John Ganley was a potential victim of identity theft).  Instead, in his under-oath statements, Defendant Ganley affirmatively swore that he "verified" the identify of the individual cashing the check, and that he was going to run a finger print left on the check.  *See* Docs. 32-1 and 32-5.

The Court indicated that the word "verified" should be interpreted with broad latitude.  Plaintiff contends just the opposite.  "Verified" is a word that connotes follow-up and careful securing of information.  The first definition to arise in a Google® search for the definition of "Verify" is: "Make sure that (something) is true, accurate, or justified.")  Merriam-Webster provides: "[T]o establish the truth, accuracy, or reality of . . . ."  https://www.merriam-webster.com/dictionary/verify (retrieved June 18, 2018).  Both sources give a secondary definition, which is to "to confirm or substantiate in law by oath."  *Id*.  Dictionary.com provides three definitions of the word:  "to prove the truth of, as by evidence or testimony; confirm; substantiate," "to ascertain the truth or correctness of, as by examination, research, or comparison," and "to act as ultimate proof or evidence of; serve to confirm."  http://www.dictionary.com/browse/verify

(retrieved June 18, 2018).  Collins Dictionary states: "If you verify something, you check that it is true by careful examination or investigation."   Collins alternatively provides the following definition:  "If you verify something, you state or confirm that it is true." https://www.collinsdictionary.com/us/dictionary/english/verify (retrieved June 18, 2018).  Oxford Living Dictionaries states: "Make sure or demonstrate that (something) is true, accurate, or justified," and, as a secondary definition, "Swear to or support (a statement) by affidavit." (https://en.oxforddictionaries.com/definition/verify)(retrieved June 18, 2018).  MacMillan gives two definitions: "To check or to provie that something is true or correct," and, as a secondary definition, "to say that something is true or correct." https://www.macmillandictionary.com/us/dictionary/american/verify (retrieved June 18, 2018). Black's Law Dictionary gives this definition: "To confirm or substantiate by oath ; to show to be true. Particularly used of making formal oath to accounts, petitions, pleadings, and other papers. The word 'verify' sometimes means to confirm and substantiate by oath, and some- times by argument. When used in legal proceedings it is generally employed In the former sense." https://thelawdictionary.org/letter/v/page/15/ (retrieved on June 18, 2018).

Plaintiff could go on, as there are many dictionaries.  Plaintiff can find none that supports a definition other than one that connotes careful investigation, confirmation, and examination, or of solemn confirmation by oath.  For a commissioned law enforcement officer to tell a judge that he has "verified" something, he is putting his trust, and his capacities and efforts as an investigator into that statement.  He is seeking to strengthen, not loosen or weaken, the believability of the statement.  This is common sense, because we all know that people use the word "verify" to add weight to an averment or assertion, not to diminish it.

Now, understanding what the word "verify" means according to an array of reputable dictionaries and common sense, it is verified that Defendant Jojola falsely swore his warrant

9

affidavit. He did not verify anything, and he knows it. Of course, he could never have verified a fact that was not true. Thus, he is liable under 42 U.S.C. § 1983. The Supreme Court of the United States recognizes that false arrest and false imprisonment pursuant to the unreasonable initiation is legally actionable under 42 U.S.C. § 1983 because it implicates a violation of a plaintiff's Fourth Amendment rights. *See, e.g., Wallace v. Kato*, 549 U.S. 384, 387-89 (2007); *Wilkins v. DeReyes*, 528 F.3d 790, 2008 WL 2391244 at *7 (stating that "challenging [the legal] process [of a warrant] by alleging the officers knowingly supplied false information in affidavits for the warrants, Plaintiffs based their malicious prosecution claim on the Fourth Amendment right against unreasonable seizures"); *Mondragon v. Thompson*, 519 F.3d, 1078, 1082 (10th Cir. 2008)("If he has been imprisoned without legal process he has a claim under the Fourth Amendment analogous to a tort claim for false arrest or false imprisonment. If he has been imprisoned pursuant to legal but wrongful process, he has a claim under the procedural component of the Fourteenth Amendment's Due Process Clause analogous to a tort claim for malicious prosecution.").

The Tenth Circuit has explained that "Probable cause for an arrest warrant is established by demonstrating a <u>substantial probability</u> that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (emphasis added). An arrest-warrant affiant violates the Fourth Amendment when he or she "knowingly . . . , or with reckless disregard for the truth," includes false statements in the affidavit, *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), or "knowingly or recklessly omit[s] from an arrest affidavit information which, if included, would have vitiated probable cause," *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990). *See Bruner v. Baker*, 506 F.3d 1021, 1026 (10th Cir. 2007).

Here, Plaintiff has demonstrated that there is at least a genuine issue of material fact regarding whether Defendant Jojola, the affiant, made his statements under oath knowingly or with

reckless disregard for the truth.  He stated in his affidavit that he had verified that John Ganley cashed the check. Yet it is known that he had clear photographs of both Plaintiff and the correct suspect, so a mistake as to identity was not reasonable.  He also knew that Mr. Ganley was a potential victim of identity theft, but he took no steps to evaluate whether Mr. Ganley was such a victim.  Defendant Jojola even had a fingerprint and stated to the judicial officer signing the warrant that he would be running it for analysis, though he did not do so until requested by Mr. Ganley's criminal defense attorney.  Without these key misstatements and omissions from Defendant Jojola, there would not have been enough information to support the warrant.

Defendants insist that there needs to be a case in the Tenth Circuit finding that a false or reckless statement in a warrant resulted in the finding of a constitutional violation.  Such a precedent is not necessary because the Tenth Circuit has clearly explained the standard.  The principle governing Defendant Jojola's behavior (reckless disregard) has been articulated in multiple cases in the Tenth Circuit in discussing arrest warrants.  It was therefore clearly established that for him to make such reckless or willfully false statements subjects him to suit under 42 U.S.C. § 1983.  Qualified immunity is inappropriate under such circumstances.

At the hearing, Defense counsel maintained that an objective standard applies in qualified immunity cases.  Generally, this proposition is true.  Nevertheless, the Tenth Circuit case law discussing constitutional violations for warrant violations requires an inquiry into whether a Defendant knowingly or with reckless disregard for the truth.  It is not clear how such an analysis can be conducted through the lens of pure objectivity given that the Defendant's state of mind is actually part of the legal standard.  Plaintiff's position is that this case provides a genuine issue of material fact regarding whether Defendant acted willfully or with reckless disregard for the veracity of his affidavit.  Contrary to Defendant's contentions, this case is not about "slight discrepancies in height and weight." Doc. 32 at 13.  Instead, Defendant Jojola had multiple very

good photographs of a suspect who looked objectively nothing like Plaintiff.  His defense, resting as it does primarily on the race of the suspect, is unacceptable.  If he had testified truthfully about the investigation he conducted, he would not have secured a warrant.

## IV.   DEFENDANT JOJOLA VIOLATED PLAINTIFF'S CLEARLY ESTABLISHED SUBSTANTIVE-DUE PROCESS RIGHTS.

Defendant Jojola also violated Plaintiff's right to substantive due process.  Court's around the country have supported liability in similar situations.  "Protection against governmental arbitrariness is the core of due process." *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 834 (1998). The United States Court of Appeals for the Eighth Circuit, recognizing that "reckless or intentional failure to investigate other leads offends a defendant's due process rights," upheld the denial of summary judgment in a lawsuit because the plaintiff had demonstrated evidence that a state law enforcement officer recklessly failed to follow other leads which would have led to plaintiff's exoneration in a murder investigation.  *Wilson v. Lawrence Cty.*, 260 F.3d 946, 955 (8th Cir. 2001). The Eight Circuit reasoned: "[I]n situations where state actors have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly."  *Id*., 260 F.3d at  956.  The United States Court of the Appeals for the Fifth Circuit has similar recognized the validity of a substantive-due process claim when law enforcement officers recklessly or intentionally conducts an investigation.  *See Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir.1992) (denying qualified immunity where evidence could support a finding that defendant had deliberately ignored exonerating information indicating he had arrested the wrong person).  The Seventh Circuit found that a plaintiff's cause of action was valid because there was evidence that, "[a]lthough some of the defendant's acts of omission may have been only negligent, there is a strong suggestion of intentional and concealed corner-cutting to accomplish the arrest."  *Whitley v. Seibel*, 613 F.2d 682, 686 (7th Cir. 1980).

The United States Court of Appeals for the Eleventh Circuit held that a plaintiff subject to arrest on a warrant based on mistaken identity had "introduced substantial evidence showing that her fourteenth amendment due process rights were violated by [defendant], who was responsible for completing the arrest procedure, and who presented to the judge the affidavit that served as the basis for the issuance of the fugitive warrant for [her] arrest." *Cannon v. Macon Cty*., 1 F.3d 1558, 1565 (11th Cir. 1993), opinion modified on reh'g, 15 F.3d 1022 (11th Cir. 1994).  In *Cannon v. Macon Cty*., the defendant swore out a fugitive warrant despite the fact that plaintiff repeatedly claimed she was not the correct suspect, the sheriff's office had hers driver's license and other identifying information on file, the information on the driver's license differed significantly from the description for the suspect, her physical description did not match the suspect's description, and while the officer initially claimed that he got the information for the arrest report from plaintiff, he later "conceded that it was possible that he obtained some of the information from the NCIC report rather than from [plaintiff]." *Id*. at 1563–64., the Eleventh Circuit therefore held: "A reasonable official also would be unlikely, in the face of Cannon's assertions of mistaken identity, to sign an affidavit swearing to a belief that Cannon was a wanted fugitive without taking any steps to verify that belief."  1 F.3d at 1565.  *See also Fairley v. Luman*, 281 F.3d 913, 915 (9th Cir. 2002) (finding municipal liability under 42 U.S.C. § 1983 where a plaintiff was arrested on a warrant meant for his twin brother and noting that "[n]either a fingerprint comparison nor Department of Motor Vehicles check was completed at any time during [plaintiff's]'s twelve-day detention. Either would have immediately alerted the City it had the wrong man.").

Plaintiff recognizes that negligent investigation does not give rise to a claim under the United States Constitution.  *See Baker v. McCollan*, 443 U.S. 137, 145–46 (1979).  "Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person."  *Id*. at 145.  *Baker*, of course, involved no problem with the

validity of the warrant, nor did the facts in that case suggest reckless or intentional acts by the defendant.  *See Id.*, 443 U.S. at 143–44.

All of the above cases demonstrate that irresponsible and reckless failure to follow up on certain information can lead to violation of clearly established rights.  The cases come from various Circuits, and all point towards liability here and suggest a weight of authority.  Plaintiff has shown, even without the benefit of discovery, that Defendant Jojola violated his clearly established due-process rights.

At the hearing, the Court asked whether *Romero v Faye*, 45 F.3d 1472 (10th Cir. 1995) applies here.  Plaintiff argues that the case sets forth some general principals that are helpful, but that the facts are distinguishable.  In Romero, the Plaintiff asserted that his rights were violated when the Defendant failed to speak to multiple alibi witnesses, and instead allowed the prosecution to move forward to a Grand Jury indictment.  Multiple Witnesses implicated the Plaintiff in the Grand Jury proceeding, and an indictment issued.

Under those facts, the Tenth Circuit found qualified immunity to be appropriate.  *See Romero v. Fay*, 45 F.3d at 1478 ("Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.").  Additionally, there is analysis in *Romero v. Fay* that is compelling in finding a lack of probable cause in the present case.  The Tenth Circuit in *Romero v. Fay* distinguished a Fourth Circuit case, *Clipper v. Takoma Park, Md*., 876 F.2d 17 (4th Cir. 1989), stating the following:

> *Clipper* illuminates Plaintiff's failure to carry his burden of alleging facts which show Defendant Fay arrested him without probable cause. Significantly, the plaintiff in *Clipper* established facts showing that the defendant officer acted unreasonably at the time of the arrest <u>by ignoring information in his knowledge-- the witnessing officer's statement that he did not think the plaintiff committed the crime--and failed to examine fundamental evidence--the bank surveillance film</u>. Thus, the plaintiff in *Clipper* demonstrated that the facts and circumstances known

> to the defendant officer did not constitute reasonably trustworthy information
> sufficient to lead a prudent officer to believe that the plaintiff had committed the
> bank robbery.

*Romero v. Fay*, 45 F.3d 1472, 1477 (10th Cir. 1995).  *Clipper*, as explained by the Tenth Circuit in *Romero v. Fay*, is like the present case in exactly the ways that the Tenth Circuit found to compel liability in *Clipper* and qualified immunity in *Romero*.  Defendant Jojola ignored statements from another investigator that it was not clear if Mr. Ganley was the victim of identity theft, and then failed to property compare surveillance footage in the form of various high quality still shots of the check cashing incident—something the Tenth Circuit characterized as "fundamental evidence."  *Romero v. Fay*, 45 F.3d at 1472.

Moreover, unlike in *Romero*, there were no eye witnesses implicating John Ganley. Defendant tries to obscure this discrepancy in his Motion for Summary Judgment, contending that there was a witness that informed him that the check was stolen and cashed by John Ganley.  *See* Doc. 32 at 15.  The Court should not let Defendant hide behind his vague characterizations.  There is no actual evidence of any eye witness that knew and could identify John Ganley.  All that Defendant Jojola had was check for which he already knew the payee had been altered.  There never was an eye witness that could or would identify the Plaintiff as being involved and Defendant knows that.

Accordingly, Defendant Jojola is not entitled to qualified immunity.  His investigation was unreasonable, as explained in Romero, and he violated Plaintiff's right to due process.  To this day he makes excuses and hides behind semantics, hoping the Court will forget the outrageous behavior he displayed that resulted in serious harm to a citizen.  The Court should deny his motion with respect to the individual federal claims.

V.     **THERE IS EVIDENCE SUPPORTING LIABILITY UNDER THE NEW MEXICO TORT CLAIMS ACT THUS PRECLUDING SUMMARY JUDGMENT.**

Defendant's argument's regarding immunity under the NMTCA are without merit.  The

Act provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.

The New Mexico Supreme Court has articulated a law enforcement officer's duty in the following

terms:

> [T]he Tort Claims Act waives governmental immunity for claims of liability "resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers . . . ." Section 41-4-12 (emphasis added). In *Methola v. County of Eddy*, 95 N.M. 329, 333, 622 P.2d 234, 238 (1980), we held that Section 41-4-12 of the Tort Claims Act waived governmental immunity not only for intentional torts committed by law enforcement officers, but also for acts committed by third parties when caused by the negligence of the officers. We explained that the phrase "caused by," as employed in Section 41-4-12, is traditionally used in negligence actions, and we therefore concluded that when a suit is brought under the Tort Claims Act, the established law of negligence and damages should apply. *Id*. at 333-34, 622 P.2d at 238-39. Accordingly, a claim arising out of one of the common-law torts enumerated within the Section 41-4-12 waiver of immunity is essentially a common-law negligence claim, and the plaintiff need only show a violation of a common-law duty. *See Blea v. City of Espanola*, 117 N.M. 217, 220-21, 870 P.2d 755, 758-59 (Ct. App.) (noting law enforcement officers may be held liable for negligently inflicting one of the enumerated torts), cert. denied, 117 N.M. 328, 871 P.2d 984 (1994).
>
> In *Cross v. City of Clovis*, we set out the ordinary, common-law duty of law enforcement officers, noting "quite simply that a law enforcement officer has the duty in any activity actually undertaken to exercise for the safety of others

> that care ordinarily exercised by a reasonably prudent and qualified officer in
> light of the nature of what is being done." *Cross v. City of Clovis*, 107 N.M.
> 251, 253, 755 P.2d 589 591 (1988) (footnote omitted); *see also Torres v. State*,
> 119 N.M. 609, 614, 894 P.2d 386, 391 (1995) (reaffirming Cross). Of course,
> the exact nature of the duty owed may vary with the particular circumstances
> of the case. *See, e.g., Methola*, 95 N.M. at 333, 622 P.2d at 238 (noting that
> corrections officers' violation of common-law duty to protect persons in
> custody, which violation resulted in an enumerated tort, gave rise to claim
> cognizable under the Tort Claims Act); *Ortiz v. New Mexico State Police*, 112
> N.M. 249, 252, 814 P.2d 117, 120 (Ct. App. 1991) (holding that officers may
> be liable for common-law claim of negligent supervision that resulted in
> commission of an enumerated tort), cert. quashed, 113 N.M. 352, 826 P.2d 573
> (1992).

*Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 1996-NMSC-021, 121 N.M. 646, 652-

53, 916 P.2d 1313, 1319-20 (emphasis added). Moreover, Defendants acknowledge, as they must,

that the New Mexico Legislature has set forth certain duties pertaining to the diligence of law

enforcement investigations, and such duties may form the basis of liability. *See* NMSA 1978, §29-

1-1 (It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other

peace officer to investigate all violations of the criminal laws of the state which are called to the

attention of any such officer or of which he is aware, and it is also declared the duty of every such

officer to diligently file a complaint or information, if the circumstances are such as to indicate to

a reasonably prudent person that such action should be taken, and it is also declared his duty to

cooperate with and assist the attorney general, district attorney or other prosecutor, if any, in all

reasonable ways."). New Mexico Courts have long recognized that the duties embodied in Section

29-1-1 can give rise to liability under the NMTCA. *See, e.g., Schear v. Bd. of Cty. Comm'rs*, 1984-

NMSC-079, ¶ 23, 101 N.M. 671, 677, 687 P.2d 728, 734 ("We therefore hold that petitioner's

complaint states a claim for relief against members of the Bernalillo County Sheriff's Office and

their principals. Accepting the allegations in the complaint as true, it shall be for the jury demanded

in this case to determine whether the duty to investigate, imposed by Section 29-1-1, was breached

and, if so, whether such conduct was negligence that proximately caused petitioner's injuries.").

*See also Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 1996-NMSC-021, 121 N.M. 646, 916 P.2d 1313.

Here, as set forth above, there are genuine issues of fact about the manner in which Defendant conducted his investigation, whether it was unreasonable for him to base a search warrant on the clear evidence he had pointing away from John Ganley as the proper suspect, whether he made false statements in a warrant affidavit, and whether he lacked probable cause to arrest or cause the arrest of Plaintiff.  Furthermore, the heightened burdens flowing from the defense of qualified immunity do not apply Plaintiff's NMTCA claims.

Moreover, it is not even a matter of dispute that malicious abuse of process claims are available against law enforcement officers.  Plaintiff has demonstrated that there is evidence in the record that Defendant lacked probable cause and used improper and irregular means to initiate judicial proceedings against Plaintiff.  *See also Santillo v. New Mexico Department of Public Safety*, 134 N.M. 84 (allowing a malicious prosecution claim to proceed against an officer who committed procedural improprieties against a liquor licensee in the process of executing an arrest warrant).  Regarding malicious abuse of process, the New Mexico Court of Appeals has explained:

> Malicious abuse of process occurs when (1) a person initiates judicial proceedings against another, (2) he commits an act in the use of process that would not be proper in the regular process of the claim, (3) a primary motive in misusing the process is to accomplish an illegitimate end, and (4) the person against whom the proceedings are initiated suffers damages. *Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007–NMSC–047, ¶ 12, 142 N.M. 150, 164 P.3d 31; *DeVaney v. Thriftway Mktg. Corp.*, 1998–NMSC–001, ¶ 17, 124 N.M. 512, 953 P.2d 277. The element of an improper act in the use of process can be established by showing that proceedings were initiated without probable cause or by establishing an "irregularity or impropriety suggesting extortion, delay, or harassment." *Fleetwood Retail Corp. of N.M.*, 2007–NMSC–047, ¶ 12; *DeVaney*, 1998–NMSC–001, ¶¶ 21–22.

*Santillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-159, ¶ 13, 143 N.M. 84, 88, 173 P.3d 6, 10. In addition, this Court has accurately summarized New Mexico law regarding the second element of malicious abuse of process as follows:

A malicious-abuse-of-process plaintiff who is attempting "to show a lack of probable cause must demonstrate, by the applicable standard of proof, that the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim." *DeVaney v. Thriftway Marketing Corp.*, 124 N.M. at 522, 953 P.2d at 287.

Lack of probable cause is not the only way to establish misuse of process; a plaintiff can also show misuse of process by pointing to "some irregularity or impropriety suggesting extortion, delay or harassment." *DeVaney v. Thriftway Mktg. Corp., 124 N.M. at 522, 953 P.2d at 287*. A plaintiff may prove misuse of process through procedural irregularity—such as misuse of discovery, subpoenas, and attachments—or an act that otherwise indicates wrongful use of proceedings—such as an extortion attempt. *See DeVaney v. Thriftway Mktg. Corp.*, 124 N.M. at 522, 953 P.2d at 287. Some examples of misuse of process include: (i) excessive execution on a judgment; (ii) attachment of property other than the property involved in the litigation; (iii) oppressive conduct in connection with an arrest or seizure of property; and (iv) extortion of excessive sums of money. *See DeVaney v. Thriftway Mktg. Corp.*, 124 N.M. at 522, 953 P.2d at 287.

Under the requirement of a primary improper motive, it is insufficient that the malicious abuse-of-process defendant acted with ill will or spite. *See DeVaney v. Thriftway Mktg. Corp.*, 124 N.M. at 522, 953 P.2d at 287 (citing W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser and Keeton on the Law of Torts § 121, at 897 (5th ed. 1984)("[E]ven a pure spite motive is not sufficient where process is used only to accomplish the result for which it was created.")(emphasis added). There must be a purpose to accomplish an illegitimate end. *See DeVaney v. Thriftway Mktg. Corp.*, 124 N.M. at 522, 953 P.2d at 287. The Supreme Court of New Mexico has given several examples of improper purpose, including: (i) a litigant who pursues a claim knowing that the claim is meritless; (ii) a litigant who pursues a claim primarily to deprive another of the beneficial use of his or her property in a manner unrelated to the merits of the claim; (iii) a litigant who misuses the law primarily for harassment or delay; or (iv) a litigant who initiates proceedings primarily for the purpose of extortion. *See DeVaney v. Thriftway Mktg. Corp.*, 124 N.M. at 522, 953 P.2d at 287.

*Aragon v. San Jose Ditch Ass'n*, No. CIV 10-0563 JB/RHS, 2011 WL 6013284, at *12–13 (D.N.M.

Nov. 22, 2011).

Under those standards, there is evidence of knowing or reckless falsehood, willingness to

proceed with an arrest and to swear out a warrant without probable cause, and a stubborn

unwillingness to remedy the situation until Plaintiff's criminal defense counsel insisted on finger

printing—something Defendant Jojola falsely had stated under oath that he planned to carry out.

At a minimum, genuine issues of material fact preclude summary judgment—especially under the circumstances of this case, in which Plaintiff has not been permitted to conduct discovery.

Defendant cites *Lessen v. City of Albuquerque*, 2008-NMCA-085, 144 N.M. 314 for the proposition that negligence claims do not lie against law enforcement officers unless the law enforcement officer's negligence causes a third party to commit an enumerated tort.  Plaintiff recognizes that Lessen appears to articulate such a concept, but such a reading of the Court of Appeals decision requires a party to ignore the much broader language that the New Mexico Supreme Court laid out in *Weinstein* and the cases cited therein.  The applicable statute also belies an overbroad reading of Lessen v. City of Albuquerque.  The statute, after all, waives immunity for various actions, including "personal injury" and constitutional violations caused by law enforcement officers acting within the scopes of their duties.  The Court should not lend credence to the City's strained and overly stingy ready of New Mexico's statutes and cases interpreting them.

## VI.   PLAINTIFF'S FEDERAL MUNICIPAL LIABILITY CLAIMS ARE STILL VIABLE EVEN IF THE COURT FINDS THAT DEFENDANT JOJOLA DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

The Defendants did not move for summary judgment on the claims against the City and did not develop a record regarding those claims, but perhaps they expect that those claims must fall if the individual claims are found to fail.  The matter, however, is not so simple.  The standard for so-called *Monell* claims was expounded in detail in a 2010 Tenth Circuit opinion:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ." (quoting 42 U.S.C. § 1983). *See Schwartz*, supra III.B.1, at § 7.19[C] (positing that imposing liability upon officials for their promulgation of a policy the enforcement

of which violates individuals' federally protected rights holds such officials "responsible for their own wrongs rather than on the basis of *respondeat superior* liability" and, therefore, comports with *Iqbal*); *see also Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 2010 U.S. Dist. LEXIS 32142, *47-49, 2010 WL 1348450, *17 (D. Colo. 2010) ("The exercise of control which may create the 'affirmative link' does not need to be the sort of on-the-ground, moment-to-moment control that defendants appear to suggest. Rather, the establishment or utilization of an unconstitutional policy or custom can serve as the supervisor's 'affirmative link' to the constitutional violation. . . . [W]here an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application."). A plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) <u>caused the complained of constitutional harm</u>, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)(emphasis).

Moreover, the Supreme Court of the United States has held that "municipalities have no immunity from damages liability flowing from their constitutional violations." *Owen v. Independence*, 445 U.S. 622, 657, (1980). In a recent ruling the United States Court of Appeals for the Second Circuit has also explained:

[T]he entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is also irrelevant to the liability of the municipality. Qualified immunity is a defense available only to individuals sued in their individual capacity. "'[M]unicipalities have no immunity from damages for liability flowing from their constitutional violations.'" *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (quoting *Owen v. City of Independence*, 445 U.S. 622, 657, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980)); *see also Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008) (noting that "a municipality may not assert qualified immunity based on its good faith belief that its actions or policies are constitutional"). The doctrine that confers qualified immunity on individual state or municipal actors is designed to ensure that the persons carrying out governmental responsibilities will perform their duties boldly and energetically without having to worry that their actions, which they reasonably believed to be lawful at the time, will later subject them to liability on the basis of subsequently developed legal doctrine. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (the doctrine of qualified immunity furthers "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority" (internal quotation marks omitted)). That policy, however, has no bearing on the liability of municipalities.

> Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights. *See Owen*, 445 U.S. at 656-57.

*Askins v. Doe*, 727 F.3d 248, 254 (2d Cir. 2013).  Askins is sound and is based on Supreme Court precedent.

The rules that the Supreme Court of the United States and the Tenth Circuit have set forth do not require that the offending policy or practice violate *clearly established* constitutional rights. Rather, they need merely have caused the deprivation of any right secured by the Constitution.

Plaintiff submits that the record has not been developed regarding municipal liability because: (i) discovery has not been permitted, and (ii) the City did not present any facts to establish a prima facie case of summary judgment on the municipal liability claims.  Under the Tenth Circuit's explicit standard, Plaintiff can maintain municipal liability claims under 42 U.S.C. § 1983 even if the Court decides to dismiss the individual federal claims on the grounds that the law was not clearly established.  Moreover, as discussed above, Plaintiff has demonstrated evidence that individual Section 1983 liability obtains in this case.  At this time, on this record, dismissal of the municipal liability claims would be improper, at least without an opportunity to conduct discovery.

## VII.    CONCLUSION.

Summary judgment is not appropriate in this case.  While the Court indicated that it was inclined to dismiss the federal claims on the grounds of qualified immunity, the record here precludes such a result.  The Defendants cite cases of mistaken identity that concern second-hand descriptions and other circumstances in which the officer was relying on information other than direct visual confirmation of the correct suspect.  Those cases therefore have no bearing on this case, except to generate counterpoints to what happened to Mr. Ganley.  Mr. Ganley looks nothing like the individual who cashed the stolen check, as would have been clear to Defendant Jojola.

The two individuals have different hair lines, different facial shapes and features, different build and statute (Mr. Ganley is much larger), different eye color, and different body types.  Their share the same race (Caucasian) and short hair, but almost nothing else.  The record indicates that Defendant Jojola knew this and decided to exaggerate the extent of his investigation by including false statements and by omitting difficult information to obtain the warrant that resulted in Plaintiff's arrest without probable cause.  He is liable under federal and state law.

WHEREFORE, Plaintiff John Ganley respectfully requests that the Court deny the motion for summary judgment with respect to all claims and that it re-open discovery in this case. Nevertheless, if the Court decides to dismiss the federal claims, it should decline to exercise supplemental jurisdiction and should instead remand them to the original state-court forum.

Respectfully submitted,

LAW OFFICE OF NICOLE W. MOSS , L.L.C.


/s/ Nicole Moss, Esq._____
Nicole W. Moss
Attorneys for Plaintiff
201 12th Street NW
Albuquerque, NM 87102
(505) 244-0950


LAW OFFICES OF MARSHALL J. RAY , LLC


/s/ Marshall J. Ray____
Marshall J. Ray
Attorneys for Plaintiff
201 12th Street NW
Albuquerque, NM 87102
(505) 312-7598

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this pleading was served to opposing counsel via the CM/ECF system on this 18th day of June 2018.


<u>/s/ Nicole W. Moss</u>
Nicole W. Moss


<u>/s/ Marshall J. Ray</u>
Marshall J. Ray