# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOHN GANLEY,

       Plaintiff,

vs.                                       No. CIV 17-0432 JB\SMV

ERIC JOJOLA, in his individual capacity,
and CITY OF ALBUQUERQUE,

       Defendants.

## **MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) Defendants Eric Jojola and City of Albuquerque's Motion for Summary Judgment on Qualified Immunity and Other Grounds, filed December 21, 2017 (Doc. 32)("MSJ"); and (ii) Plaintiff John Ganley's Motion for a Continuance of the Motion for Summary Judgment to Permit Discovery Pursuant to Rule 56(d) and Affidavit at 1, filed January 1, 2018 (Doc. 35)("Rule 56(d) Motion"). The Court held a hearing on June 4, 2018. The primary issues are: (i) whether Defendant Eric Jojola violated Ganley's constitutional rights under the Fourth and Fourteenth Amendments of the Constitution of the United States by securing an arrest warrant based on the Criminal Complaint -- Arrest Warrant Affidavit (executed March 14, 2016), filed December 21, 2017 (Doc. 32-1)("Warrant Aff."), which Jojola authored, that incorrectly identifies Ganley as having committed check fraud; (ii) whether Jojola violated Ganley's constitutional rights by not uncovering evidence of Ganley's innocence; (iii) whether Jojola would have violated Ganley's constitutional rights if he did not achieve Ganley's release immediately upon finding exculpatory evidence in Ganley's booking sheet; and (iv) whether Ganley needs further discovery to defend against the MSJ. The Court concludes that: (i) Jojola did not violate Ganley's constitutional rights by submitting the Warrant Aff., because the Warrant

Aff. cured of its alleged inaccuracies establishes probable cause for Ganley's arrest; (ii) Jojola did not violate Ganley's constitutional rights by not uncovering exonerating evidence, because Jojola did not act recklessly or deliberately; (iii) Jojola would not have violated Ganley's constitutional rights if he had ignored exonerating evidence on Ganley's booking sheet, because Ganley was already released from detention before Jojola could have acted on the booking sheet's exonerating evidence; and (iv) further discovery is not necessary to defend against the MSJ, because Ganley does not identify specific information necessary to establish a constitutional violation. Accordingly, the Court grants the MSJ's requests to dismiss Ganley's Fourth and Fourteenth Amendment claims in Count I of Ganley's First Amended Complaint for Damages for Violation of Civil Rights and Tort Claims, filed August 8, 2017 (Doc. 22)("Complaint"), and denies the Rule 56(d) Motion. The Court also dismisses the Complaint's municipal liability claim in Count III, because that claim requires that Ganley prove a city employee violated Ganley's federal constitutional rights, and the Court determines that Jojola did not violate Ganley's constitutional rights. Having granted summary judgment on all the Complaint's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims and remands them to the County of Bernalillo, Second Judicial District Court, State of New Mexico.

### FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in their MSJ briefing. See MSJ ¶¶ 1-23, at 2-5; Plaintiff's Response to Defendants Eric Jojola and the City of Albuquerque's Motion for Summary Judgment on Qualified Immunity and Other Grounds ¶¶ 2-23, at 2-6, filed June 18, 2018 (Doc. 47)("MSJ Response"); Defendants Eric Jojola and City of Albuquerque's Reply in Support of Their Motion for Summary Judgment on Qualified Immunity and Other Grounds ¶¶ 1-13, at 1-5, filed July 11, 2018 (Doc. 51)("MSJ Reply"). Jojola,

a law enforcement officer for the City of Albuquerque, began investigating a "large amount of stolen mail" in October, 2015. MSJ ¶ 3, at 2 (asserting this fact). See MSJ Response ¶ 3, at 2 (admitting this fact). During Jojola's investigation, Postal Inspector Brad Specht told Jojola that a man named Ganley cashed a forged check ("Ganley Check") on September 4, 2015. See MSJ ¶ 4, at 2 (asserting this fact); Warrant Aff. at 1; Affidavit of Detective Eric Jojola ¶ 3, at 1 (executed December 21, 2017), filed December 21, 2017 (Doc. 32-2)("Jojola Aff.").[1] Jojola contacted an investigator, Steve Torbett,[2] on March 3, 2016, about the Ganley Check, and Torbett gave Jojola a copy of the Ganley Check. See MSJ ¶ 6, at 2-3 (asserting this fact); Warrant Aff. at 1; Jojola Aff. ¶¶ 5-6, at 1.[3] Torbett also gave Jojola still photographs from a surveillance video showing a

---

[1]Ganley purports to dispute this fact. See MSJ Response ¶ 4, at 3. Ganley argues that "Jojola was already on alert . . . that the names added as payees to the altered checks in question, including the name of John Ganley, may have belonged to victims of identity theft" and, therefore, Jojola knew that "Mr. Ganley's name had been used as the payee of the check -- not that John Ganley had cashed a check." MSJ Response ¶ 4, at 3 (citing Burt Report at 1 (dated September 21, 2015), filed June 18, 2018 (Doc. 47-1)(stating that it was "unknown" if the checks' forged payee names -- including Ganley's -- "are offenders or victim[s] of identity theft")). What Burt put in his report, and what Jojola might have thought about it, does not relate to whether Specht told Jojola that Ganley cashed a forged check. The Court therefore deems this fact undisputed. See Fed. R. Civ. P. 56(e)(2); D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[2]The record does not reveal for whom Torbett worked as an investigator. See Defendants Eric Jojola and City of Albuquerque's Response in Opposition to Plaintiff's 'Motion for a Continuance of the Motion for Summary Judgment to Permit Discovery Pursuant to Rule 56(d) and Affidavit,' filed February 1, 2018 (Doc. 36)("Rule 56(d) Response")(stating that "Torbett is not an employee of the City of Albuquerque nor was he an employee at the time of the events in question").

[3]The Defendants assert that Torbett "provided Detective Jojola with a copy of the forged check cashed by John Ganley." MSJ ¶ 6, at 2-3 (emphasis added). Ganley disputes that fact, noting that he did not cash the check. See MSJ Response ¶ 6, at 3 (citing Jojola Aff. ¶ 24, at 3 (stating that, as of October 19, 2016, "it was learned that [Ganley] had likely been the victim of identity theft and was no longer a suspect")). The Defendants respond that Ganley's dispute is "immaterial," as he bases his attempt to show a dispute of facts on information "acquired . . . after

white male with brown hair cashing the Ganley Check.  See MSJ ¶ 7, at 3 (asserting this fact);

MSJ Response ¶ 7 at 3 (not disputing this fact)[4]; Warrant Aff. at 1; Jojola Aff. ¶ 7 at 1.

In his investigation, Jojola learned that a bank teller wrote down a driver's license number

associated with the Ganley Check.  See MSJ ¶ 8, at 3 (asserting this fact); MSJ Response ¶ 8, at 4

(admitting this fact).  Jojola also learned that the person cashing the Ganley Check left a fingerprint

on the check.  See MSJ Response ¶ 8, at 4 (asserting this fact); Warrant Aff. at 1.[5]  Jojola did not

analyze the fingerprint before executing the Warrant Aff.  See MSJ Response ¶ 8, at 4 (asserting

---

the [Warrant Aff.] was submitted."  MSJ Reply ¶ 4, at 3 (citing Montoya v. Ramos, No. 1:13 CV-
0773 WJ-SCY, 2017 WL 4325731, at *1 (D.N.M. Sept. 26, 2017)(Johnson, J.)).  The Court
presumes the Defendants cite to Montoya v. Ramos for its recognition that "[t]he existence of
probable cause is determined in terms of the circumstances confronting the arresting officer at the
time of the seizure, and so the validity of an arrest is not affected by subsequent events."  Montoya
v. Ramos, 2017 WL 4325731, at *1.  The Court has no quibble with the Honorable William Paul
Johnson, Chief Judge for the United States District Court for the District of New Mexico, on that
issue, but the Defendants miss the point of what the Court is trying to do here: determine which
facts are undisputed.  Torbett did not give Jojola a copy of the check that Ganley cashed,
because -- if there is one thing on which the parties all agree -- Ganley was not the one who cashed
that check.  Therefore, Ganley's purported dispute with the Defendants' statement that Ganley
cashed the check is not a genuine dispute, because the Defendants do not mean to assert that as a
fact.

Ganley states, however, that he "does not have any information to dispute that Steve
Torbett provided a copy of the forged check to Defendant Jojola."  MSJ Response ¶ 6, at 3.  Thus
the Court deems that fact to be undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set
forth in the Response will be deemed undisputed unless specifically controverted.").

[4]Ganley asserts that he has "no information to dispute that Mr. Torbett provided still
photographs of the transaction involving the altered check."  MSJ Response ¶ 7 at 3.  The Court
therefore deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in
the [Motion for Summary Judgment] will be deemed undisputed unless specifically
controverted.").

[5]The Defendants do not address this fact in its MSJ Reply.  The Court therefore deems this
fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set for in the Response will be
deemed undisputed unless specifically controverted").

- 4 -

this fact); MSJ Reply ¶ 6, at 3 (not disputing this fact); Warrant Aff. at 1 (stating that "a forensic comparison will be ordered to match the fingerprint on the check to John's fingerprint").

Jojola searched New Mexico's Motor Vehicle Department ("MVD") records for the driver's license number. See MSJ ¶ 9, at 3 (asserting this fact); Jojola Aff. ¶ 9, at 2.[6] The driver's license number belongs to Ganley. See MSJ ¶ 10, at 3 (asserting this fact); MSJ Response ¶ 10, at 4 (admitting this fact); Jojola Aff. ¶ 10, at 2. Jojola obtained a MVD photograph of Ganley. See MSJ ¶ 11, at 3 (asserting this fact); MSJ Response ¶ 11, at 4 (admitting this fact); Warrant Aff. at 1; Jojola Aff. ¶ 11, at 2. Ganley's MVD photograph shows Ganley with short brown hair. See MSJ ¶ 12, at 3 (asserting this fact); MSJ Response ¶ 12, at 4 (admitting this fact); Jojola Aff. ¶ 12, at 2. Jojola compared Ganley's MVD photograph with the surveillance video photographs of the man cashing the Ganley Check. See MSJ ¶ 12, at 3 (asserting this fact); MSJ Response ¶ 12, at 4 (admitting this fact); Jojola Aff. ¶ 12, at 2. Ganley in his MVD photograph and the man in the surveillance video photographs are both white men with short brown hair. See MSJ ¶ 12, at 3 (asserting this fact); MSJ Response ¶ 12, at 4 (admitting this fact); Jojola Aff. ¶ 12, at 2. Jojola thought that the person in the surveillance video "appeared to be of a similar age" to Ganley in his MVD photograph. MSJ ¶ 13, at 5 (asserting this fact); Jojola Aff. ¶ 13, at 2.[7] Ganley was thirty-

---

[6]Ganley states that he "does not have information to dispute" this fact. MSJ Response ¶ 9, at 4. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [motion for summary judgment] will be deemed undisputed unless specifically controverted.").

[7]Ganley purports to dispute this fact, arguing that Ganley is roughly ten years older than the man in the surveillance footage, and that the MVD records show Ganley's age and listed other facts that indicated that Ganley was not the man in the surveillance footage, such as that Ganley was listed at 6'2" and over 200 pounds, and the man in the surveillance footage is not that big. See MSJ Response ¶ 13, at 5. Ganley also argues that his booking sheet indicates that he does not have any tattoos, but the man in the surveillance footage had tattoos on his arms. See MSJ

nine years old when the Ganley Check was cashed; the man cashing the Ganley check was about

twenty-nine years old at that time. See MSJ Response ¶ 13, at 5 (asserting this fact); New Mexico

Driver License Inquiry at 1, filed December 21, 2017 (Doc. 32-5)(stating that Ganley was born on

March 18, 1976).[8]  The man cashing the check had tattoos on his arms, but Ganley's MVD

_____

Response ¶ 13, at 5.  These assertions do not dispute that Jojola thought the men in the photographs were of similar age.  The Court therefore deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [Motion for Summary Judgment] will be deemed undisputed unless specifically controverted.").

To be sure, the Defendant's use of the word "observe" may confuse this issue.  See MSJ Response ¶ 13, at 5.  The Defendants assert: "Comparing the photographs, Detective Jojola also observed that the person pictured in the surveillance video photographs appeared to be of a similar age to the individual pictured in the MVD photograph."  MSJ Response ¶ 13, at 5 (citing Jojola Aff. ¶ 13, at 2).  "Observing" that something is the case suggests that the thing observed is objectively true; one typically does not "observe" that something is so when that thing is the observer's subjective opinion.  E.g., Observe, Merriam-Webster, https://www.merriam-webster.com/dictionary/observe (last visited April 17, 2019)("to watch carefully especially with attention to details or behavior for the purpose of arriving at a judgment"); id. ("to come to realize or know especially through consideration of noted facts").

In context, however, it is clear that the Defendants mean to assert that Jojola subjectively concluded that they were of a similar age.  First, the Defendants later frame this factual assertion as a fact that Jojola reached a certain conclusion, not that the conclusion is true: "[T]hat the individuals pictured in the photographs were different ages, weight, and height, does not change the fact that Detective Jojola made observations through his comparison of the photographs."  MSJ Reply ¶ 8, at 3 (emphasis added).  Second, the Defendants, throughout their MSJ, assert facts that can only sensibly be understood as reflecting Jojola's subjective point of view rather than as a literal statement of facts.

Nevertheless, the pictures' similarity factors into the Court's analysis in this Memorandum Opinion and Order.  Many of Ganley's claims depend on whether there was probable cause for his arrest.  For instance, Ganley argues that Jojola's assertion, in the Warrant Aff., that he "verified" that Ganley was the man in the surveillance video cashing the check, was deceptive, and that, had the judge understood what Jojola meant, there would not be probable cause for his arrest.  See Complaint at ¶¶ 38-40, at 7-8.  When a party contends that there would be no probable cause absent false statements or deceptive omissions, courts consider whether there is probable cause even after curing the arrest warrant's perfidy.  See Kerns v. Bader, 663 F.3d 1173, 1188 (10th Cir. 2011)(Gorsuch, J.).  The Court thus considers whether probable cause remains once the photographs' dissimilarities are taken into account.

_____

[8]The Defendants purport to dispute these facts.  See MSJ Reply ¶ 8, at 3.  According to the Defendants, Ganley and the other man's age, weight, and height do "not change the fact that

photograph does not show his arms. See MSJ ¶ 14, at 4 (asserting this fact); New Mexico Driver

License Inquiry at 1; Surveillance Video Images at 1-7, filed December 21, 2017 (Doc. 32-4).[9]

Jojola concluded that Ganley was the man in the surveillance video cashing the check. MSJ ¶ 15,

at 4 (asserting this fact); Jojola Aff. ¶ 15, at 2.[10] On March 7, 2017, Jojola spoke with the check's

---

Detective Jojola made observations through his comparison of the photographs." MSJ Reply ¶ 8, at 3. The Defendants also contend that the facts about Ganley's tattoos are immaterial to the probable-cause determination. See MSJ Reply ¶ 8, at 3. The Defendants dispute these facts' materiality and not their veracity. The Court therefore deems these facts undisputed. See D.N.M.LR-56.1(b) ("All material facts set forth in the [Motion for Summary Judgment] will be deemed undisputed unless specifically controverted."). The Court will consider these facts' materiality infra in its analysis.

[9]Ganley "admits that the MVD photograph does not show Plaintiff's arms," but argues that "his face and that of the correct suspect are so different that it was objectionably unreasonable for Defendant Jojola to consider them the same person." MSJ Response ¶ 14, at 5. Whether their facial features are so different that it was unreasonable to conclude that they are the same person does not implicate whether the MVD photograph shows Ganley's arms. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [motion for summary judgment] will be deemed undisputed unless specifically controverted.").

[10]Ganley purports to dispute this fact. See MSJ Response ¶ 15, at 5. In the MSJ, the Defendants assert that, "[b]ased on the identity of the name with the driver's license number and the similarities Detective Jojola observed between the two sets of photographs, Detective Jojola verified that John Ganley cashed the check on September 4, 2015." MSJ ¶ 15, at 4. Ganley counters that

> [i]t is well known by now that Defendant Jojola could not have "verified that John Ganley cashed the check" because everyone admits that John Ganley did not cash the check. Defendant's insistence on swearing this fact is defamatory and perpetuates the falsehood that Mr. Ganley was anything other than a victim of identity theft.

MSJ Response ¶ 15, at 5. As the Defendants no longer contend that Ganley actually cashed the check, the parties do not dispute facts so much as spar over the meaning of the word "verified" in this context. Ganley does not, therefore, dispute that Jojola concluded that Ganley was the man in the surveillance video. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [Motion for Summary Judgment] will be deemed undisputed unless specifically controverted.").

true owner -- Nancy Starr -- and the owner told Jojola that Ganley did not have permission to cash the check. See MSJ ¶ 16, at 4 (asserting this fact); Warrant Aff. at 1; Jojola Aff. ¶ 16 at 2.[11]

Jojola attempted to call Ganley on the telephone but was unable to reach him. See MSJ ¶ 17, at 4 (asserting this fact); Jojola Aff. ¶ 17, at 3.[12] When Jojola examined the check, Jojola concluded that "John Ganley appeared to have signed the back of the check." MSJ ¶ 18, at 4 (asserting this fact); Warrant Aff. at 1; Jojola Aff. ¶ 18, at 3; Check Copy at 2, filed December 21, 2017 (Doc. 32-3)(showing a signature on the back of the check).[13]

---

[11]Ganley purports to dispute this fact. See MSJ Response ¶ 16, at 5. In the MSJ, the Defendants state that "Jojola spoke with the victim of the forged check cashed by John Ganley who informed him that John Ganley did not have permission to cash the check and did not have an affiliation with the business." See MSJ ¶ 16, at 4 (emphasis added). Ganley takes issue with this characterization, arguing once again that "Ganley did not cash the check at issue and . . . [i]t is confusing that, even now, Defendants are making statements in court pleadings accusing Mr. Ganley of cashing the forged check when they know he did nothing of the kind." MSJ ¶ 16, at 5. Once again, it appears that the parties do not dispute facts so much as get hung up on how they are described. The Defendants do not contend that Ganley cashed the check; rather, they present the facts as Jojola understood them at the time. Presenting facts not as they are but as someone mistakenly believes them to be at the time can make for dramatic narrative, where the reader or viewer shares in a character's surprise, see, e.g., The Third Man (Carol Reed, 1949)(Holly Martins spotting Harry Lime in a dark doorway, alive and well), but not helpful in a briefing for a motion for summary judgment, when the Court is trying to nail down undisputed facts. Thus, Ganley's purported dispute with the Defendants' asserted fact is no dispute at all, because the Defendants do not assert the fact to which Ganley objects. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [motion for summary judgment] will be deemed undisputed unless specifically controverted.").

[12]Ganley states that he "does not have information to dispute" this fact. MSJ Response ¶ 17, at 5. The Court therefore deems this fact undisputed. See D.N.M.LR-56.1(b) ("All material facts set forth in the [Motion for Summary Judgment] will be deemed undisputed unless specifically controverted.").

[13]Ganley purports to dispute this fact. See MSJ Response ¶ 18, at 6. According to Ganley, there is "no evidence submitted to show that Defendant Jojola knew what John Ganley's signature looked like, such that he could state that it appeared that John Ganley signed the back of the check. What Detective Jojola saw was a signature on the back of the check." MSJ Response ¶ 18, at 6. Whether Jojola made a reasonable, well-informed conclusion does not implicate whether he

Jojola submitted the Warrant Aff. to a judge in the Metropolitan Court for the County of Bernalillo, State of New Mexico, on March 14, 2016, swearing that Ganley had committed forgery and violated the Remote Financial Services Act, N.M. Stat. Ann. § 58-16-16. See MSJ ¶ 19, at 4 (asserting this fact); MSJ Response ¶ 19, at 6 (admitting this fact); Warrant Aff. at 1; Jojola Aff. ¶ 19, at 3. That same day, an arrest warrant was issued for Ganley. See MSJ ¶ 21, at 4 (asserting this fact); Jojola Aff. ¶ 20, at 3; Warrant for Arrest at 1, filed December 21, 2017 (Doc. 32-6).[14]

Officer Kelly Burt conducted a preliminary investigation into the stolen checks, and Burt wrote in his report that "[i]t is unknown if they are offenders or victim[s] of identity theft." MSJ ¶ 22, at 5 (asserting this fact); Jojola Aff. ¶¶ 21-22, at 3.[15] During Jojola's investigation, and after speaking with Specht and Torbett, Jojola reviewed Burt's report. See MSJ ¶ 22, at 5 (asserting this fact); Jojola Aff. ¶ 23, at 3.[16] Jojola searched for Ganley in a criminal history database, but did not find evidence that Ganley had committed fraud or burglary in the past. See MSJ ¶ 23, at 5

---

reached that conclusion. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [Motion for Summary Judgment] will be deemed undisputed unless specifically controverted.").

[14]Ganley states that he "does not have information to dispute" this fact. MSJ Response ¶ 21, at 6. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [motion for summary judgment] will be deemed undisputed unless specifically controverted.").

[15]Ganley states that he "does not have information to dispute" this fact. MSJ Response ¶ 22, at 6. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [motion for summary judgment] will be deemed undisputed unless specifically controverted.").

[16]Ganley states that he "does not have information to dispute" this fact. MSJ Response ¶ 22, at 6. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [motion for summary judgment] will be deemed undisputed unless specifically controverted.").

(asserting this fact); Jojola Aff. ¶ 23, at 3.[17]  Law enforcement no longer considered Ganley a

suspect as of October 19, 2016, at the latest.  See MSJ ¶ 23, at 5; (asserting this fact); Jojola Aff.

¶ 24, at 3.[18]

---

[17]Ganley states that he "does not have information to dispute" this fact.  MSJ Response ¶ 22, at 6.  The Court therefore deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the [Motion for Summary Judgment] will be deemed undisputed unless specifically controverted.").

[18]When Jojola learned that Ganley was not the culprit is disputed.  The Defendants state that "it was learned" on October 19, 2016, that "Ganley had likely been the victim of identity theft and was not a suspect."  MSJ ¶ 23, at 5.  Ganley purports to dispute this fact, contending that, at the June 4, 2018, hearing, the Defendants represented that "Jojola suspected before that date that he had the wrong person."  MSJ Response ¶ 23, at 6 (citing Tr. at 39:25-40:16 (Nixon)).  The Defendants reply that Ganley "misrepresent[s]" the Defendants' statements at the hearing, arguing that the Defendants' counsel "explained that Detective Jojola had a suspicion upon entering the meeting on October 19, 2016, that Plaintiff may not have been the suspect in the check fraud case based upon his review of the booking sheet" and so "did not represent that Detective Jojola had such suspicion before the date of the meeting."  MSJ Reply ¶ 12, at 4 n.2.  At the hearing, the following exchange took place between the Court and the Defendants' counsel:

> THE COURT:  What was it that Mr. Jojola saw when Mr. Ganley walked into the room that made him instantly realize that he wasn't the right person?
>
> MS. NIXON:  It's my understanding that it was the tattoos on the arm.  Detective Jojola had an idea before meeting with Mr. Ganley that he was not the person based on the booking sheets obtained after the arrest, long after the arrest warrant affidavit was completed, because those booking sheets indicated . . . he did not have any tattoos.  I suspect that that would be the same reason that upon seeing Mr. Ganley and being able to see Mr. Ganley's arms for the first time in person, and observing that his arms did not have the tattoos that we see in the surveillance video photos, that Detective Jojola knew that Mr. Ganley was not the person who had appeared in those surveillance videos.

Tr. at 39:25-40:16 (Court, Nixon)(emphasis added).  Although Ms. Nixon's statement that Jojola "had an idea before meeting with Ganley that he was not the person based on the booking sheets" suggests that Jojola's suspicions began before he took a look at Ganley in person, it is not inconsistent with Jojola only figuring it out that morning, and, therefore, not "before the date of the meeting."  MSJ Reply ¶ 12, at 4 n.2.  Thus, the parties agree that Jojola began to suspect Ganley was not the culprit at some point after seeing Ganley's booking sheet, because the booking sheet does not list any tattoos and the man in the surveillance video has many tattoos on his arms.  See

# PROCEDURAL BACKGROUND

Ganley filed his first Complaint for Damages for Violation of Civil Rights and Tort Claims, in state court on March 5, 2017, filed in federal court on April 10, 2017 (Doc. 1-1). The Defendants removed the case to federal court asserting federal-question jurisdiction. See Notice of Removal at 2, filed April 10, 2017 (Doc. 1). In Ganley's Complaint, he asserts three Counts. First, he asserts that the Defendants violated his civil rights under the Fourth and Fourteenth Amendments, see Complaint ¶¶ 36-44, at 7-9, and that Jojola violated clearly established law, by ignoring exculpatory information and not completing the investigation into the check fraud, see Complaint ¶¶ 38-40, at 7-8. Second, Ganley asserts tort claims against the Defendants. See Complaint ¶¶ 45-54, at 9-10. Ganley alleges that Jojola's "tortious conduct proximately caused damages and injuries, including physical and emotional suffering, attorney fees, costs of record expungement, reputation damage, damage to personal relationships, lost time and productivity, and continuing medical expenses and expenses associated with counseling." Complaint ¶ 47, at 9-10. Third, Ganley alleges that the City of Albuquerque deprived Ganley of his Fourth, Fifth, and Fourteenth Amendment rights, see Complaint ¶¶ 55-57, at 11, because Jojola's "actions constituted a custom, practice, and policy of deliberate indifference" to Ganley's and other citizens' civil rights, Complaint ¶ 56, at 11.

---

MSJ Reply ¶ 12, at 4 n.2; MSJ Response ¶ 23, at 6. The dispute instead boils down to whether Jojola put the pieces together on the day that he met Ganley -- either "upon entering the meeting," MSJ Reply ¶ 12, at 4 n.2, or "before the meeting," Tr. at 40:4-5 (Nixon) -- or whether Jojola's suspicions began on some prior day, see MSJ Response ¶ 23, at 6 ("Jojola suspected before that date that he had the wrong person." (emphasis added)).

The Defendants answered the Complaint. <u>See</u> Defendants' Answer to Plaintiff's "First Amended Complaint for Damages for Violation of Civil Rights and Tort Claims," filed August 22, 2017 (Doc. 26)("Answer"). The Defendants deny Ganley's claims and allegations. <u>See</u> Answer ¶¶ 36-57, at 7-9. The Defendants assert several affirmative defenses:

1. Plaintiff has failed to set forth one or more claims for which relief may be granted.

2. There was probable cause for Eric Jojola to submit the arrest warrant and charge Plaintiff.

3. Eric Jojola's actions were objectively reasonable under the totality of the circumstances, done in good faith, and therefore, he is entitled to qualified immunity and immunity under the New Mexico Tort Claims Act.

4. Eric Jojola did not commit a clearly established constitutional violation.

5. The City of Albuquerque is not liable because one or more of its employees did not commit any constitutional violation or commit any torts under the New Mexico Claims Act.

6. The City of Albuquerque is not liable because there was no unlawful policy or custom which was the moving force behind an alleged constitutional violation.

7. The City of Albuquerque is not liable because it was not negligent in its supervision, retention, hiring, and training of Eric Jojola.

8. The City of Albuquerque is not liable because its supervision, retention, hiring, and training of Eric Jojola did not cause any alleged constitutional violation or commission of any torts under the New Mexico Tort Claims Act.

9. Plaintiff's state law claims are barred, in whole or in part, by the provisions set forth in the New Mexico Tort Claims Act.

10. Plaintiff failed to comply with the notice provisions set forth pursuant to the New Mexico Tort Claims Act, NMSA 1978, § 41-4-16.

11. The Defendants' immunity has not been waived under the New Mexico Tort Claims Act.

12. Plaintiff's injuries or losses, if any, were proximately caused by the negligence, intentional misconduct, or other fault of Plaintiff and/or other third-party for whom Defendants are not liable.

13. Plaintiff's damages, if any, were due to an independent, intervening cause rather than due to any fault on the part of Defendants.

14. Plaintiff failed to mitigate his damages, if any.

15. Plaintiff's claims should be barred or reduced insofar as any alleged acts or omissions on the part of the Defendants, which is denied, were not the cause of Plaintiff's damages, if any.

16. Defendants breached no duty owed to Plaintiff.

17. There are insufficient grounds to permit Plaintiff to recover punitive damages.

18. The Defendants reserve the right to assert additional affirmative defenses which may become available during the course of litigation in this matter and which are not asserted herein.

Answer at ¶¶ 2-18, at 9-11.

**1.      The Motion for Summary Judgment.**

The Defendants move for summary judgment.  See MSJ at 1.  The Defendants first argue that Ganley's wrongful arrest claim "cannot be premised on the Fourteenth Amendment," because, according to the Defendants, the Fourth Amendment, and not the Fourteenth, governs unlawful detention claims.  MSJ at 7-8.  The Defendants contend that probable cause supported the Warrant Aff.  See MSJ at 8-9.  The Defendants also argue that Ganley cannot succeed on a 42 U.S.C. § 1983 claim, because Jojola did not act with reckless disregard for the truth or intentionally use false statements in the arrest warrant's affidavit.  See MSJ at 11-12.  Specifically, the Defendants contend that it was reasonable for Jojola to conclude that Ganley was the man in the surveillance video, because Ganley's MVD photograph resembled the man in the surveillance video, and because the differences between Ganley and the man in the surveillance video are not apparent when looking at the MVD photograph, which shows only Ganley's face -- e.g., that the man in the surveillance video has tattoos on his arms but Ganley does not have tattoos.  See MSJ at 12-13. The Defendants contend that overlooking the differences in the basic characteristics between the

two men, such as their height and weight, does not "negate probable cause," because such differences are slight discrepancies. MSJ at 13 (citing <u>Thompson v. Prince William Cty.</u>, 753 F.2d 363, 365 (4th Cir. 1984)).

The Defendants contend that Jojola had "at least arguable probable cause" to submit the affidavit, because the photographic evidence, the driver's license number, and the name on the forged check all point to Ganley. MSJ at 16. The Defendants also respond to Ganley's contention that Jojola did not conduct a complete investigation before seeking the arrest warrant, arguing that his investigation was "[c]onstitutionally [s]ound" based on the totality of the circumstances. MSJ at 17-18.

Next, the Defendants contend that the constitutional violations that Ganley alleges are not clearly established. <u>See</u> MSJ at 19. Specifically, the Defendants argue that Jojola "could not have been on notice that submission of the Affidavit amounted to a constitutional violation on its face," because there is a presumption that detectives act in good faith when a Magistrate Judge finds probable cause, and, even assuming that Jojola included false statements in the affidavit, Jojola "would not have been on notice that identity of the name on the forged check, as confirmed by a witness, with the MVD record would not have established probable cause." MSJ at 20-21. Jojola contends that not interviewing Ganley before submitting the affidavit is not a constitutional violation for which Jojola would be on notice, because the United States Court of Appeals for the Tenth Circuit does not require a law enforcement officer to continue investigating once probable cause is established. <u>See</u> MSJ at 21-22.

Next, the Defendants address Ganley's tort claim, contending that New Mexico has not waived immunity for false arrest, constitutional violations, or failure to investigate. <u>See</u> MSJ at 22-23. The Defendants also contend that Ganley's false arrest claim fails in any case, because

Jojola's actions were lawful, and because he acted with probable cause. See MSJ at 23-24. The Defendants also contend that Jojola did not violate N.M. Stat. Ann. § 29-1-1, which provides that law enforcement officers have a duty

> "to investigate all violations of criminal laws of the state which are called to the attention of any such officer or which he is aware, and it is also declared the duty of every such officer to diligently file a complaint or information, if the circumstances are such to indicate to a reasonably prudent person that such action should be taken."

MSJ at 24 (quoting N.M. Stat. Ann. § 29-1-1). The Defendants reiterate that Jojola did not violate that statute, because Jojola conducted a "constitutionally appropriate investigation" and found probable cause that Ganley committed a crime. MSJ at 24. The Defendants conclude that the Court should grant Jojola qualified immunity and should dismiss Counts I and II with prejudice. See MSJ at 25.

### 2. The Rule 56(d) Motion.

Ganley asks for leave to conduct discovery before responding to the MSJ. See Rule 56(d) Motion at 1. Ganley asks that the Court stay his deadline to respond to the MSJ and allow Ganley to seek discovery necessary to respond to the MSJ. See Rule 56(d) Motion at 1. Specifically, Ganley requests leave to conduct the following discovery:

> Written interrogatories and a deposition of Defendant Jojola limited in scope to questions about the investigation he conducted in the underlying criminal case and about his assertions set forth in his affidavit supporting summary judgment, to questions about past lawsuits or complaints similar to this one, questions about his past discipline for conduct similar to what is alleged in this lawsuit, and to questions about his training as relevant to investigating check fraud and identity theft; (ii) a limited deposition of Steve Torbett, an individual who initially investigated the matters leading to Plaintiff's arrest and who, according to Defendant Jojola's affidavit, spoke with Defendant Jojola about the matter; and (iii) a limited deposition of Officer Kelly Burt, whom Defendant identifies in his reports, in his affidavit supporting summary judgment, and in his motion for summary judgment as someone who participated in the investigation and prepared a report. Plaintiff has been diligent in litigating the matter and seeking discovery.

Rule 56(d) Motion at 1-2.

Ganley contends that he has acted in good faith and has not been dilatory in making discovery requests. See Rule 56(d) Motion at 7-8. Nonetheless, Ganley states that he and the Defendants have not reached an agreement about discovery's scope. See Rule 56(d) Motion at 7. Ganley asserts that he has "not had an opportunity to conduct any meaningful discovery and it would be unfair to prevent Plaintiff to conduct some limited discovery before he is required to respond to the summary judgment motion." Rule 56(d) Motion at 8.

Ganley asserts that "Defendant Jojola's factual narratives, as set forth in his warrant affidavit, and in his summary judgment affidavit, are self-serving and should be tested through deposition testimony." Rule 56(d) Motion at 10. Ganley contends that Jojola's liability depends on "whether he was reasonable or whether he acted with deliberate indifference to Plaintiff's rights, based on the facts known to him." Rule 56(d) Motion at 10. Ganley believes that

> Defendant Jojola was not as careful as he claims to be in his investigation, that other investigators involved did not say what Defendant Jojola asserts they said, and that Defendant Jojola did not do what he says he did or would do in his arrest warrant affidavit, and deposition testimony from him and the individuals he worked with can illuminate the discrepancies.

Rule 56(d) Motion at 10-11. Ganley also asserts that Jojola can provide answers relating to the Albuquerque Police Department's customs or practices. See Rule 56(d) Motion at 11.

### 3.    The Rule 56(d) Motion Response.

The Defendants respond to the Rule 56(d) Motion. See Defendants Eric Jojola and City of Albuquerque's Response in Opposition to Plaintiff's 'Motion for a Continuance of the Motion for Summary Judgment to Permit Discovery Pursuant to Rule 56(d) and Affidavit' at 1, filed February 1, 2018 (Doc. 36)("Rule 56(d) Response"). The Defendants argue that Ganley has not identified

how he intends to narrow discovery issues.  See Rule 56(d) Response at 1-2; id. at 4-8. Specifically, the Defendants contend that Ganley does not identify "what facts regarding Detective Jojola's training, alleged past discipline or past complaints are necessary to rebut the Motion for Summary Judgment."  Rule 56(d) Response at 5.  The Defendants also argue that Ganley has not shown that deposing Torbett and Burt is necessary to respond to the MSJ.  See Rule 56(d) Response at 5-6.

The Defendants dispute Ganley's assertion that they oppose any discovery in light of the MSJ.  See Rule 56(d) Response at 7 (citing Rule 56(d) Motion at 7).  Rather, the Defendants contend that they have "repeatedly requested" that Ganley "identify, with specificity, what facts will be sought in the discovery as being necessary to respond" to the MSJ, but that Ganley has not demonstrated how "limited discovery, narrowly tailored to the issue of qualified immunity, will raise a genuine issue of material fact."  Rule 56(d) Response at 7.  The Defendants also argue that Ganley's requests for video recordings made after Jojola submitted the Warrant Aff. is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, because the qualified immunity question depends on whether Jojola had probable cause before submitting the Warrant Aff.  See Rule 56(d) Response at 8.  The Defendants also contend that Ganley violated the Federal Rules of Civil Procedure by subpoenaing a third party without first providing notice to other parties.  See Rule 56(d) Response at 8 (citing Fed. R. Civ. P. 45(a)(4)).  The Defendants also note that Ganley made requests pursuant to the Inspection of Public Records Act, N.M. Stat. Ann. § 14-2-1 ("IPRA"), after the Defendants filed their motion to stay discovery, see Detective Jojola and City of Albuquerque's Motion for Stay of Discovery, filed January 4, 2018 (Doc. 33), and after the parties agreed to stay discovery and define parameters of limited discovery, see Rule 56(d) Response at 9-10.  According to the Defendants, although IPRA provides anyone a right to

inspect public records, that right is not unconditional, and, therefore, Ganley should not have the right to make IPRA requests while also agreeing to limit discovery.  See Rule 56(d) Response at 10 (citing State ex rel. Newsome v. Alarid, 1977-NMSC-076, ¶¶ 27-34, 568 P.2d 1236, 1243). The Defendants add that, once they asserted Jojola's qualified immunity defense, pretrial discovery should cease.  See Rule 56(d) Response at 10-11.

### 4.    The Rule 56(d) Motion Reply.

Ganley replies to the Rule 56(d) Response.  See Plaintiff's Reply in Support of his Motion Pursuant to Rule 56(d), filed February 14, 2018 (Doc. 37)("Rule 56(d) Reply").  Ganley contends that the Defendants "struggle mightily to obscure their role in trying to prevent Plaintiff from receiving any information regarding this case."  Rule 56(d) Reply at 1.  Ganley argues that the discovery which he seeks "is not out of bounds for defending a qualified immunity motion, as it is all directed at specific factual statements made in the Defendant's motion."  Rule 56(d) Reply at 2.

Ganley contends that deposing Jojola will help determine if Jojola had probable cause by "inquir[ing] into Defendant Jojola's state of mind," which is "difficult, if not impossible" to discern from police reports and affidavits.  Rule 56(d) Reply at 4-5.  Ganley also contends that discovery relating to Jojola's state of mind -- including lapel footage of Jojola apparently discussing deficiencies of his investigation and whether Jojola examined the fingerprint -- addresses "factual issues" that are "directly relevant to whether qualified immunity is appropriate." Rule 56(d) Reply at 5-6.

Ganley also contends that the Honorable Stephan M. Vidmar, United States Magistrate Judge for the United States District Court for the District of New Mexico, should not have granted a stay of discovery, because the District of New Mexico's local rules give a party fourteen days to

respond to a motion to stay discovery, but Magistrate Judge Vidmar granted the stay request after only twelve days.  See Rule 56(d) Reply at 6.  Ganley adds that he has in good faith agreed to the Defendants' requests for extensions in responding to discovery requests, so it "would be an abuse of Plaintiff's counsels' professional courtesies to allow Defendants to enjoy summary judgment because Plaintiff did not get the opportunity to receive responses to his discovery requests."  Rule 56(d) Reply at 7.  Moving to the IPRA issue, Ganley contends that the public's right to IPRA is not limited and that the Defendants cite to outdated caselaw in their arguments to the contrary. See Rule 56(d) Reply at 9-10 (citing Republican Party of N.M. v. N.M. Taxation & Revenue Dep't, 2012-NMSC-026, ¶¶ 14-16, 283 P.3d 853, 860).

> **5.    The Hearing.**

The Court held a hearing.  See Draft Hearing Transcript at 1:21 (taken June 4, 2018)("Tr.") (Court).[19]   The Court began by wondering whether it could consider the photographic evidence -- i.e., Ganley's MVD photograph and the surveillance footage images -- when ruling on a matter of law or whether considering photographic evidence is a factual inquiry for a jury.  See Tr. at 3:17-4:3 (Court).  The Court added that it thought there was "probably . . . enough probable cause here, and there is not a constitutional violation," Tr. at 4:4-7 (Court), and that Ganley has not pointed to an established constitutional right that Jojola may have violated, see Tr. at 4:8-5:3 (Court).  The Court next stated that it was inclined to deny the Rule 56(d) Motion, because the requested discovery and Jojola deposition is not likely to lead to case-determinative information. See Tr. at 5:11-25 (Court).

---

[19]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  If a final transcript is made, it may contain slightly different page and/or line numbers.

The Court asked the Defendants how law enforcement came to determine that Ganley was the victim and not the perpetrator of identity fraud. See Tr. at 10:8-12 (Court). The Defendants explained that, about six months after Ganley was arrested, Ganley visited the district attorney's office and told them he believed he was a victim of identity theft. See Tr. at 10:13-17 (Nixon). The district attorney's office connected Ganley with Jojola, who took Galey's fingerprints and determined that the fingerprint on the check did not belong to Ganley. See Tr. at 10:17-24 (Nixon).

The Court then asked the Defendants whether, if it dismisses Ganley's federal claims, it should decide the state claims. See Tr. at 11:22-12:1 (Court). The Defendants stated that they would not object to that approach, but asserted that it might not be a great leap to dismiss the state claims as well, because those claims also fail if Jojola had probable cause to arrest Ganley. See Tr. at 12:2-8 (Nixon).

Ganley wished to "clarify how it became apparent that Mr. Ganley was a victim of identity theft," stating that, when Ganley arrived to be fingerprinted, Jojola saw Ganley and said, "'Oh, that's not our guy,' because he obviously wasn't." Tr. at 13:1-7 (Ray). Ganley added that his criminal lawyer at the time witnessed Jojola's reaction to seeing Ganley and that Ganley could submit a sworn statement describing his encounter with Jojola. See Tr. at 13:22-24 (Ray). Ganley also noted that Jojola stated in a report that there was video recording the encounter, but the Defendants "have decided that that video doesn't exist anymore, although everything that happened afterwards does." Tr. at 13:23-14:5 (Ray). Ganley addressed the photographs:

> [H]e had a bunch of photographs in front of him of the perpetrator -- a much younger man with a different looking face, with a different hairline, a much younger you know more forward hairline and then the driver's license photo which is an even older photo than what those recent photos were that he saw short guy with a much more recede hairline. It requires a little bit of willful blindness on the part of the city to say, yeah, white guy with short hair, close enough. And I think, I mean, I

wonder what a Court's analysis would [look] like in saying, you know a white person with short hair [is] close enough for an officer to say I've got probable cause.

Tr. at 14:16-15:8 (Ray).

Next, Ganley addressed the Warrant Aff., arguing that it contains "either reckless or knowing false statements." Tr. at 15:13-15 (Ray). Ganley first took issue with the Warrant Aff.'s statement that, after comparing Ganley's MVD photograph with the surveillance footage, "it was verified John Ganley cashed the check." Tr. at 15:20-24 (Ray)(quoting Warrant Aff. at 1). The Court pushed back on Ganley's criticism of the word "verified," stating:

> [I]t may not be the most artful way to say that to me they look like the same person, but, isn't that what he's saying in his own words that he looked at the two pictures, and in his mind that they were the same person? Now, I think it's a little odd to use the word verified, because that sounds like somebody else did it. But isn't it pretty clear and there is nothing terribly devious about the fact that he's telling us that he looked at the two pictures, and in his mind, they were the same person?

Tr. at 16:8-18 (Court). Ganley disagreed with the Court, arguing that Jojola could have described exactly what he did -- i.e., compared the two photographs and found them to be similar -- but instead he "used the passive voice" to indicate that the match "was verified," which "implies that there was some proceeding that he used to confirm the identity of the person." Tr. at 16:19-17:3 (Ray). Ganley then argued that Jojola again makes misleading statements in the Warrant Aff. regarding fingerprinting, such that a judge would believe that "a fingerprint has been run and matched, and . . . that it's been verified." Tr. at 17:16-20 (Ray). The Court rebutted that the Warrant Aff. makes clear that law enforcement has a fingerprint but is waiting for the warrant before analyzing the fingerprint further. See Tr. at 17:24-18:12 (Court). Ganley insisted that the Warrant Aff. uses "way [too] much puffing [of] the facts that did not occur," and that, if a law enforcement officer uses the word "verified," he or she should mean that the fact was actually verified. Tr. at 18:13-20 (Ray).

The Court asked Ganley whether his "stronger argument" is that the Court cannot grant summary judgment, because the photographs show two men with different features. Tr. at 19:1-6 (Court). Ganley said that he agreed the photographs are important, because, according to Ganley, "the photographs are so different that it was at least reckless." Tr. at 19:7-9 (Ray).

Ganley added that the parties' discussion about what Jojola meant to say in the Warrant Aff. supports granting Ganley's Rule 56(d) Motion, because discovery would allow Ganley to ask Jojola what he intended to say. See Tr. at 19:18-23 (Ray). The Court questioned the value of deposing Jojola on these topics given that, in the Tenth Circuit, an officer's subjective thoughts are not the pivotal issue in § 1983 claims. See Tr. at 19:24-20:5 (Court). Ganley acknowledged that qualified immunity generally concerns objective analysis, but mused:

> I've always wondered how we deal with that in the situation where the test for, say, a false affidavit requires that there be some sort of the recklessness or intentional falsification of fact. [Do] you see how there is a little bit of a disconnect in the case law on how to analyze that? . . . [W]e've got this analysis that comes in [regarding] whether the officer recklessly or intentionally didn't investigate something properly or misrepresented the facts to a magistrate in order to establish probable cause and obtain a warrant, I think the analysis is a little bit tricky to go back and say well, he objectively was or wasn't reckless or [he] objectively didn't intentionally or did intentionally misstate his facts [to a] magistrate in order to obtain a warrant.

Tr. at 20:8-21:11 (Ray). Ganley next asserted that the differences in the photographs present a factual issue for a jury to resolve. See Tr. at 22:5-8 (Ray). Ganley also stated that, if Court dismisses the federal claims based on qualified immunity, the Court should send the state claims back to state court. See Tr. at 23:10-13 (Ray).

The Court then asked Ganley which cases from the Tenth Circuit or the Supreme Court of the United States are so factually similar to this case that Jojola would have been on notice that his actions were unconstitutional. See Tr. at 23:15-21 (Court). Ganley responded:

> I don't really have a Tenth Circuit case where something like this happened. . . . But the generic standard that the Tenth Circuit has cited in a bunch of cases is if there is a reckless disregard or intentional misrepresentation of fact in the affidavit, then that would be a constitutional [violation]. And there is a lot of common sense to that. An officer is always on notice that I can't misrepresent the facts that in order to create probable cause. That's . . . just Basic Integrity and Honesty 101.

Tr. at 23:22-24:8 (Ray). Ganley added that, in other Courts of Appeals, courts "have said that reckless and intention always seems to be the standard to investigatory leads of a defendant's due process rights," and that, "in situations where state actors have the opportunity to deliberate various alternatives prior to selecting [a] course of action they violate due process if they do so recklessly, i.e., he's got at [sic] fingerprint in hand and he's got pictures that don't look alike." Tr. at 24:9-21 (Ray)(citing Wilson v. Lawrence Cty., 260 F.3d 946 (8th Cir. 2001); Sanders v. English, 950 F.2d 1152, 1155 (5th Cir. 1992)); Whitley v. Seibel, 676 F.2d 245, 247 (7th Cir. 1982)). The Court stated its belief that the closest Tenth Circuit case factually to this case is Romero v. Fay, 45 F.3d 1472 (10th Cir. 1995), which also involves misidentification by law enforcement. See Tr. at 35:17-23 (Court). The Defendants agreed that Romero v. Fay is probably the closest Tenth Circuit case to this case, but contended that, even if Ganley's allegations are true, the factual differences between the two cases prevent Romero v. Fay from indicating whether Jojola lacked probable cause or violated a clearly established constitutional right. See Tr. at 35:25-36:9 (Nixon).

The Defendants responded to Ganley's Rule 56(d) Motion, and argued that Ganley requests discovery beyond the primary inquiry relating to qualified immunity. See Tr. at 38:14-39:6 (Court). The Defendants concluded that "there is no discovery which would lead to a genuine dispute of material fact which would . . . defeat . . . the defendant's motion for summary judgment on qualified immunity." Tr. at 39:21-24 (Court).

The Court asked what Jojola saw when Ganley arrived for the fingerprinting that made him realize that Ganley was not the right person. See Tr. at 39:25-2 (Court). The Defendants responded:

> It's my understanding that it was the tattoos on the arm. Detective Jojola had an idea before meeting with Mr. Ganley that he was not the person based on the booking sheets obtained after the arrest, long after the arrest warrant affidavit was completed, because those booking sheets indicated he was not -- he did not have any tattoos. I suspect that that would be the same reason that upon seeing Mr. Ganley and being able to see Mr. Ganley's arms for the first time in person, and observing that his arms did not have the tattoos that we see in the surveillance video photos, that Detective Jojola knew that Mr. Ganley was not the person who had appeared in those surveillance videos.

Tr. at 40:3-16 (Nixon).

The Court gave Ganley the last word on the Rule 56(d) Motion. See Tr. at 42:1-3 (Court). Ganley stated that the hearing has underscored how "some of the questions that the Court has raised would be illuminated by discovery." Tr. at 42:4-6 (Ray). Ganley stated that he just heard for the first time that Jojola's "epiphany of recognition happened because he didn't see tattoos on John Ganley's arms," and so discovery would allow Ganley to clear up factual disputes by, for example, hearing from witnesses under oath about Ganley's appearance. Tr. at 42:7-18 (Ray).

The Court stated:

> I obviously am going to have to spend some time in determining whether there is a constitutional violation, and I will. . . . But I guess I'm just not seeing a way that I can deny the [MSJ], at least on clearly established grounds. I'm thinking that this is too factually intense to . . . come up [in] any case. And the one case that I keep coming back to, Romero v. Fay, . . . the Tenth Circuit found that there was no constitutional violation. So the one case we have available points in the opposite direction. So probably one way or another I'll be granting this motion, and dismissing out the federal claims, and remanding the state claims and the rest of the case back to state court.

Tr. at 44:12-45:2 (Court). The Court stated that it would not permit further discovery for now. See Tr. at 45:24-25 (Court). The Court continued:

The one thing . . . I need to give some thought as to when if Mr. Jojola began to get suspicious and when that would make any difference as to the claims here. It might have more to do with damages than it does to claims . . . . If I agree with the city and with Mr. Jojola that there was probable cause at the beginning, does him beginning to get suspicious that he had is the wrong person if, does a new claim sort of accrue at that point that has some legs? That's the only thing that I guess I'm walking away from this a little bit concerned [about] and think I need to maybe look at [more].

Tr. at 46:5-18 (Court). Ganley addressed the Court's point, and clarified that, although he contends that Jojola did not have probable cause when submitting the Warrant Aff., Ganley also believes that there may be an "independent constitutional claim" arising at the moment that "Jojola learns that there is a problem" in targeting Ganley. Tr. at 47:13-25 (Ray). The following exchange ensued:

> MS. NIXON: Your Honor, I would just argue that [the independent constitutional claim theory is] not part of the amended complaint that been filed in this case -- [it] has never been an allegation in this case.

> MR. RAY: That's what happens when you disclose a fact at the hearing that nobody has ever of heard of before.

> MS. NIXON: And it's also not dispositive to the issues before the Court at this time. Again, based upon the complaint, we are looking at what Detective Jojola knew at the time that he effectuated the arrest warrant affidavit, not what was learned after, not when it was learned after. I think that was a question of damages, which we don't get to in this case yet.

Tr. at 48:14-49:3 (Nixon, Ray). The Court recognized that "we have a new issue that y'all may need to address in the briefing, so I'll look forward to seeing what y'all have to say on that issue."

Tr. at 49:4-7 (Court).

6.   **The MSJ Response.**

Ganley responds to the MSJ. See MSJ Response at 1. Ganley argues that "the sort of aggressive puffery that Defendant Jojola displayed in his criminal complaint and warrant affidavit

were unreasonable and constituted knowing false statements, the absence of which would have vitiated probable cause." MSJ Response at 8. Ganley adds that

> [i]t is difficult to imagine a judicial officer signing this warrant if it had contained the truth (i.e., the Detective observed several color pictures of the suspect cashing the check, he pulled the driver's license number and name written on the forged check, saw that it was another white male with short hair, chose not to run a finger print even though one was present on the check, and had been advised that John Ganley was a potential victim of identity theft).

MSJ Response at 8.

Ganley also disagrees with the Court's contention that the affidavit's use of the word "verified" should be interpreted loosely. MSJ Response at 8. Rather, Ganley insists that verified "connotes follow-up and careful securing of information." MSJ Response at 8.[20] Ganley

---

[20]As proof, Ganley provides numerous definitions for "verified":

> The first definition to arise in a Google search for the definition of "Verify" is: "Make sure that (something) is true, accurate, or justified."[] Merriam-Webster provides: "[T]o establish the truth, accuracy, or reality of . . . . " https://www.merriamwebster.com/dictionary/verify (retrieved June 18, 2018). Both sources give a secondary definition, which is to "to confirm or substantiate in law by oath." Id. Dictionary.com provides three definitions of the word: "to prove the truth of, as by evidence or testimony; confirm; substantiate," "to ascertain the truth or correctness of, as by examination, research, or comparison," and "to act as ultimate proof or evidence of; serve to confirm." http://www.dictionary.com/browse/verify (retrieved June 18, 2018). Collins Dictionary states: "If you verify something, you check that it is true by careful examination or investigation." Collins alternatively provides the following definition: "If you verify something, you state or confirm that it is true." https://www.collinsdictionary.com/us/dictionary/english/verify (retrieved June 18, 2018). Oxford Living Dictionaries states: "Make sure or demonstrate that (something) is true, accurate, or justified," and, as a secondary definition, "Swear to or support (a statement) by affidavit." (https://en.oxforddictionaries.com/definition/verify)(retrieved June 18, 2018). MacMillan gives two definitions: "To check or to provide that something is true or correct," and, as a secondary definition, "to say that something is true or correct." https://www.macmillandictionary.com/us/dictionary/american/verify (retrieved June 18, 2018). Black's Law Dictionary gives this definition: "To confirm or

continues: "For a commissioned law enforcement officer to tell a judge that he has 'verified' something, he is putting his trust, and his capacities and efforts as an investigator into that statement. He is seeking to strengthen, not loosen or weaken, the believability of the statement." MSJ Response at 9. Ganley insists, however, that Jojola "falsely swore his warrant affidavit," because "he did not verify anything, and he knows it." MSJ Response at 9-10.

Ganley contends that he has demonstrated "that there is at least a genuine issue of material fact regarding whether Defendant Jojola, the affiant, made his statements under oath knowingly or with reckless disregard for the truth." MSJ Response at 10-11. Specifically, Ganley contends that Jojola unreasonably misidentified Ganley based on the photographic evidence, knew that Ganley may have been the victim of identity theft, but did not investigate that possibility, and did not analyze the fingerprint until Ganley's criminal defense attorney asked for it to be analyzed. See MSJ Response at 10-11.

Ganley then addresses whether Jojola's actions violated a clearly established civil right. See MSJ Response at 11. Ganley argues that there need not be a Tenth Circuit case "finding that a false or reckless statement in a warrant resulted in the finding of a constitutional violation," because the "principle governing Defendant Jojola's behavior (reckless disregard) has been

---

substantiate by oath ; to show to be true. Particularly used of making formal oath to accounts, petitions, pleadings, and other papers. The word 'verify' sometimes means to confirm and substantiate by oath, and some- times by argument. When used in legal proceedings it is generally employed [i]n the former sense." https://thelawdictionary.org/letter/v/page/15/ (retrieved on June 18, 2018).

Plaintiff could go on, as there are many dictionaries. Plaintiff can find none that supports a definition other than one that connotes careful investigation, confirmation, and examination, or of solemn confirmation by oath.

MSJ Response at 9.

articulated in multiple cases in the Tenth Circuit in discussing arrest warrants" and, therefore, it was clearly established that his actions were unconstitutional.  MSJ Response at 11.  Ganley also contends that, although qualified immunity relies on an objective standard, inquiry into subjective perspectives is necessary when it comes to whether someone acted knowingly or with reckless disregard for the truth.  See MSJ Response at 11.  Thus, Ganley asserts that "this case provides a genuine issue of material fact regarding whether Defendant acted willfully or with reckless disregard for the veracity of his affidavit."  MSJ Response at 11.

Ganley then asserts that United States Courts of Appeals have found due process violations in circumstances similar to this case.  See MSJ Response at 12-13 (citing Fairley v. Luman, 281 F.3d 913, 915 (9th Cir. 2002); Wilson v. Lawrence Cty., 260 F.3d 946 (8th Cir. 2001); Cannon v. Macon Cty., 1 F.3d 1558 (11th Cir. 1993); Sanders v. English, 950 F.2d 1152 (5th Cir. 1992); Whitley v. Seibel, 613 F.2d 682 (7th Cir. 1980)).  According to Ganley, those cases "demonstrate that irresponsible and reckless failure to follow up on certain information can lead to violation of clearly established rights."  MSJ Response at 14.  Ganley also contends that the facts in Romero v. Fay are distinguishable from this case.

Ganley then argues that qualified immunity does not bar his tort claims, noting that the New Mexico Tort Claim Act ("NMTCA"), N.M. Stat. Ann. § 41-4-1 to -30, waives immunity for

> personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

MSJ Response at 16 (quoting N.M. Stat. Ann. § 41-4-12).  Ganley also contends that the Defendants' qualified immunity defense does not apply to his claims against the City of

Albuquerque.  See MSJ Response at 20-22.  Ganley concludes by asking the Court to deny the MSJ and to permit discovery to continue.  See MSJ Response at 23.  Ganley also asks that, if the Court dismisses his federal claims, it should decline to exercise supplemental jurisdiction and remand the state claims to state court.  See Response at 23.

**7**      **The MSJ Reply.**

The Defendants reply to Ganley's response.  See MSJ Reply at 1.  The Defendants first address Ganley's argument that qualified immunity does not apply, because Jojola submitted the Warrant Aff. with false statements, and that, without those false statements, probable cause does not exist.  See MSJ Reply at 6.  The Defendants argue that, to prevail on that argument, Ganley must demonstrate that Jojola "knowingly, or with reckless disregard for the truth, included false statements in the affidavit."  MSJ Reply at 6 (citing Kerns v. Bader, 663 F.3d 1173, 1188 (10th Cir. 2011)(Gorsuch, J.)).  The Defendants contend, however, that Jojola's statement that "it is verified John Ganley cashed the check," MSJ Reply at 6 (quoting Warrant Aff. at 1), is "not false nor made knowingly or with reckless disregard for the truth," MSJ Reply at 6.  The Defendants further argue that, even excluding that statement, the Warrant Aff. demonstrates probable cause, because it "outline[s] a series of facts to demonstrate a substantial probability" that Ganley committed a crime.  MSJ Reply at 6.

The Defendants then address Ganley's argument that including in the Warrant Aff. a statement that Ganley was a potential victim of identity theft would have vitiated the affidavit's probable cause.  See MSJ Reply at 7.  The Defendants contend that there is nothing in Jojola's investigation leading him to believe that Ganley is "*in fact* a victim of identity theft."  MSJ Reply at 7 (emphasis in original).  Moreover, the Defendants note that Burt's statement was that it was "unknown" whether Ganley was a victim of identity theft and not that he is potentially a victim.

MSJ Reply at 7 (emphasis omitted).  The Defendants also contend that Ganley did not omit material information or mislead the judge regarding the fingerprint, arguing that the Warrant Aff. clearly states that the fingerprint had not yet been analyzed.  See MSJ Reply at 8.

The Defendants next argue that summary judgment is proper in this case, because there is "arguable probable cause to support" the Warrant Aff.  MSJ Reply at 9.  See id. at 9-10.  The Defendants also reiterate that the Fourth Amendment governs Ganley's claims and that Jojola's investigation was robust enough not to violate the Fourth Amendment.  See MSJ Reply at 10-11. The Defendants then assert that Jojola did not violate any clearly established constitutional rights. See MSJ Reply at 11 (citing White v. Pauly, 137 S. Ct. 548, 552 (2017); Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).

Next, the Defendants address Ganley's tort claims.  See MSJ Reply at 13-17.  The Defendants argue that the NMTCA does not waive immunity for simple negligence: "While immunity may be waived where a law enforcement officer negligently causes a third party to commit one of the enumerated torts, '[t]here is substantial case law in New Mexico establishing that under Section 41-4-12, immunity is not waived for negligence standing alone.'"  MSJ Reply at 14 (quoting Lessen v. City of Albuquerque, 2008-NMCA-085, ¶ 35, 187 P.3d 179, 186).  The Defendants admit that the NMTCA waives immunity for failure to investigate pursuant to N.M. Stat. Ann. § 29-1-1, but argue that Jojola met his duty to investigate as that statute requires.  See MSJ Reply at 14-15.  Similarly, the Defendants recognize that the NMTCA waives immunity for false imprisonment, but argue that Jojola had probable cause to submit the Warrant Aff.  See MSJ Reply at 15.  The Defendants conclude that the Court should grant the MSJ.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex")

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. 2:11-cv-757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[21] Once the movant meets this burden,

---

[21]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue

Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind

the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the

blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation

omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

## LAW REGARDING RULE 56(d)

Rule 56(d) provides:

(d) When Facts Are Unavailable to the Nonmovant.

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).[22]  "A party who seeks relief under subdivision (d) may seek an order

---

[22]Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments.

deferring the time to respond to the summary-judgment motion." Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments. The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required. See Fed. R. Civ. P. 56(d). The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit." Fed. R. Civ. P. 56(c) advisory committee's note to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion. See Jensen v. Redev. Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993). "Unless dilatory or lacking in merit," a party's 56[(d)] application "should be liberally treated." Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554 (internal quotation marks and citations omitted). "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to opposition." Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000). Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete. See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ." Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990). To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment. See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554. Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable. See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554. Moreover, while the summary judgment movant's exclusive control of

information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554. Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted." Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554 (denying a 56(d) request stating "the record reflects that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit"). See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion). The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant. Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts. In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (citations and internal quotation marks omitted). See Tadlock v. Lahood, 2013 WL 6284428, at *5 (10th Cir. 2013)(unpublished)(citing Price ex rel. Price v. W. Res., Inc. for the rule 56(d) requirements after the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656, 658 (10th Cir. 2006)(stating that the affidavit must state how additional time will enable the party to meet its burden "with specificity"). A rule 56(d) affidavit or declaration must state, with specificity, exactly what additional discovery is believed necessary. See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325, 334 (10th Cir. 2005)(unpublished)("To resist

summary judgment on this basis (56[(d)]), a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues."). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 2013 WL 6284428, at *5.

The Court has previously denied rule 56(d) motions where the information sought does not relate to a relevant legal question. See Martinez v. Lucero, 2012 WL 2175772, at *30 (D.N.M. May 31, 2012)(Browning, J.)("Because the information sought would not alter the Court's decision on either absolute or qualified immunity, the Court will deny the request for discovery pursuant to rule 56(d)."). Similarly, it has denied 56(d) requests where the party seeks duplicative information. See Todd v. Montoya, 877 F. Supp. 2d 1048, 1099 (D.N.M. 2012)(Browning, J.)("There is little difference between the discovery he seeks and what he would seek if Montoya had not raised a qualified-immunity defense."). Finally, the Court has dismissed rule 56(d) motions where the proponent does not submit a rule 56(d) affidavit. See Chavez v. Cty. of Bernalillo, 3 F. Supp. 3d 933, 991 (D.N.M. 2014)(Browning, J.)("He did not submit a rule 56(d) affidavit or declaration.").

## LAW REGARDING § 1983 CLAIMS

Section 1983 is the exclusive vehicle for vindication of substantive rights under the Constitution of the United States of America. See Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979); Albright v. Oliver, 510 U.S. 266, 271 (1994)(explaining that § 1983 creates no substantive rights; rather it is the means through which a plaintiff may seek redress for deprivations of rights established in the Constitution). Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the United

States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must assert that government officials acted under color of law in a way that resulted in a deprivation of rights which the United States Constitution secures.  See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988). There must be a connection between official conduct and violation of a constitutional right; conduct that is not connected to a constitutional violation is not actionable under § 1983.  See Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 1998).

Further, a civil rights action against a public official or entity may not be based solely on a theory of respondeat superior liability for the actions of co-workers or subordinates.  A plaintiff must allege that each government official, through the official's own individual actions, has violated the Constitution.  See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  To succeed under § 1983, the plaintiff must allege some identified official's personal involvement in the alleged constitutional violation.  See Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008).  In a § 1983 action, it is particularly important that a plaintiff's complaint "make clear exactly *who* is alleged to have done *what to whom*, to provide each individual with fair notice as to the basis of the claim against him or her."  Robbins v. Oklahoma, 519 F.3d 1242, 1249-50 (10th Cir. 2008)(emphasis in original). Nor do generalized statements that the defendants caused the deprivation of a constitutional right, without plausible supporting factual allegations, state any claim for relief.  See Robbins v. Oklahoma, 519 F.3d at 1249-50.

A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff.  To establish municipal liability, a plaintiff has the burden of demonstrating: (i) the existence of a municipal policy or custom; and (ii) a direct causal link between the policy

or custom, and the alleged injury.  See Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993). A municipal policy or custom may be shown by: (i) "a formal regulation or policy statement"; (ii) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (iii) "the decisions of employees with final policymaking authority"; (iv) "the ratification by such final policymakers of the decisions -- and the basis for them -- of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (v) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1189-90 (10th Cir. 2010)(first quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); then quoting City of Canton v. Harris, 489 U.S. 378, 388-91(1989)(internal quotation marks omitted); and then quoting Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010)).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal

officials." Butz v. Economou, 438 U.S. 478, 504 (1978).  See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 392 (1971)("Bivens").  "The qualified immunity analysis is the same whether the claims are brought under *Bivens* or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.   To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).   When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v.

Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.    **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[23] the clearly established prong of the qualified immunity analysis: when (i) the constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is

_____

[23]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81. The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

necessary, and the conduct is likely to face challenges only in the qualified immunity context.

Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[24]  "Courts should

---

[24]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that:

>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District

of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary

think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions

of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"

Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[25]

See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard

again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the

district court for further consideration when the district court has given only cursory treatment to

---

Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[25]Appellate courts may fail to appreciate how difficult it is to do a clearly established prong review first without looking -- closely or superficially -- at whether there is a constitutional right and whether there is a violation.  It is difficult to stop and review the facts, rights, and alleged violations in other cases to determine the clearly established prong without first looking at the facts, rights, and alleged violations on the merits in the case before the Court, and determining the universe of comparable cases.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  Saucier v. Katz worked better in practice.

qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

      **2.**      **Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established

law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We

have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth

Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis, see

Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II").  In Aldaba II, the Tenth

Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba

I"), that officers were entitled to qualified immunity after the Supreme Court vacated its decision

in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam).  In concluding that they had

previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one.
> Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-
> established-law discussion, we did not just repeat its general rule and conclude that
> the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-
> scale approach measuring degrees of egregiousness in affirming the denial of
> qualified immunity.  We also relied on several cases resolving excessive-force
> claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case.  See Aldaba II, 844 F.3d at 874 n.1.  The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with
> "fundamentally similar" facts, noting that "officials can still be on notice that their
> conduct violates established law even in novel factual circumstances." *Id.* at 741[].
> This calls to mind our sliding-scale approach measuring the egregiousness of
> conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the Supreme
> Court has vacated our opinion here and remanded for us to reconsider our opinion
> in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it
> relied on were "simply too factually distinct to speak clearly to the specific
> circumstances here." 136 S. Ct. at 312.  We also note that the majority opinion in
> *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, [] (2002).  As can happen over
> time, the Supreme Court might be emphasizing different portions of its earlier
> decisions.

<u>Aldaba II</u>, 844 F.3d at 874 n.1.  Since <u>Aldaba II</u>, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision.  <u>See</u> <u>White v. Pauly</u>, 137 S. Ct. at 551.  In

concluding that police officers were entitled to qualified immunity, the Supreme Court

emphasized: "As this Court explained decades ago, the clearly established law must be

'particularized' to the facts of the case."  <u>White v. Pauly</u>, 137 S. Ct. at 552 (quoting <u>Anderson v.</u>

<u>Creighton</u>, 483 U.S. at 640).  With that principle in mind, the Supreme Court explained that the

Tenth Circuit "panel majority misunderstood the 'clearly established' analysis: It failed to identify

a case where an officer acting under similar circumstances as Officer White was held to have

violated the Fourth Amendment."  <u>White v. Pauly</u>, 137 S. Ct. at 552.  <u>See</u> <u>District of Columbia v.</u>

<u>Wesby</u>, 138 S. Ct. at 591 ("Tellingly, neither the panel majority nor the partygoers have identified

a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth

Amendment violation under similar circumstances.").  Although the Supreme Court noted that "we

have held that [<u>Tennessee v.</u>] *Garner*[, 471 U.S. 1 (1985)] and *Graham* do not by themselves create

clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is

obvious that there was a violation of clearly established law under *Garner* and *Graham*."  <u>White</u>

<u>v. Pauly</u>, 137 S. Ct. at 552 (quoting <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004)).[26]

---

[26]If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established.  As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  <u>See</u> Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  Although still stating that there might be an obvious case under <u>Graham v. Connor</u> that would make the law clearly established without a Supreme Court or Circuit Court case on point, <u>see</u> <u>White v. Pauly</u>, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower

courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts, see Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police when shot and was not raising his gun, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies").

Factually identical or highly similar factual cases are not, however, the way the real world works.  Cases differ.  Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  Nevertheless, the Supreme Court has crafted its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Supreme Court's obsession with the clearly established prong assumes that police officers are reading Supreme Court and Tenth Circuit opinions routinely in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day to day police work.  It is hard enough for the federal judiciary to do what the Supreme Court wants on a full time basis.

The Court thus disagrees with that approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."  Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, Pauly v. White, 138 S.Ct. 2650 (No. 17-1078)("Cato Brief")(available at https://www.supremecourt.govDocketPDF/17/17-078/37345/20180302120715934_Pauly%20v. %20White%20Cato%20amicus%20brief.pdf).  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct.  Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification."  Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as the Honorable Clarence Thomas, Associate Justice of the United States Supreme Court, has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret [ing] the intent of Congress in enacting the Act."  Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted  "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s]

## LAW REGARDING MONELL CLAIMS

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

The Supreme Court has recognized that "municipalities and other bodies of local government are 'persons' within the meaning of this statute." St. Louis v. Praprotnik, 485 U.S. at, 121. The Supreme Court has articulated "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." St. Louis v. Praprotnik, 485 U.S. at 123 (citation omitted).

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered. Second, only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability. Third, whether a particular official has final policymaking authority is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official

---

that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that the defendants were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, 69 Stan. L. Rev. Online 163 (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3; Brown v. City of Colorado Springs, 2017 WL 4511355, at *8, and willing to reverse district court decisions.

or officials responsible under state law for making policy in that area of the city's business.

St. Louis v. Praprotnik, 485 U.S. at 123 (citations and internal quotations omitted). The Tenth Circuit has explained that there are two elements that a plaintiff must show when "suing a county under section 1983 for the actions of one of its officers": (i) "a municipal employee committed a constitutional violation"; and (ii) "a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)(citing Monell, 436 U.S. at 694); Hinton v. City of Elwood, 997 F.2d at 782 (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Apodaca v. Rio Arriba Cty. Sheriff's Dep't, 905 F.2d 1445, 1447-48 (10th Cir. 1990); Watson v. City of Kansas City, 857 F.2d 690, 697 (10th Cir. 1988)). Those elements apply when the plaintiff alleges that the acts of a final policymaker are the policy of the municipality.

> The defendants do not deny that Sheriff Sharp, as the supervising law enforcement officer, was a final policymaker with respect to the decision to enter the apartment. Thus, there is no dispute in this case that the County, through Sheriff Sharp, was the 'moving force' behind the decision to enter the apartment. If that decision -- the decision to enter the apartment -- resulted in a constitutional violation, the County would be liable.

Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d at 1319 (citation omitted).

## LAW REGARDING SUBSTANTIVE DUE PROCESS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts. See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). "[N]othing in the language of the Due Process Clause itself requires the State to protect

the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195. The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1. Exceptions to the General Rule.

There are, however, two exceptions to this general rule. The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994). The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923). "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2. Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine. A plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine. See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an

individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3. Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d at 923. See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)). To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk. See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations omitted).

4.    **What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort

law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process rights when they did not take sufficient action to prevent a student at the school from "racking"[27] the plaintiffs' son. 716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience. See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING UNLAWFUL ARREST

"A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(citing Tennessee v. Garner, 471

---

[27]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles." 716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

U.S. at 7). "The law . . . is unambiguous: a government official must have probable cause to arrest an individual." Cortez v. McCauley, 478 F.3d 1108, 1117 (10th Cir. 2007)(citing Tennessee v. Garner, 471 U.S. at 7). See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979)("[T]he Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense."). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she had reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008)(quoting Romero v. Fay, 45 F.3d at 1476). The Supreme Court has stated that the existence of probable cause for an arrest depends on whether, based on historical facts leading up to the arrest, an objectively reasonable police officer would find probable cause:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."

Ornelas v. United States, 517 U.S. 690, 696-97 (1996)(alterations in original)(quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19 (1982)).

The Tenth Circuit has explained that a plaintiff alleging that the "government has unconstitutionally imprisoned him has at least two potential constitutional claims: 'The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.'" Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008)(quoting Pierce v. Gilchrist, 359 F.3d at 1285-86). If the

plaintiff was imprisoned without legal process, his Fourth Amendment claim[28] is analogous to false arrest or false imprisonment; if he was imprisoned "pursuant to legal but wrongful process, he has a claim under the procedural component of the Fourteenth Amendment's Due Process Clause analogous to a tort claim for malicious prosecution." Mondragon v. Thompson, 519 F.3d at 1082. More recently, the Tenth Circuit has explained that the Fourteenth Amendment claim analogous to a malicious prosecution claim would not be available if an adequate state remedy exists, but a plaintiff may have the option of bringing a Fourth Amendment claim using a similar malicious prosecution theory. See Myers v. Koopman, 738 F.3d 1190, 1192 (10th Cir. 2013). In Myers v. Koopman, the plaintiff alleged that a detective fabricated facts to create the illusion of probable cause and, as a result, the plaintiff spent three days in custody. See 738 F.3d at 1192. The plaintiff brought a claim under § 1983 for malicious prosecution, alleging that the detective violated his Fourth and Fourteenth Amendment rights. See 738 F.3d at 1192. The plaintiff brought the Fourteenth Amendment malicious prosecution claim based on the detective's conduct in "conjur[ing] up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution." 738 F.3d at 1193. The Tenth Circuit explained that "[t]he Fourteenth Amendment protects individuals against deprivations of liberty without due process of law. If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy -- such as a state tort claim -- will satisfy due process

---

[28]The Tenth Circuit clarified that, because the Fourteenth Amendment incorporates the Fourth Amendment's protections against the states, a Fourth Amendment claim against state actors is also a Fourteenth Amendment claim. See Mondragon v. Thompson, 519 F.3d at 1082 n.3. The Court will likewise "avoid this terminology here to reduce confusion," opting instead to refer to the Fourth Amendment in reference to the right to be free from unlawful seizures, and the Fourteenth Amendment in reference to the right to due process. Mondragon v. Thompson, 519 F.3d at 1082 n.3.

requirements." 738 F.3d at 1193 (citations omitted).  Because a malicious prosecution claim under

Colorado law was available, the Tenth Circuit affirmed the district court's dismissal: "The

existence of the state remedy flattens the Fourteenth Amendment peg on which [the plaintiff] now

tries to hang his § 1983 malicious-prosecution claim." 738 F.3d at 1193.  The plaintiff also brought

a malicious prosecution claim under the Fourth Amendment; the district court analogized the claim

to a false imprisonment claim, but the Tenth Circuit said that the plaintiff was correct in casting

his claim as malicious prosecution, "because he was seized after the institution of legal process."

738 F.3d at 1194.  The Tenth Circuit described the difference between a § 1983 claim for false

imprisonment and malicious prosecution under the Fourth Amendment:

> What separates the two claims? -- the institution of legal process.  Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims.  See Wallace[ v. Kato], 549 U.S. [384,] 389 [(2007)] (concluding that false imprisonment was the proper analogy where defendants did not have a warrant for the plaintiff's arrest and thus detention occurred without legal process).  Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims.  See Heck[ v. Humphrey], 512 U.S. [477,] 484 [(1994)](where detention occurs with legal process the "common-law cause of action for malicious prosecution provides the closest analogy").  Like rain and snow, the claims emanate from the same source, but under different conditions.

Myers v. Koopman, 738 F.3d at 1194 (footnote omitted).  The Tenth Circuit explained that the

plaintiff was "arrested pursuant to a validly issued -- if not validly supported -- arrest warrant" and

that the plaintiff's suit "challenges the probable-cause determination that generated the legal

process." 738 F.3d at 1195.

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent

unfair and inequitable results which occur in the strict application of the doctrine of sovereign

immunity." N.M. Stat. Ann. § 41-4-2A. The New Mexico Legislature, however, also is recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2A. As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2A. The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2C.

### 1. __Section 41-4-4(A)__.

The NMTCA's § 41-4-4(A), which grants immunity and authorizes exceptions thereto, states:

> A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act [N.M. Stat. Ann. §§ 28-22-1 to 28-22-5] and by Sections 41-4-5 through 41-4-12 NMSA 1978. Waiver of this immunity shall be limited to and governed by the provisions of Sections 41-4-13 through 41-4-25 NMSA 1978, but the waiver of immunity provided in those sections does not waive immunity granted pursuant to the Governmental Immunity Act.

N.M. Stat. Ann. § 41-4-2A. Accordingly, a plaintiff may not sue a New Mexico governmental entity or its employees or agents, unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees. See N.M. Stat. Ann. §§ 41-4-5 through 41-4-12. See also Begay v. State, 1985-NMCA-117, ¶ 10, 723 P.2d 252, 255 ("Consent to be sued may not be implied, but must come within one of the exceptions to

immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 1986-NMSC-049, ¶ 10, 721 P.2d 1306 (1986). A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity. See Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 11, 952 P.2d 474, 477 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city, its employees, or its agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127 ¶¶ 11-12, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 257 (concluding that no waiver exists in the NMTCA for suit under Article II, § 11 of the New Mexico Constitution). Accordingly, if no specific NMTCA waiver can be identified, a plaintiff's complaint against the governmental entity or its employees must be dismissed. See Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 255. Further, the NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A). A plaintiff thus "may not sue a New Mexico governmental entity, or its employees or agents, unless the plaintiff's cause of action fits within one of the exceptions to immunity that the NMTCA grants." Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028,

1087 (D.N.M. 2016)(Browning, J.), <u>aff'd</u> 863 F.3d 1226, 1228 (10th Cir. 2017). "A plaintiff also may not sue a governmental entity or its employees for a . . . damages claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity." <u>Pueblo of Pojoaque v. New Mexico</u>, 214 F. Supp. 3d at 1087. "Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint [for damages] against the governmental entity or its employees must be dismissed." <u>Salazar v. City of Albuquerque</u>, 2013 WL 5554185 at *24 (D.N.M. Aug. 20, 2013)(Browning, J.)(citing <u>Begay v. State</u>, 1985-NMCA-117, ¶ 10, 723 P.2d at 255).

## 2. <u>Section 41-4-6.</u>

N.M. Stat. Ann. § 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6. This exception balances the principle that "government should not have the duty to do everything that might be done" with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care." <u>Cobos v. Doña Ana Cty. Hous. Auth.</u>, 1998-NMSC-049, ¶ 6, 970 P.2d 1143, 1145 (citations and internal quotations omitted). To resolve the tension between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general immunity from tort liability, [and] waives that immunity in certain defined circumstances." <u>Cobos v. Doña Ana Cty. Hous. Auth.</u>, 1998-NMSC-049, ¶ 6, 970 P.2d at 1145 (alterations added). The Supreme Court of New Mexico has explained that, "[w]hile 41-4-6 may appropriately be termed a 'premises liability' statute, the liability envisioned by that section is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal." <u>Cobos v. Doña</u>

Ana County Hous. Auth., 1998-NMSC-049, ¶ 9, 970 P.2d at 1146 (alteration added). Section 41-4-6 "contemplate[s] waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." Bober v. N.M. State Fair, 1991-NMSC-031, ¶ 27, 808 P.2d 614, 623 (alterations original)(internal quotation marks and citation omitted). New Mexico courts have concluded that § 41-4-6's waiver of immunity does not extend to negligent supervision, see Pemberton v. Cordova, 1987-NMCA-020, ¶ 5, 734 P.2d 254, 256, negligent design, see Rivera v. King, 1988-NMCA-093, ¶¶ 30-35, 765 P.2d 1187, 1194, negligent inspection, see Martinez v. Kaune, 1987-NMCA-131, ¶ 9, 745 P.2d 714, 716-17, or negligent classification of a prison inmate, see Archibeque v. Moya, 1993-NMSC-079, ¶¶ 11-14, 866 P.2d at 348.

In the prison context, the Supreme Court of New Mexico has held that "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in 41-4-6, does not include the security, custody, and classification of inmates . . . . Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." Archibeque v. Moya, 1993-NMSC-079, ¶ 8, 866 P.2d at 347 (alterations added)(citations omitted). In Archibeque v. Moya, Chris Archibeque, an inmate at the Central New Mexico Correction Facility, was transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Before being released into general population, a prison intake officer, Moya-Martinez, met with Archibeque to discuss whether he had any known enemies within the prison's general population. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Archibeque informed Moya-Martinez that another inmate, Gallegos, was one of his enemies, and Moya-Martinez, without checking an available list of current inmates, informed Archibeque that Gallegos was no longer at the prison. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. He was released into general

population, and Gallegos assaulted him that night.  See 1993-NMSC-079, ¶ 2, 866 P.2d at 346.

Archibeque sued Moya-Martinez, other corrections officers, and the New Mexico Corrections

Department in federal court for violations under 42 U.S.C. § 1983 and under the NMTCA.  See

1993-NMSC-079, ¶ 3, 866 P.2d at 346.  The district court interpreted § 41-4-6 narrowly, and held

that the statute did not waive immunity for negligent security and custody of inmates at the

penitentiary.  See 1993-NMSC-079, ¶ 4, 866 P.2d at 346.  Thereafter, Archibeque's § 1983 claims

were resolved in favor of Moya-Martinez and the other corrections employees.  See 1993-NMSC-

079, ¶ 4, 866 P.2d at 346.  The federal district court denied Archibeque's motion for

reconsideration.  See 1993-NMSC-079, ¶ 4, 866 P.2d at 346.  Archibeque appealed, and the Tenth

Circuit certified a question to the Supreme Court of New Mexico:

> Does [NMSA 1978, Section 41-4-6] of the New Mexico Tort Claims Act, [NMSA
> 1978, Sections 41-4-1 to -29], provide immunity from tort liability to an employee
> of the state penitentiary whose alleged negligence in releasing a prisoner into the
> general prison population, which included known enemies of the prisoner, resulted
> in the prisoner being beaten and injured by one of his enemies?

1993-NMSC-079, ¶ 1, 866 P.2d at 345-46 (alterations in original).  Archibeque argued that Moya–

Martinez was participating in the operation of the penitentiary when she classified Archibeque as

an inmate who could safely be released into the general prison population, and he argued that

Moya-Martinez' alleged negligence in misclassifying him and releasing him into the general

population constituted negligent operation of the penitentiary, thereby waiving immunity under

§ 41-4-6.  See 1993-NMSC-079, ¶ 5, 866 P.2d at 346-47.  The Supreme Court of New Mexico

concluded that § 41-4-6 did not waive Moya-Martinez' immunity, stating that "[t]he 'operation'

and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does not

include the security, custody, and classification of inmates."  1993-NMSC-079, ¶ 6, 866 P.2d at

347 (alteration added).  The Supreme Court of New Mexico reasoned that Moya-Martinez was not

operating and maintaining the prison's physical premises when she negligently classified Archibeque. See 1993-NMSC-079, ¶ 8, 866 P.2d at 347. Rather, the Supreme Court of New Mexico explained that

> [Moya-Martinez] was performing an administrative function associated with the operation of the corrections system. Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions. To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute.

1993-NMSC-079, ¶ 8, 866 P.2d at 347 (alteration added)(citation omitted). The Supreme Court of New Mexico further explained:

> While Moya-Martinez's misclassification of Archibeque put him at risk, the negligence did not create an unsafe condition on the prison premises as to the general prison population. Reading Section 41-4-6 to waive immunity every time a public employee's negligence creates a risk of harm for a single individual would subvert the purpose of the Tort Claims Act, which recognizes that government, acting for the public good, "should not have the duty to do everything that might be done," and limits government liability accordingly.

1993-NMSC-079, ¶ 8, 866 P.2d at 348 (citation omitted)(quoting N.M. Stat. § 41-4-2(A)). According to the Supreme Court of New Mexico, to permit a waiver of immunity under § 41-4-6 whenever injury results from a negligently performed administrative task "would undermine the purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate." 1993-NMSC-079, ¶ 14, 866 P.2d at 349. The Supreme Court of New Mexico noted that, "[w]hile a segment of the population at risk might justify waiver of immunity under Section 41-4-6, a situation in which a single inmate is put at risk is not comparable." 1993-NMSC-079, ¶ 14, n.3, 866 P.2d at 349 n.3. The Honorable Richard Ransom, then-Chief Justice of the Supreme Court of New Mexico, in his concurring opinion, noted:

I concur because there was no showing that the general prison population reflected anything but the reasonable and expected risks of prison life. The classification of Archibeque did not change the condition of the premises. I see Archibeque's injuries as having been proximately caused by a discrete administrative decision. As an alternative to releasing Archibeque into the general population, he could have been placed in administrative segregation, a form of protective custody. The risk arose not from a condition of the premises (as with the wild dogs in Castillo [v. County of Santa Fe, 1988-NMSC-037, 755 P.2d 48,] or, arguably, the inadequate health care facilities in Silva [v. State, 1987-NMSC-107, 745 P.2d 380]); it arose from the classification itself.

Archibeque v. Moya, 1993-NMSC-079, ¶ 17, 866 P.2d at 350 (Ransom, C.J., concurring).

In Callaway v. New Mexico Department of Corrections, 1994-NMCA-049, ¶ 19, 875 P.2d 393, 398, the Court of Appeals of New Mexico concluded that the plaintiff had "stated a claim sufficient to waive immunity under Section 41-4-6," because the New Mexico Corrections Department "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." 1994-NMCA-049, ¶ 19, 875 P.2d at 399. The Court of Appeals of New Mexico additionally noted, in "support for [its] holding[,]" that the "inmate assailant was unusually dangerous and the prison authorities had knowledge of the danger posed by the inmate." 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (alterations added). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1251-56, aff'd, 499 F. App'x 771 (10th Cir. 2012); C.H. v. Los Lunas Sch. Bd. of Educ., 852 F. Supp. 2d 1344, 1358-59 (D.N.M. 2012)(Browning, J.)(holding that allegations of negligence against the Defendants fell within the § 41-4-6 waiver, in part, because the Plaintiff "adequately allege[d] that the Defendants knew or should have known of the dangerous condition").

### 3. __Section 41-4-16__.

Section 41-4-16 provides:

A. Every person who claims damages from the state or any local public body under the Tort Claims Act shall cause to be presented to the risk management division for claims against the state, the mayor of the municipality for claims against the municipality, the superintendent of the school district for claims against the school district, the County clerk of a county for claims against the County, or to the administrative head of any other local public body for claims against such local public body, *within ninety days after an occurrence giving rise to a claim for which immunity has been waived under the Tort Claims Act,* a written notice stating the time, place and circumstances of the loss or injury.

B. No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section, or *unless the governmental entity had actual notice of the occurrence.* The time for giving notice does not include the time, not exceeding ninety days, during which the injured person is incapacitated from giving the notice by reason of injury.

N.M. Stat. Ann. § 41-4-16(A)-(B). "[D]efendants have the burden of proving that the notice requirement was not met." Dutton v. McKinley Cty. Bd. of Comm'rs, 1991-NMCA-130, ¶ 7, 822 P.2d 1134, 1135. "[T]he law is now firmly established that the notice required 'is not simply actual notice of the occurrence of an accident or injury but rather, actual notice that there exists a 'likelihood' that litigation may ensue.'" Dutton v. McKinley Cty. Bd. of Comm'rs, 1991-NMCA-130, ¶ 9, 822 P.2d at 1136 (quoting Frappier v. Mergler, 1988-NMCA-021, ¶ 11, 752 P.2d 253, 256). Mere awareness that an accident involving a state employee is insufficient to put a governmental entity on notice under § 41-4-16(A). See Powell v. N.M. State Highway & Transp. Dep't, 1994-NMCA-035, ¶ 15, 872 P.2d 388, 392 (stating that "where virtually every employee was aware of occurrence, but not of likelihood of litigation, such knowledge held insufficient to comply with notice requirement of section 41-4-16" and "where both mayor and chief of police were aware of occurrence, but not that litigation might result, or that the plaintiff considered

accident to be fault of the defendants, actual notice held not provided" (citing <u>Dutton v. McKinley</u>

<u>Cty. Bd. of Comm'rs</u>, 1991-NMCA-130, ¶ 9, 822 P.2d at 1136; <u>Frappier v. Mergler</u>, 1988-NMCA-

021, ¶¶ 15-16, 752 P.2d at 256-57).

> Nor does actual notice under Section 41-4-16(B) require that the notice of a claim
> indicate that a lawsuit will in fact be filed against the state, but rather, that the state
> must be given notice of a likelihood that litigation may ensue, in order to reasonably
> alert the state to the necessity of investigating the merits of the potential claim.

<u>Callaway v. N.M. Dep't of Corr.</u>, 1994-NMCA-049, ¶ 6, 875 P.2d at 396. The Court has noted

that "[p]roper notice under the NMTCA appears to be jurisdictional." <u>Todd v. Montoya</u>, 877 F.

Supp. 2d 1048, 1102 n.60 (D.N.M. 2012)(Browning, J.). <u>See</u> <u>Coffey v. United States</u>, 2011 WL

2729068, at *6 (D.N.M. July 7, 2011)(Browning, J.)("Because the notice provisions of the

NMTCA are jurisdictional . . . New Mexico courts have narrowly construed whether actual notice

of the likelihood of litigation has been given to the proper entity.").

### <u>LAW REGARDING SUPPLEMENTAL JURISDICTION</u>

It is a fundamental precept of American law that the federal courts are "courts of limited

jurisdiction." <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 552 (2005). Federal

courts "possess only that power authorized by Constitution and statute." <u>Kokkonen v. Guardian</u>

<u>Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed

upon the courts is the power to hear controversies arising under federal law -- federal-question

jurisdiction -- and controversies arising between citizens of different states -- diversity

jurisdiction. <u>See</u> 28 U.S.C. §§ 1331-32. Section 1367 additionally grants the federal courts power

to hear claims over which the court lacks original jurisdiction, if those claims are part of the same

constitutional case as claims over which the court has original jurisdiction. <u>See</u> 28 U.S.C.

§ 1367(a).

1. **Congressional Authority to Exercise Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. The Supreme Court of the United States has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines, pendent jurisdiction and ancillary jurisdiction; section 1367's passage codified those jurisdictional forms, and also allowed courts to hear cases under pendent-party jurisdiction, which the Supreme Court had previously disallowed in Finley v. United States, 490 U.S. 545 (1989). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties, whose insertion into the litigation does not have the support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms. See James v. Chavez, 2011 WL 6013547, at *5 (D.N.M. Nov. 21, 2011)(Browning, J.). In response to the Committee's findings regarding pendent, ancillary, and pendent-party jurisdiction, Congress codified the doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). In enacting 28 U.S.C. § 1367, Congress conferred upon federal courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2. The District Courts' Discretion to Exercise Supplemental Jurisdiction.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)). In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction. 383 U.S. at 726.

Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)      the district court has dismissed all claims over which it has original jurisdiction, or

(4)      in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164. Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changes the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Ct., 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of *Gibbs* in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c). . . ."); Bonadeo v. Lujan, 2009 WL 1324119, at *9 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."). At least one other district court in the Tenth

Circuit besides this Court has reached the same conclusion. See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should presume to decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)). That conclusion is consistent with the Supreme Court's statement that

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726 (footnote omitted).

The Tenth Circuit has recognized that a district court does not abuse its discretion when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it has dismissed all claims over which it has original jurisdiction." Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).[29] The Court has previously

---

[29]Muller v. Culbertson is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that

stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies. See Armijo v. New Mexico,2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Court has consistently declined to exercise supplemental jurisdiction when it dismisses all of a case's federal claims with prejudice.  See, e.g., McGarry v. Bd. of Cty. Commissioners for Cty. of Lincoln, 294 F. Supp. 3d 1170, 1206 (D.N.M. 2018)(Browning, J.)("The only remaining claim before the Court is McGarry's NMTCA claim. . . . The Court declines to exercise supplemental jurisdiction over that claim."); Parrish v. Roosevelt Cty. Board of Cty. Comm'rs, 2017 WL 6759103, at *20 (D.N.M. Dec. 31, 2017)(Browning, J.)("The Court declines to exercise supplemental jurisdiction over Parrish's remaining state-law breach-of-contract claim."); Martinez v. Guadalupe Cty., 200 F. Supp. 3d 1216, 1265 (D.N.M. 2016)(Browning, J).  The Court has also, however, declined to dismiss state-law claims when it dismisses a party's federal claims without prejudice.  See Young v. City of Albuquerque, 77 F. Supp. 3d 1154, 1189 (D.N.M. 2014)(Browning, J.)("[T]he Court would normally remand those [state law] claims to state court.  To give the Plaintiffs an opportunity to amend the Complaint to add federal claims against Dear and any other individuals, however, the Court will not remand the state-law claims to state court at this point.").

1.    **Whether an Issue is Novel**.

Under 28 U.S.C. § 1367(c)(1), a district court "may decline to exercise supplemental jurisdiction over a claim" if "the claim raises a novel or complex issue of state law."  28

---

decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Muller v. Culbertson, Mountain States Media, LLC v. Adams Cty., Nard v. City of Okla. City, Douglas v. Norton, and Wallin v. Dycus have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

U.S.C. § 1367(c)(1).  What makes a state law issue novel is unclear from binding Tenth Circuit caselaw.  See, e.g., Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1236-37 (10th Cir. 1997)(not distinguishing between "novel" and "complex" and dismissing a state law claim on § 1367(c)(1) grounds and because no federal law claims remained); Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995)(dismissing a state law claim as novel and complex, merely because a plaintiff alleged a violation of the Kansas Risk Management Act, Kan. Stat. Ann. §§ 65-4921 to 4940).[30]  A discernible test for novelty is also not apparent from studying Professors Charles Alan Wright and Arthur Miller's Federal Practice and Procedure.  See generally 13D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3567.3, at 417-421 nn. 60-61 (3d. ed. 2008)(collecting cases).  The only general rule that Professors Wright and Miller recognize for the novelty test is that, "[a]s a general matter, common law contract and tort claims do not present novel or complex questions of state law."  13D Wright & Miller, supra § 3567.3, at 417 n.60.  See, e.g., Blakely v. United States, 276 F.3d 853 (6th Cir. 2002)("This case does not present complex or novel issues of state law.  It involves a fraud claim.").  But cf. Wallin v. Dycus, 224 F. App'x 734, 740 (10th Cir. 2007)(unpublished), as amended nunc pro tunc (March 5, 2008)(affirming a district court for dismissing a state law claim as novel, because it required the

---

[30]The Tenth Circuit concluded that the issue was novel and complex without elaborating a test, writing:

> However, we do not have to decide whether the court insufficiently took the extent of the pretrial proceedings into consideration because there is an independent reason for dismissing Ms. Anglemyer's pendent state claims.  In her complaint (Count III), she alleged the hospital violated the Kansas Risk Management Act.  We believe the Kansas courts are the appropriate forum to decide this novel and complex issue of state law.

Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995).

court to determine whether Colorado law recognized that a jailer owed a duty of care to protect a prisoner's health in tort). Otherwise, they acknowledge a hodgepodge of different factors that federal courts have found operative when considering whether a claim is novel. See 13D Wright & Miller, supra, § 3567.3, at 417 n.60 (citing Dream Palace v. Cty. of Maricopa, 384 F.3d 990, 1022 (9th Cir. 2004)(determining a state issue was novel, because it concerned "issues of the balance of power between state and local authorities in Arizona"); Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 927 (9th Cir. 2001)(concluding novelty existed, because it raised "an issue of first impression as to how [a state law] provision is to be applied"); Doe v. Sundquist, 106 F.3d 702, 708 (6th Cir. 1997)(concluding an issue was novel, because it involved interpretation of the state constitution and a new state statute); Wilson v. PFS, LLC, 493 F. Supp. 2d 1122, 1126 (S.D. Cal. 2007)(Hayes, J.)(determining an issue novel or complex, because there is conflicting state law interpretations of the law); Kadetsky v. Egg Harbor Twp. Bd. of Educ., 164 F. Supp. 2d 425, 437 (D.N.J. 2001)(Orlofsky, J.)(concluding an issue novel, because it turned on "application of a recent change in New Jersey state law"); Rockey v. Courtesy Motors, Inc., 199 F.R.D. 578, 596 (W.D. Mich. 2001)(Scoville, M.J.)(concluding an issue is novel, because "there is not a single published state-court opinion on point")). See also 13D Wright & Miller, supra, § 3567.3, at 416 ("Occasionally, a court appears to decline supplemental jurisdiction simply because the supplemental claim involves questions of state law."). Some courts, however, have bucked one or more of these factors. See e.g., Schwarm v. Craighead, 233 F.R.D. 655, 659 (E.D. Cal. 2006)(Shubb, J.)(exercising supplemental jurisdiction, even though California courts had not yet interpreted the statute at issue, because "the court here faces a single unexceptional question of statutory interpretation"); Hunter by Conyer v. Estate of Baecher, 905 F. Supp. 341, 343 (E.D. Va. 1995)(Clarke, J.)("It is true that state caselaw concerning the [Virginia Residential Landlord

and Tenant Act, Va. Code Ann. §§ 55-248.2 to 248.50] generally and in the lead paint context specifically is sparse. Nevertheless, the lack of caselaw does not make the VRLTA unintelligible to this Court."). Perhaps recognizing that what is novel is unfixed, Wright and Miller note that "each case is decided on its own facts." 13D Wright & Miller, supra, § 3567.3, at 417-18. See id. at 400 n.27 (citing Karen Nelson Moore, The Supplemental Jurisdiction Statute: An Important but Controversial Supplement to Federal Jurisdiction, 41 Emory L.J. 31, 62-63 (1992)("In particular, it may be relatively easy for a district judge to conclude that a novel or complex issue of State law is involved and to exercise essentially unreviewable discretion to dismiss such a claim.")).

This uncertainty does no good for litigants. Cf. Teague v. Lane, 489 U.S. 288, 332 (1989)(Brennan, J., dissenting)(noting that "predictability in the law" permits "litigants and potential litigants" to act with knowledge, and with assurance that "they will not be treated unfairly as a result of frequent or unanticipated changes in the law"). A judicial decision whether a claim is novel should not be like reading a fresh novel every time. The Court, accordingly, deems it prudent to outline a test for 28 U.S.C. § 1367(c)(1)'s novelty requirement.[31]

---

[31]28 U.S.C. § 1367(c)(1)'s novelty and complexity requirements are separate tests -- that is, "novel or complex" is disjunctive, so it should not be read as "novel and complex." 28 U.S.C. § 1367(c)(1). See Ameritox, Ltd. v. Millennium Labs., Inc., 803 F.3d 518, 536 n.27 (11th Cir. 2015). The United States Court of Appeals for the Eleventh Circuit has written:

> Additionally, § 1367(c)(1) grants district courts the discretion to decline to exercise supplemental jurisdiction if the claim raises a novel *or* complex issue of State law. Thus, even if the claims were not complex -- and they are complex -- the claims' novelty would be sufficient to vest the District Court with discretion.

Ameritox, Ltd. v. Millennium Labs., Inc., 803 F.3d at 536 n.27. That conclusion is also supported by the plain meaning of both words. "Novel," as explored below, generally means new or perhaps notably new. See infra, 36-37. Complex on the other hand, typically means complicated, involved, intricate, or not easily analyzed. See Complex, Oxford English Dictionary, https://www.oed.com/view/Entry/37672?rskey=5VQ3ic&result=2&isAdvanced=false#eid (last

28 U.S.C. § 1367(c)(1) is rooted in the seminal United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966)("Gibbs").  In that case, the Supreme Court created a two-part test for what was then known as pendent jurisdiction.  See Gibbs, 383 U.S. at 725.  The test's first consideration turned on constitutional concerns -- the federal court's subject matter jurisdiction over the state claim.  See Gibbs, 383 U.S. at 725.  To satisfy that constitutional requirement, the Supreme Court determined that "the state and federal claims must derive from a common nucleus of operative fact."  See Gibbs, 383 U.S. at 725.  The test's second-part turned on more pedestrian but nonetheless crucial practical concerns.  See 383 U.S. at 726.  The "justification" in exercising jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants."  383 U.S. at 726.  Thus, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law."  Gibbs, 383 U.S. at 726 (citing Strachman v. Palmer, 177 F.2d 427, 437 (1st Cir. 1949)(Macgruder, C.J., concurring)("Federal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation.")).  The Supreme Court's thought is that state courts either are more adept at adjudicating state law matters or as a matter of respecting our federal system, state sovereigns -- where possible, convenient, and just -- should decide state law matters.  See Gibbs, 383 U.S. at 726.

---

visited April 17, 2019)(defining complex as "consisting of parts or elements not simply co-ordinated, but some of them involved in various degrees of subordination; complicated, involved, intricate; not easily analysed or disentangled").  Something can easily be new without being complicated.  With these divergent meanings, it is unlikely that Congress meant for those words to be read together to form one test.

28 U.S.C. § 1367 supersedes Gibbs, at least in part. See Wright & Miller, supra, § 3567.3, at 400 ("These statutory factors do not completely mesh with the examples provided in Gibbs."). See also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 546. The underlying practical considerations animating Gibbs, however, appear to remain intact. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164 ("Seeking to vindicate values of economy, convenience, fairness, and comity underlying the judicially-created doctrine of pendent jurisdiction, Congress granted statutory authority to district courts to hear claims that form part of the same case or controversy."). The Court proceeds, accordingly, with those considerations of economy, convenience, fairness, and comity in mind.

Black's Law dictionary does not define "novel." See Black's Law Dictionary 1169 (9th ed. 2009). It is more a colloquial word than a legal word. "Novel" means new. See Pacific Operators Offshore, LLP v. Valladolid, 565 U.S. 207, 223 (2012)(Scalia, J., dissenting)("Substantial nexus is novel legalese with no established meaning in the present context."); School Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 304 (1963)("The principles which we reaffirm and apply today can hardly be thought novel or radical. They are, in truth, as old as the Republic itself."). In this context, however, the Court concludes that novel cannot mean only new, because such a meaning would make supplemental jurisdiction completely discretionary and § 1367(c) plain language does allow that expansive meaning. See 28 U.S.C. § 1367(c). Every case is new in some way; there are always new parties with new facts, and thus the legal analysis -- how the law applies to those facts -- is also new for every case. See McGarry v. Bd. of Cty. Commissioners for Cty. of Lincoln, 294 F. Supp. 3d 1170, 1188 n.13 (D.N.M. 2018)(Browning, J.)("Cases differ. Many cases, such as this one, have so many facts that are unlikely to ever occur again in a significantly similar way."). Thus, if newness, alone, is the test, the Court would always

or almost always have discretion to decline supplemental jurisdiction, which cannot be the test. See Moore, supra, at 62-63.

The word "novel" does not just mean "new," however. See Novel, Oxford English Dictionary, http://www.oed.com/view/Entry/128758?rskey=g8PS24&result=2&isAdvanced=false#eid (last visited April 17, 2019)(defining "novel" as "interestingly new or unusual") ; Novel, Merriam-Webster, https://www.merriam-webster.com/dictionary/novel?src=search-dict-hed (last visited April 17, 2019)(defining novel as "original or striking especially in conception or style") . Novel, accordingly, is not necessarily just new, but new and noteworthy. Some of the cases construing novel have attuned to that noteworthy component. See Dream Palace v. Cty. of Maricopa, 384 F.3d at 1022 (determining a state issue was novel, because it concerned "issues of the balance of power between state and local authorities in Arizona"); Doe v. Sundquist, 106 F.3d at 708 (concluding an issue was novel, because it involved interpretation of the state constitution). As the state's controlling document, interpreting a state constitution, especially on a matter that a state court had not yet considered, would matter a great deal to that sovereign. Similarly, adjudicating a new issue which upsets the balance of power between the state and local authorities would be of great importance to that state. In contrast, a regular tort claim, albeit with new issues, might be of less concern to the state, especially if the litigants are private actors. To be sure, a district court's ruling is binding only on the parties and can be only persuasive authority in subsequent cases. That does not mean, however, that state courts would not want to decide the issue first. A first reasoned decision in an area of law can act as a powerful anchor to a position or a legal rule, requiring litigants opposed to that position to overcome it -- both in court and in settlement negotiations.

With those thoughts in mind, the Court concludes that a state law issue is novel when it is: (i) new; and (ii) concerns a notable state matter. This test is subject to a bit of a sliding scale. If a case merely has new facts, but the Court is equipped with settled caselaw, the Court is unlikely to determine that there is a novel issue even if it involves a high-stakes state matter. For example, if the Court is confronted with a state constitutional issue that involves fairly original facts, the Court will not deem the issue novel if the Supreme Court of New Mexico has interpreted the state constitutional provision at issue. The Court is also unlikely to conclude an issue is novel, merely because there are no state court cases interpreting a relevant statute. While such a scenario might be sufficiently new under the first prong of the Court's test, any given state statute does not necessarily concern a sufficiently notable state matter. If, for example, statutory interpretation would require the court only to determine the rights or duties between private parties, such as when the Court is interpreting a statute like the Uniform Commercial Code, the Court is less likely to find the issue a notable state matter. If, on the other hand, the outcome of the Court's statutory interpretation would greatly affect the balance of power between state and local authorities, the Court is more likely to determine that a matter is notable.

The Court deems that this test is appropriate, as it not only accounts for 28 U.S.C. § 1367(c)(1)'s meaning of novel, but also respects the federalism and comity considerations articulated in Gibbs. See 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law."). The state sovereign would be less concerned with a federal court deciding a state issue that has limited impact on a state law's application or meaning, but would be more concerned if the federal court's determination skews the state's jurisprudence on a significant state issue for years to come. Those considerations are especially significant when the

issue is currently being litigated in state courts. See Rhines v. Weber, 544 U.S. 269, 274 (2005)(defining comity as the principle that "one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigations, have had an opportunity to pass on the matter"). The Court, accordingly, adopts for the forgoing test.

## ANALYSIS

The Court denies the Rule 56(d) Motion, because the motion does not request specific discovery that is necessary to defend against the MSJ. The Court grants the MSJ's requests with respect to Ganley's Fourth and Fourteenth Amendment claims, because the undisputed facts and the material disputed facts weighed in Ganley's favor do not amount to any constitutional violations. Although the Defendants do not move for the Court to enter summary judgment on Ganley's Monell claim, the Court must dismiss that claim as well, because supervisory or municipal liability requires that an individual actor violate a constitutional right, and the facts do not indicate that Jojola violated Ganley's constitutional rights. With all federal claims dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state claims. The Court therefore remands the state claims to state court.

## I. THE COURT GRANTS THE MSJ, BECAUSE JOJOLA DID NOT VIOLATE GANLEY'S CONSTITUTIONAL RIGHTS.

When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d at 1107. See Romero v. Fay, 45 F.3d at 1475 (stating that, when considering a qualified immunity claim on a motion for summary judgment, district courts must first determine whether the

"'plaintiff has sufficiently asserted the violation of a constitutional right at all'" (quoting Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir.1994)). Although the clearly established prong is often the legal bulwark against which § 1983 claims break, based on the undisputed facts and the material disputed facts considered in the light most favorable to Ganley, Ganley has not demonstrated that the Defendants violated his constitutional rights.

### A. GANLEY DOES NOT DEMONSTRATE THAT JOJOLA VIOLATED HIS CONSTITUTIONAL RIGHT AGAINST FALSE ARREST.

In the Complaint, Ganley asserts § 1983 claims for wrongful arrest. See Complaint at 7. To the extent that Ganley argues that Jojola included false statements and omitted exculpatory information in the Warrant Aff., those allegations do not amount to a constitutional violation. Inaccurate information included in an arrest warrant affidavit does not violate the Constitution if the warrant -- stripped of such inaccurate information -- nevertheless establishes probable cause.

Ganley alleges that Jojola made false or misleading statements in the Warrant Aff. -- namely, that Jojola indicated that he confirmed that Ganley was the man who cashed the check by comparing Ganley's photograph to the surveillance video images and by analyzing the fingerprint found on the check. See Rule 56(b) Motion at 6. Ganley also insists that Jojola should have mentioned in the Warrant Aff. that an investigator previously indicated in a report that "Ganley was a potential victim of identity theft." MSJ Response at 8. According to Ganley, probable cause for his arrested would not have existed without those misleading statements and omissions. See MSJ Response at 8.

When a defendant asserts that an arrest warrant affidavit includes false statements and omits exculpatory ones, courts undertake the following exercise:

> Where false statements are alleged to have been *included* in an arrest warrant affidavit or grand jury testimony, "probable cause is determined by setting aside

the false information and reviewing the remaining" truthful facts. *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996). Similarly, where true information has been allegedly and unlawfully *omitted* from an affidavit or grand jury proceeding, the existence of probable cause is determined "by examining the affidavit [or proceedings] as if the omitted information had been included and inquiring if the affidavit [or proceedings] would still have given rise to probable cause." *Id.* (internal quotation omitted).

Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). The Warrant Aff. so amended would present a judge with the following assertions:

- According to Specht, people have been using stolen or forged Postal service keys to steal businesses' outgoing checks from mailboxes. These people alter the stolen checks so that they list a different name as the payee.

- According to Torbett, a man purporting to be Ganley cashed a stolen check on September 4, 2015, that had been altered to list Ganley as the payee.

- Burt investigated the stolen and cashed checks. In his report, he states that stolen checks have been altered to list different names as payees -- Nikita Sosa, Jennifer Aragon, Mary Chavez, and Ganley -- and it is "unknown if they are offenders or victim[s] of identity theft."

- Torbett gave affiant Jojola the Ganley check. The check has a signature on the back; forensics found a fingerprint on the front. The fingerprint has not been analyzed. The signature has not been analyzed.

- Torbett gave Jojola photographs from a surveillance video showing a white male with short brown hair cashing the Ganley check.

- Torbett also gave Jojola a driver's license number that the bank teller wrote down when cashing the Ganley check.

- Jojola searched MVD records for the driver's license number. The driver's license number belonged to John Ganley.

- Ganley's MVD photograph shows the face of a white male with short brown hair. In Jojola's opinion, based on this photograph, Ganley is the man in the surveillance video cashing the check.

- The person who wrote the check said that she did not know Ganley and that he did not have permission to cash the check.

An arrest warrant affidavit does not need to establish that a suspect is guilty beyond a reasonable doubt or that a "suspect's guilt [is] 'more likely true than false.'" Kerns v. Bader, 663 F.3d at 1188 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). Rather, a warrant affidavit must only "establish something 'more than a bare suspicion.'" Puller v. Baca, 781 F.3d 1190, 1200 (10th Cir. 2015)(quoting United States v. Ludwig, 641 F.3d 1243, 1252 (10th Cir. 2011)). The "relevant question is whether a 'substantial probability' existed that the suspected committed the crime." Kerns v. Bader, 663 F.3d at 1188 (quoting Taylor v. Meacham, 82 F.3d 1556, 1562 (10th Cir. 1996)). An arrest warrant affidavit asserting the above facts establishes probable cause, because it establishes something more than a bare suspicion that Ganley committed the crime. To be sure, the asserted evidence is consistent with someone resembling and purporting to be Ganley committing the check fraud crime. That possibility does not foreclose the other option -- Jojola's interpretation -- that Ganley wrote the check out in his name and provided his own driver's license number in the process. Reasonable minds may disagree about which scenario is more likely, but such argument lies beyond a probable cause inquiry. See Kerns v. Bader, 663 F.3d at 1188. Because the above facts establish a substantial probability that Ganley committed the crime, there is no need for discovery to prove the truth or falsity of Jojola's statements regarding the verification and analysis of Ganley's identity and fingerprint.[32]

_____

[32]At the hearing, the Court asked whether the probable cause determination would require a jury to compare the photographs or whether the Court could do it as a matter of law. See Tr. at 3:17-4:6 (Court). Ganley argued that the photographs should go to a jury. See Tr. at 22:6-8 (Ray). The Court concludes that the photographs do not present a question of fact that a jury must resolve. For one, whether Ganley, in his MVD photograph, looked so similar to the man in the surveillance video that there is probable cause for Ganley's arrest is a question that the Court may soundly consider when deciding whether an arrest warrant affidavit establishes probable cause when cured of its misleading facts. See Kerns v. Bader, 663 F.3d at 1188 ("Where false statements are alleged to have been *included* in an arrest warrant affidavit . . . . 'probable cause is determined by setting

To the extent that Ganley alleges that Jojola violated his constitutional rights by not sufficiently investigating evidence before submitting the Warrant Aff. that would have exonerated Ganley, that allegation falls short of a constitutional violation. Once an officer establishes probable cause, he or she is "not required to continue to investigate for exculpatory evidence before arresting a suspect." Cortez v. McCauley, 478 F.3d at 1121 n. 18. Romero v. Fay shows that a law enforcement officer's failure to pursue certain leads negates probable cause only when the

---

aside the false information and reviewing the remaining' truthful facts." (quoting Wolford v. Lasater, 78 F.3d at 489)). As the Court concluded above, if the affidavit for Ganley's arrest warrant request explained precisely what Jojola did -- compared two photographs -- and stated Jojola's opinion based on that comparison -- that Jojola concluded that Ganley was the man in the surveillance video committing the crime, there would be probable cause for Ganley's arrest. Even if Jojola submitted the Warrant Aff. with both photographs attached for the Magistrate Judge's consideration, the Court concludes that there would be probable cause.

Ganley contends that the men in the two photographs are too different for anyone to plausibly mistake them as the same person. See MSJ Response at 23. He explains: "The two individuals have different hair lines, different facial shapes and features, different build and statute (Mr. Ganley is much larger), different eye color, and different body types. Th[ey] share the same race (Caucasian) and short hair, but almost nothing else." MSJ Response at 23. Although Ganley's MVD photograph shows only his face, Ganley notes that the MVD information listing Ganley's height as 6'2" and his 212 pounds, see Complaint ¶ 17, at 4, and argues that the "MVD records describ[es] Plaintiff in a way that contradicts the photographic evidence of the check forgery suspect," see Complaint ¶ 37, 8. Ganley also notes that Ganley was thirty-nine years old at the time of the crime but the man in the surveillance photograph "was, at the time, approximately 29 years old." MSJ Response ¶ 13, at 5.

The Court recognizes those differences, but is not convinced that they are so distinct or obvious that they negate probable cause. Were the two men of different races, or one was elderly and the other a teenager, the Court could conclude that a judge laying eyes on the photographs would not find probable cause. Here, however, the photographs show two white men with short brown hair of approximately similar age who do look similar. The differences in height and weight are not meaningful, because it is unclear how tall the man in the surveillance video is, and, although one might guess that he weighs less than 212 pounds, a person's weight can change. The differences in hair lines and facial features are not so distinct that they jump out; the Court would not even be sure how to describe those differences. MVD's records indicate that Ganley has blue eyes, but, try as it might, the Court cannot, from the surveillance video footage, venture a guess as to the other man's eye color. As to the age difference, the Court is certainly not surprised that the man in the surveillance photograph is perhaps as much as a decade younger than Ganley, but that age difference is not so visually obvious that a judge would deny probable cause.

evidence upon which the officer relied was not reasonably trustworthy. See Romero v. Fay, 45 F.3d at 1476 (stating that a plaintiff's burden, in a false arrest claim, is to show that "the statements supplied by [two witnesses] did not constitute reasonably trustworthy information sufficient to lead a prudent police officer to conclude" that the plaintiff committed the murder). Although Jojola could have pursued leads that might have exonerated Romero, the information upon which he relied was reasonably trustworthy.

A closer look at Romero v. Fay demonstrates how this analysis unfolds. In Romero v. Fay, police arrested the plaintiff, Paul Romero, for murdering an acquaintance, David Douglas. See 45 F.3d at 1474. Two witnesses had apparently implicated Romero for the Douglas murder. See 45 F.3d at 1474. Thereafter, Romero gave the arresting officer, Damon Fay, the names of three people who could confirm that Romero was in bed asleep when Douglas was killed; he also gave Fay the names of people who saw a man named David Benavidez try to start a fight with Douglas just a few hours before Douglas was killed. See 45 F.3d at 1474. Fay refused to interview Romero's alibi witnesses or the witnesses to the Benavidez and Douglas conflict. See 45 F.3d at 1474. A few weeks later, Fay and two witnesses testified before a grand jury about the Douglas murder, and the grand jury indicted Romero. See 45 F.3d at 1474. Romero spent three months in jail before prosecutors dropped the charges and released him. See 45 F.3d at 1474. Romero filed a § 1983 lawsuit, contending that Fay and other members of the Albuquerque Police Department

> violated his federal constitutional rights by: (1) arresting Plaintiff without probable cause pursuant to an unreasonable pre-arrest investigation; (2) conducting an unreasonable post-arrest investigation; (3) insufficiently staffing the Violent Crimes Unit of the Albuquerque Police Department; (4) falsely imprisoning Plaintiff; and (5) maliciously prosecuting Plaintiff in violation of New Mexico law.

45 F.3d at 1474. The defendants moved for summary judgment, which the district court denied, determining that the defendants were not entitled to qualified immunity. See 45 F.3d at 1474.

On appeal, the Tenth Circuit reversed the district court's decision. First, the Tenth Circuit determined that qualified immunity protected the defendants against Romero's wrongful arrest claim. See Romero v. Fay, 45 F.3d at 1476. The Tenth Circuit reasoned that Fay had probable cause to arrest Romero, because he interviewed two witnesses who implicated Romero, and Romero did not show that those witnesses' accounts were not reasonably trustworthy. See 45 F.3d at 1476. The Tenth Circuit rejected Romero's argument that clearly established law compelled Fay to interview the witnesses which Romero tried to give to Fay and that, had Fay done those interviews, those witnesses would have provided information that would have negated probable cause. See 45 F.3d at 1476. According to the Tenth Circuit, Fay's "failure to investigate Plaintiff's alleged alibi witnesses did not negate the probable cause for the warrantless arrest in the absence of a showing that [his] initial probable cause determination was itself unreasonable." 45 F.3d at 1477-78. The Tenth Circuit contrasted Romero's case with Clipper v. Takoma Park, 876 F.2d 17 (4th Cir. 1989)("Clipper"). In Clipper, the United States Court of Appeals for the Fourth Circuit upheld a jury verdict, ruling

> that the jury could have concluded that the police officer acted unreasonably and therefore arrested the plaintiff without probable cause because he failed to view the bank surveillance film of the robbery, ignored a witnessing officer's comment that he did not think the plaintiff was the robber, and failed to interview the plaintiff's alleged alibi witnesses. *Id.* at 19–20. The Fourth Circuit noted, however, that the defendant officer's failure to interview the plaintiff's alibi witnesses did not, by itself, render the arrest wrongful. "We would not suggest that [defendant's] failure to investigate the leads that [plaintiff] provided was, in itself, sufficient to negate probable cause." *Id.* at 20. Instead, the court concluded that the cumulative effect of the officer's unreasonable conduct during the investigation rendered "a sufficient evidentiary base to sustain the verdict upon post-trial motions and on appeal." *Id.*

Romero v. Fay, 45 F.3d at 1477 (quoting Clipper, 876 F.2d at 19-20). The Tenth Circuit stated:

> Significantly, the plaintiff in *Clipper* established facts showing that the defendant officer acted unreasonably at the time of the arrest by ignoring information in his knowledge -- the witnessing officer's statement that he did not think the plaintiff

committed the crime -- and failed to examine fundamental evidence -- the bank surveillance film. Thus, the plaintiff in *Clipper* demonstrated that the facts and circumstances known to the defendant officer did not constitute reasonably trustworthy information sufficient to lead a prudent officer to believe that the plaintiff had committed the bank robbery

Romero v. Fay, 45 F.3d at 1477. The Tenth Circuit distinguished Romero's case from Clipper by noting that Romero did not allege that Fay "failed to investigate fundamental evidence at the crime scene" nor did Romero argue that Fay "acted unreasonably" based on the witnesses' statements to Fay implicating Romero. Romero v. Fay, 45 F.3d at 1477. The Tenth Circuit concluded that, once Fay determined, "based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause." 45 F.3d at 1478.

Ganley argues that this case is more like Clipper than it is like Romero v. Fay, for two reasons. See MSJ Response at 14-15. First, Ganley argues that, like the officer in Clipper, Jojola "ignored statements from another investigator that it was not clear if Mr. Ganley was the victim of identity theft." MSJ Response at 15. See Clipper, 876 F.2d at 19 ("Officer Wortman, the officer on the scene of the robbery, told him that although Clipper looked like the robber, he was not sure that Clipper was the man."). Second, Ganley asserts that, like the officer in Clipper, Jojola "failed to properly compare surveillance footage in the form of various high quality still shots of the check cashing incident -- something the Tenth Circuit characterized as 'fundamental evidence.'" MSJ Response at 15 (quoting Romero v. Fay, 45 F.3d at 1472). See Clipper, 876 F.2d at 19 ("It is not clear whether anyone in the Takoma Park Police Department had obtained copies of the bank surveillance photographs prior to Clipper's arrest or while he was incarcerated."). Ganley argues that this case is different than Romero v. Fay in important ways, such as that no eye witnesses implicated Ganley. See MSJ Response at 15.

These arguments are unavailing. First, the evidence that the detective ignored in Clipper weighed more towards exoneration than the evidence in this case. In Clipper, a law enforcement officer who got a first-hand look at the bank robber stated that, "although Clipper looked like the robber, he was not sure that Clipper was the man." 876 F.2d at 19. In this case, an investigator stated in a report that it was not yet known whether Ganley was the perpetrator or victim. See Burt Report at 1 (dated September 21, 2015), filed June 18, 2018 (Doc. 47-1). Second, in Clipper, the plaintiff insisted that the investigator could have eliminated him as a suspect if he had looked at the bank surveillance footage, and there was no evidence that the investigating officer looked at footage. See 876 F.2d at 19. The Fourth Circuit characterized the surveillance footage as "fundamental evidence," suggesting that not considering fundamental evidence that would have exonerated the arrestee may violate the arrestee's constitutional rights. See 876 F.2d at 19. Although surveillance footage of a crime may be "fundamental evidence," Ganley does not allege that Jojola never looked at it; rather, he recognizes that Jojola examined the surveillance footage stills but argues that Jojola "failed to properly compare [the] surveillance footage" with Ganley's MVD photograph. MSJ Response at 15 (emphasis added). Although Jojola reached the wrong conclusion, he did what the Fourth Circuit, in Clipper, expected law enforcement officers to do -- consult the fundamental evidence. See, e.g., MSJ ¶¶ 9, at 3; Jojola Aff. ¶ 9, at 2 (searching MVD records for the driver's license number); MSJ ¶ 12, at 3; Jojola Aff. ¶ 12, at 2 (comparing surveillance photographs to Ganley's MVD photograph); MSJ ¶ 16, at 4; Warrant Aff. at 1; Jojola Aff. ¶ 16 at 2 (speaking with the check's owner).

Second, Ganley has not presented facts indicating that Jojola acted on evidence that was unreasonably trustworthy. To be sure, Ganley is correct that the Tenth Circuit determined that the detective in Romero v. Fay relied on reasonably trustworthy evidence when he relied on two

witnesses' statements implicating Romero in the murder, see Romero v. Fay, 45 F.3d at 1478, whereas no witnesses implicated Ganley in this case. Jojola nonetheless relied on other evidence that the Court concludes was reasonably trustworthy. Jojola looked at the check, which was made out to Ganley; the driver's license number, which belonged to Ganley; and the surveillance footage, which he compared to Ganley's MVD photograph. No one contends that the evidence was fraudulent or in some way untrustworthy; Jojola was right to consider that evidence, although he was wrong in his conclusions.

In sum, that Jojola did not take extra steps before submitting the Warrant Aff. does not change the Court's false arrest analysis. Although the courts and public may hope for maximum diligence from detectives, Romero v. Fay indicates that a law enforcement officer need not turn over every rock to avoid a constitutional violation -- as easy as those rocks might be to overturn. See Romero v. Fay, 45 F.3d at 1477-78 (stating that the Fourth Amendment's probable cause standard "requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention"). Thus, the law enforcement officer need only rely on reasonably trustworthy evidence.

**B.      GANLEY DOES NOT DEMONSTRATE THAT JOJOLA VIOLATED HIS CONSTITUTIONAL RIGHT AGAINST FALSE IMPRISONMENT OR THAT THE CONSTITUTION AFFORDS GANLEY A RIGHT TO A REASONABLE POST-ARREST INVESTIGATION.**

To the extent that Ganley alleges that the Defendants violated his constitutional rights by falsely imprisoning him or conducting an unreasonable post-arrest investigation, Ganley again does not allege facts that establish a constitutional violation. To succeed on those theories, Ganley would have to show that Jojola's failure to find exculpatory evidence was because of his deliberate

or reckless actions.  See Romero v. Fay, 45 F.3d at 1478.[33]  The Court cannot soundly read Jojola's

investigative choices as anything more than negligent.  In Romero v. Fay, the Tenth Circuit

indicates that plaintiffs who allege reckless or deliberate actions face a high bar:

> With the benefit of hindsight, it may have been fruitful for Defendants to investigate Plaintiff's alibi witnesses, or to attempt to contact individuals who witnessed David Benavidez threaten David Douglas.  The essence of Plaintiff's argument, however, is that the police assumed a duty to conduct a post-arrest investigation which they performed poorly.  Although Defendants may not have conducted their post-arrest investigation as efficiently as possible, their conduct as alleged by Plaintiff simply does not exceed negligence.  Plaintiff has therefore failed to assert a constitutional violation at all.

Romero v. Fay, 45 F.3d at 1479.  Thus, even when an officer is aware that certain witnesses may

provide exculpatory information, failure to interview such witnesses is, at worst, negligent.  By

contrast, Jojola's actions are not nearly as egregious as the officer's actions in Romero v. Fay,

because nothing Jojola knew suggested that pursuing certain leads would uncover exculpatory

evidence.  For example, Jojola would have known that analyzing the fingerprint could produce

---

[33]In Romero v. Fay, the Tenth Circuit determines that Romero did not allege conduct amounting to a constitutional violation for unreasonable post-arrest investigation.  See 45 F.3d at 1478.  The Tenth Circuit states that, to show a Fourteenth Amendment violation for unreasonable post-arrest investigation, Romero needed to prove that the defendants acted with "deliberate or reckless intent."  45 F.3d at 1478.  According to the Tenth Circuit, "it may have been fruitful for Defendants to investigate Plaintiff's alibi witnesses, or to attempt to contact individuals who witnessed David Benavidez threaten David Douglas," but not following those leads "simply does not exceed negligence."  45 F.3d at 1479.

The Tenth Circuit also determines that the district court erred in denying qualified immunity for Romero's false imprisonment claim.  See 45 F.3d at 1480.  The Tenth Circuit states that a successful false imprisonment claim requires showing that a government official violated the plaintiff's Fourteenth Amended rights by "act[ing] with deliberate or reckless intent to falsely imprison the plaintiff."  Romero v. Fay, 45 F.3d at 1480.  The Tenth Circuit concludes that the defendants did not violate Romero's Fourteenth Amendment rights against false imprisonment when they failed to investigate potentially exculpatory witnesses after Romero's arrest, because the defendants acted negligently, and not deliberately or recklessly.  See Romero v. Fay, 45 F.3d at 1480.

additional information, but there was nothing about the fingerprint indicating that analyzing it would eliminate Ganley as a suspect.

Ganley cites several United States Courts of Appeals opinions which conclude that investigators violated a person's due process rights by recklessly or deliberately failing to investigate exculpatory leads.[34] See MSJ Response at 12-13. Ganley offers these cases as support for his assertion that Jojola violated a clearly established constitutional right. Each case, however, requires plaintiffs to articulate how law enforcement acted recklessly or deliberately, and Ganley does not surpass this high bar. In Wilson v. Lawrence County., 260 F.3d 946 (8th Cir. 2001), for example, the United States Court of Appeals for the Eighth Circuit affirmed a district court's denial of qualified immunity, concluding that an investigator's failure to follow leads could be reckless or intentional if the investigator coerced the plaintiff's confession instead of investigating other leads. See 260 F.3d at 955.

In Sanders v. English, 950 F.2d 1152 (5th Cir. 1992), a man riding a bicycle robbed a Louisiana resident at gunpoint. See 950 F.2d at 1154 ("This is the case of the bicycle bandit."). Pursuant to a warrant, a police lieutenant arrested Floyd Sanders for the crime. See 950 F.2d at 1154. The next day, a witness to the robbery -- one who helped a police sketch artist draft a

---

[34]These cases generally deal with post-arrest investigations or actions, but the Court suspects that the due process theory behind wrongful imprisonment claims is not limited to the post-arrest timeframe. The Court imagines that a law enforcement officer can act recklessly or intentionally to avoid discovering exculpatory evidence before arresting someone, yet nevertheless gather enough evidence for probable cause. For example, the United States Court of Appeals for the Eighth Circuit has held that "intentionally or recklessly failing to investigate other leads or manufacturing false evidence may shock the conscience" and violate substantive due process under the Fourteenth Amendment. Livers v. Schenck, 700 F.3d 340, 351 (8th Cir. 2012). According to the Eighth Circuit, examples of reckless investigation include coercing a confession, purposefully ignoring contrary evidence, and "systemic pressure to implicate [a suspect] in the face of evidence to the contrary." Livers v. Schenck, 700 F.3d at 351.

depiction of the bicycle bandit -- told the lieutenant that Sanders was not the man he saw.  See 950 F.2d at 1156.  The lieutenant also showed other presumed bicycle-bandit victims Sanders' photograph, but none of these victims identified Sanders as the criminal.  See 950 F.2d at 1156.  A few days after the arrest, three people visited the lieutenant at his home and told him that they were with Sanders doing work out-of-town when the crime occurred.  See 950 F.2d at 1156.  One of these men provided the lieutenant with evidence that Sanders received compensation for the work he performed out-of-town on the morning in question.  See 950 F.2d at 1156-57.  The lieutenant did nothing with this evidence.  See 950 F.2d at 1157.  Sanders, meanwhile, was unable to pay a $50,000.00 bond and remained incarcerated until the bond amount was lowered fifty days later.  See 950 F.2d at 1158.  The United States Court of Appeals for the Fifth Circuit stated that Sanders "has come forward with evidence which, if credited by the fact-finder, would establish that the defendant knowingly and willfully ignored substantial exculpatory evidence," and that the lieutenant "deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man."  950 F.2d at 1162.  The Fifth Circuit concluded that the lieutenant's "deliberate failure to disclose this undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983." Sanders v. English, 950 F.2d at 1162.

In Cannon v. Macon County, 1 F.3d 1558 (11th Cir. 1993), a sheriff's deputy arrested the plaintiff, Mary R. Parrott, after mistaking her for another woman wanted by Kentucky authorities, Mary E. Mann, who also went by the alias Mary E. Parrott.  See 1 F.3d at 1560.  The deputy took the plaintiff to county jail, where a jail official completed the arrest report.  See 1 F.3d at 1560. The arrest report form asked for the arrestee's birthdate and physical characteristics, and the jail official, Robin Collins, entered Mann's information in place of Parrott's.  See 1 F.3d at 1560.

Collins had a copy of Mann's fugitive report, which stated that Mann was born in 1951 and was five-feet-five inches tall with brown eyes.  See 1 F.3d at 1560.  Collins also had Parrott's driver's license, which listed her birth year as 1963 and described her as five-foot-one inches tall with blue eyes.  See 1 F.3d at 1560.  Collins also signed and submitted to a judge a warrant affidavit stating that he believed that Parrott was Mann.  See 1 F.3d at 1560.  Parrott spent several days in jail before extradition to Kentucky, where authorities realized that she was not Mann and thereafter released her.  See 1 F.3d at 1560.  Parrott subsequently brought a § 1983 claim, and a jury returned a verdict in her favor and against Collins; however, the trial judge granted Collins' motion for judgment notwithstanding the verdict.  See 1 F.3d at 1561.  The United States Court of Appeals for the Eleventh Circuit reversed the trial court's decision, concluding that substantial evidence supported the jury's determination that Collins acted with deliberate indifference.  See 1 F.3d at 1563.

These cases each indicate that a law enforcement officer acts recklessly or deliberately only when the officer ignores obviously exculpatory evidence -- not evidence that may prove exculpatory.[35]  In this case, there are several ways that Jojola could have eliminated Ganley as a

---

[35]These decisions appear to follow the "beyond any reasonable doubt" test established by the Court of Appeals for the First Circuit in Thompson v. Olsen.  In Thompson v. Olsen, the First Circuit held that "following a legal warrantless arrest based on probable cause, an affirmative duty to release arises only if the arresting officer ascertains beyond a reasonable doubt that the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded."  798 F.2d 552, 556 (1st Cir.1986).  The Tenth Circuit has expressly declined to adopt the "Thompson standard."  Panagoulakos v. Yazzie, 741 F.3d 1126, 1130 (10th Cir. 2013)("We cited Thompson v. Olsen in Romero v. Fay . . . but we did not adopt its test.").  If anything, the Tenth Circuit's caselaw regarding facts that could compel an affirmative duty to release is narrower than these Courts of Appeals, because, after Romero v. Fey, an officer does not act recklessly or deliberately even when the officer does not interview people whom the officer knows may possess exculpatory evidence.  See Romero v. Fey, 45 F.3d at 1479.

suspect: had Jojola analyzed the fingerprint, he could have received a match with someone other than Ganley; had he met with Ganley in person, he could have seen that Ganley did not have tattoos on his arms; and had he obtained Ganley's signature, he could have compared it to the signature on the check. The Court cannot soundly say, however, that following those investigative paths, or any others, would have led to Ganley's exoneration.

Ganley suggests that Burt's statement that it was unknown whether Ganley was the perpetrator or a victim is evidence of Ganley's innocence. See, e.g., MSJ Reply at 3 ("Jojola was already on alert . . . that the names added as payees to the altered checks in question, including the name of John Ganley, may have belonged to victims of identity theft."). In the Court's view, the most sensible interpretation of the Burt Report is that, at one point in the investigation, a law enforcement officer could not eliminate the possibility that Ganley did not commit a crime. Burt's statement is proof that he did not at that time have cause to eliminate Ganley as a suspect; it is not proof of Ganley's innocence. In contrast, the law enforcement officer in Wilson v. Lawrence County manufactured incriminating evidence by coercing a confession. See 260 F.3d at 955. The lieutenant in Sanders v. English ignored input and exonerating evidence from multiple people, all of which told him that he had arrested the wrong person. See 950 F.2d at 1156-57. The jail official in Cannon v. Macon County answered the arrest report's request for the arrestee's physical characteristics by consulting the fugitive report used to make the arrest, rather than observing the arrested woman or consulting her driver's license. See 1 F.3d at 1560-61. Unlike the obviously exculpatory evidence in these cases, the potentially exonerating evidence in the case before the Court indicates that Jojola's decisions not to further analyze the fingerprint and not to give greater credence to the Burt Report were in no way worse than negligent.

At the hearing, the Court questioned whether Jojola might have violated the Constitution if, after submitting the Warrant Aff. but prior to the meeting on October 19, 2016, he realized he had mistakenly identified Ganley but failed to act on this realization. See Tr. at 46:5-18 (Court). The Defendants indicated that Jojola "had an idea" that Ganley was innocent before October 19, year, because Jojola looked at Ganley's booking sheet and saw that it did not list Ganley as having any tattoos, while the man in the surveillance video had tattoos on his arms. Tr. at 40:3-16 (Nixon). Ganley does not know when Jojola looked at the booking sheet, dated May 25, 2016. See MSJ Response ¶ 13, at 5 ("It is not clear when Defendant saw the booking sheet, but statements made by his attorney suggest it was before the case was dismissed."); Offender Booking Sheet at 1, filed June 18, 2018 (Doc. 47-3). Ganley asserts that "the point in time when Defendant recognized his error, if not from the very beginning, is something that is material to this case and Plaintiff has not had the opportunity to explore it in discovery because of the stay." MSJ Response ¶ 16, at 5. For this reason, the Court considered denying the MSJ with respect to Ganley's due process claims and permitting Ganley to pursue discovery regarding when Jojola first looked at the booking sheet; however, an order on those grounds would be inappropriate. The booking sheet shows that Ganley entered the MDC on May 25, 2016. See Complaint ¶ 26, at 6; Offender Booking Sheet at 1. He left the MDC between six to eight hours later. See Complaint ¶ 29, at 6. After posting bond, Ganley was never again in custody. See Tr. at 40:17-21 (Court, Nixon). Any false imprisonment theory based on Jojola's booking sheet epiphany fails for the basic reason that Ganley spent no time in custody after Jojola looked at the booking sheet.[36] See Wallace v. Kato, 549 U.S. 384, 389

---

[36]Ganley does not assert Fourth Amendment malicious prosecution claims in his Complaint, but he mentions malicious prosecution in his Response. See MSJ Response at 2 ("Plaintiff admits that he has sued Defendant Jojola . . . for . . . the malicious prosecution and false

(2007)("[F]alse imprisonment consists of detention without legal process.").  Whatever liability

Jojola's potential inaction may have created, it does not result in federal constitutional liability.[37]

---

arrest and imprisonment.").  To the extent that Ganley asserts a Fourth Amendment malicious prosecution claim, that theory also fails for the same reason that his false imprisonment theory fails: a Fourth Amendment malicious prosecution violation requires seizure or detention of the plaintiff, and the undisputed facts demonstrate that Ganley was neither seized nor detained by the time that Jojola could have reviewed Ganley's booking sheet.  See Myers v. Koopman, 738 F.3d 1190, 1194 (10th Cir. 2013)("Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims.").

Although Ganley is foreclosed from bringing a malicious prosecution claim, his claim that Jojola deliberately fabricated evidence or intentionally failed to investigate exculpatory evidence is potentially actionable under a substantive due process theory.  See Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1243 (10th Cir. 2003)(stating that substantive due process analysis is appropriate in cases that involve excessive force where Fourth Amendment does not apply because no "seizure" has occurred).  To succeed under the amorphous substantive due process standard, however, Ganley would need to allege extreme behavior that "shocks the conscience."  See Becker v. Kroll, 494 F.3d 904, 918-19 (10th Cir. 2007)("The conduct alleged must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power . . . . [It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.").  Jojola's actions, even when viewed in the light most favorable to Ganley, do not begin to approach the high hurdle for truly conscience-shocking conduct.  See, e.g., Holland v. Harrington, 268 F.3d 1179 (10th Cir. 2001)(finding substantive due process violation where police held children at gunpoint for extensive period of time after control of home had been secured); Dubbs v. Head Start, Inc., 336 F.3d 1194 (10th Cir. 2003)(recognizing parental claim for substantive due process violation where government did not seek consent before performing blood tests and genital exams on minor children).

[37]It is unclear from the record whether Ganley is also asserting that Jolola violated his procedural due process rights by failing to disclose the identification error to the prosecution, which presumably would have compelled timelier dismissal of Ganley's charges.  Under what constitutional theory such a claim would lie is far from certain given that Ganley was neither detained nor convicted, although several Courts of Appeals have found that police obligations with respect to potentially exculpatory evidence implicate prosecutors' disclosure duties as the Supreme Court established in Brady v. Maryland.  See, e.g., Brady v. Dill, 187 F.3d 104, 114 (1st Cir. 1999)("The police satisfy their obligations under Brady when they turn over exculpatory evidence to the prosecutors."); Walker v. City of New York 974 F.2d 293, 299 (2d Cir. 1992)("[A] police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information."); Jean v. Collins, 221 F.3d 656, 659 (4th Cir. 2000)("The question before us now is whether there was an additional constitutional violation in this case -- a due process violation by Officers Collins and Shingleton for withholding [potentially exculpatory

information] from the prosecutor."); Jones v. City of Chicago, 856 F.2d 985, 995 (7th Cir. 1988)("Brady v. Maryland does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors . . . cannot be tolerated.").

Although the Tenth Circuit has not explored the reach of Brady v. Maryland in the context of a § 1983 action against police officers alleged to have withheld potentially exculpatory evidence from the prosecution, the Fourth Circuit addressed this issue in Jean v. Collins. See Jean v. Collins, 221 F.3d at 656. In Jean v. Collins, six circuit judges, sitting en banc, declined to find police officers liable absent a showing of bad faith, because "the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over all evidence to him." 221 F.3d at 661. Under the same analysis, even assuming that Jojola acknowledged his error in time to affect the proceedings against Ganley, Ganley cannot assert a claim on these grounds absent a showing that Jojola deliberately withheld this realization from the prosecution, which Ganley has not alleged here.

Further support for a "bad faith" liability requirement is seen in Arizona v. Youngblood, 488 U.S. 51 (1988), a case with analogous concerns over the disposition of potentially exculpatory evidence. In Arizona v. Youngblood, the Supreme Court refused to find that police officers violated the Due Process Clause in the absence of evidence that the officers acted in bad faith. See 488 U.S. at 58. Arizona v. Youngblood involved police who failed to refrigerate clothing that contained semen stains and to perform tests on other semen samples. 488 U.S. at 53-55. The defendant argued that properly preserved evidence might well have shown that he was innocent of any sexual assault. The Arizona v. Youngblood Court held, however, that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58, 109.

Although Arizona v. Youngblood dealt with the failure to preserve evidence, its principles are applicable to the facts as alleged by Ganley. Here, as in Arizona v. Youngblood, the prosecutor failed to receive exculpatory evidence from the police, and here, as in Arizona v. Youngblood, the police officer's actions were alleged to constitute a due process violation. The Arizona v. Youngblood Court stressed its "unwillingness" to read the Due Process Clause to impose "on the police an undifferentiated and absolute duty to retain . . . material that might be of conceivable evidentiary significance." 488 U.S. at 58.

The Court approves of a "bad faith" requirement for police officer liability and notes several obvious drawbacks to imposing the kind of sweeping disclosure duty on police that Ganley suggests would have avoided the alleged due process violation resulting from Jojola's nondisclosure. For example, because prosecutors enjoy absolute immunity in the exercise of their prosecutorial functions, which include the disposition of Brady material, such a duty would widen the legal gulf between prosecutors and police to an extent that would turn police officers into scapegoats for every item of exculpatory evidence discovered post-arrest. To confer on prosecutors absolute immunity while denying such immunity to police would increase § 1983 claims against all officers, even those who exercise their ministerial functions with great concern for the rights of the accused.

Moreover, the fact that the law has already placed on prosecutors ultimate responsibility for the disclosure of exculpatory evidence indicates that police knowledge is imputed to the

Moreover, even if Ganley was in custody after Jojola realized his mistake, and Jojola failed to act on this realization, Ganley has not shown that such inaction violates a clearly-established constitutional right. See Currier v. Doran, 242 F.3d at 923 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."). The plaintiff bears the burden of showing that the law is clearly established. See Kerns v. Bader, 663 F.3d at 1180. The Court has observed that "the Supreme Court has sent out unwritten signals to the lower courts that [a] factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts."[38] Nelson v. City of Albuquerque, 283 F. Supp. 3d 1048, 1107 n.44

---

prosecution for purposes of the prosecutors' Brady duties. See Kyles v. Whitley, 514 U.S. 419, 437-38 (1995)("Kyles")("[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all [exculpatory] evidence."); Giglio v. United States, 405 U.S. 150, 154 (1972)("Giglio")("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). Thus, the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over relevant evidence. To hold otherwise -- that officers are responsible under § 1983 for the types of communication failures that Kyles and Giglio charge the prosecution with preventing -- would encourage unproductive exercises in finger-pointing and ultimately drive the federal courts deep into the processes of state administrative offices, a breach of federalism principles for which the Due Process Clause provides no authorization.

[38]The Court further notes that the Supreme Court's qualified immunity jurisprudence "effectively eliminate[s] § 1983 claims by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong." Nelson v. City of Albuquerque, 283 F. Supp. 3d 1048, 1107 n.44 (D.N.M. 2017). Such de facto rigidity has led Professor Karen Blum of Suffolk University Law School to conclude that the Supreme Court's approach to qualified immunity has

> (1) stifled the development of constitutional standards while creating a confusing and divisive debate about what constitutes "clearly established" law; (2) imposed substantial burdens and costs on the litigation of civil rights claims by encouraging multiple and often frivolous or meritless interlocutory appeals; and (3) resulted in judges displacing jurors as fact finders.

(D.N.M. 2017)(Browning, J.).  See White v. Pauly, 137 S. Ct. at 552 ("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case.").  Ganley does not carry his heavy burden in showing that the contours of the right at issue were sufficiently clear that reasonable officers in Jojola's shoes would have known they were violating that right.

Ganley further struggles because no Tenth Circuit or Supreme Court case clearly establishes a constitutional right to a reasonable post-arrest investigation.[39]  The closest the Tenth

---

Karen M. Blum, Qualified Immunity: Time to Change the Message, 93 Notre Dame L. Rev. 1887, 1891 (2018)(citing Nelson v. City of Albuquerque, 283 F. Supp. 3d at 1107 n.44).  Professor Blum is not alone.  The Honorable Robert W. Pratt, senior United States District Judge for the United States District Court for the Southern District of Iowa, sitting by designation, has likewise noted that "because every individual case will present at least nominal factual distinctions[,] . . . [i]f precisely identical facts were required, qualified immunity would in fact be *absolute* immunity for government officials."  Easley v. City of Riverside, 890 F.3d 851, 851 (9th Cir. 2018)(Pratt, J., dissenting)(emphasis in original).  Moreover, the Honorable Jack B. Weinstein, senior United States District Judge for the United States District Court for the Eastern District of New York, has also criticized the doctrine on the same grounds, and, in Thompson v. Clark, No. 14-CV-7349, 2018 WL 3128975 (E.D.N.Y. June 11, 2018), Judge Weinstein devotes significant discussion to highlighting concerns he and others have regarding the Supreme Court's qualified immunity jurisprudence.  See Thompson v. Clark, No. 14-CV-7349, 2018 WL 3128975, at *6 (E.D.N.Y. June 26, 2018)(Weinstein, J.)("The Court's expansion of immunity, specifically in excessive force cases, is particularly troubling.").  Although the Court agrees that such criticism is warranted, and would, if the Court were writing on a clean slate, minimize the expansion of the judicially created clearly established prong so that it does not eclipse the congressionally enacted § 1983 remedy, as a district court, the Court is bound to apply faithfully and honestly controlling Supreme Court and Tenth Circuit precedent, and it will do so here.

[39]The purported right to a reasonable post-arrest investigation, as alleged in Romero v. Fay, is essentially a post-arrest duty of law enforcement to continue to pursue investigative leads when presented with potentially exculpatory information.  See Romero v. Fay, 45 F.3d at 1479 ("The essence of Plaintiff's argument . . . is that the police assumed a duty to conduct a post-arrest investigation[,] which they performed poorly.").  Presumably, thorough post-arrest investigation would uncover actual exculpatory evidence, which would then compel the release of the arrestee.  See Romero v. Fay, 45 F.3d at 1480 n.4 ("Plaintiff alternately styles the alleged constitutional right as the right to a 'reasonable', 'adequate', or 'sufficient' post-arrest investigation.").  According to this theory, the failure to conduct a post-arrest investigation is violative of an innocent arrestee's Fourteenth Amendment liberty interests.  See Romero v. Fay, 45 F.3d at 1479 ("Plaintiff claims that Defendants violated his constitutional right to a reasonable post-arrest investigation by failing

Circuit comes to addressing this issue is in <u>Romero v. Fay</u>, where the Tenth Circuit explained that, "to succeed on [a] claim of an unreasonable post-arrest investigation in violation of his Fourteenth Amendment rights, Plaintiff must assert facts that, at a minimum, demonstrate Defendants acted with deliberate or reckless intent." <u>Romero v. Fay</u>, 45 F.3d at 1478. Later Tenth Circuit cases, however, have tempered that statement, clarifying that false imprisonment claims in general require a plaintiff to show that the government official acted recklessly or deliberately, but that it "is not clear that individuals have a constitutional right to a reasonable post-arrest investigation."[40]

---

to contact his alibi witnesses."). Such a theory is inapplicable to Ganley, however, because he was not detained and because he has not alleged facts which indicate that Jojola's failure to investigate further was anything more than negligent, which is a level of culpability that falls short of the Tenth Circuit's threshold requirement for an unreasonable post-arrest investigation claim. <u>See</u> <u>Romero v. Fay</u>, 45 F.3d at 1478 ("[T]o succeed on [a] claim of an unreasonable post-arrest investigation in violation of his Fourteenth Amendment rights, Plaintiff must assert facts that, at a minimum, demonstrate Defendants acted with deliberate or reckless intent."). A survey of both Tenth Circuit and out-of-circuit caselaw indicates that no federal jurisdiction has recognized a per se right to a post-arrest investigation. Again, the facts in this case -- Jojola's decisions not to further analyze the fingerprint and not to give greater credence to the Burt Report -- do not indicate that Jojola acted in any way worse than negligent.

[40]The Court concludes that there is good cause not to extend the Fourteenth Amendment in such a fashion, principally because an absolute right to a reasonable post-arrest investigation would place a significant -- and heretofore nonexistent -- burden on law enforcement. As the Court of Appeals for the Sixth Circuit articulated in <u>Peet v. City of Detroit</u>, 502 F.3d 557 (6th Cir. 2007), a right to a post-arrest investigation

> would give investigators the responsibility to reevaluate probable cause constantly with every additional witness interview and scrap of evidence collected. Moreover, as investigations progress, the strength of evidence against a suspect may frequently change. Some released suspects would be rearrested when further inculpatory evidence emerged and showed that probable cause existed after all. And in lengthy, close cases these suspects might be re-released, and then re-rearrested, and so on.

<u>Peet v. City of Detroit</u>, 502 F.3d at 565. Absent a showing that investigating officers deliberately ignored exonerating evidence, discussed <u>supra</u> at nn.37-38 and <u>infra</u> at n.40, the procedural safeguards of probable cause and a speedy trial are the constitutional protections against wrongful arrest. <u>See</u> <u>Baker v. McCollan</u>, 443 U.S. 137, 145-46 (1979)("Given the requirements that arrest

Barham v. Town of Greybull Wyoming, 483 F. App'x 506, 509 (10th Cir. 2012)(McKay, J.)(unpublished)(citing Romero v. Fay, 45 F.3d at 1478). "To the extent there is such a right," the Tenth Circuit continued, "it must be based on 'facts that, at a minimum, demonstrate Defendants acted with deliberate or reckless intent.'" Barham v. Town of Greybull Wyo., 483 F. App'x at 509 (quoting Romero v. Fay, 45 F.3d at 1478). Given the paucity of Tenth Circuit cases identifying clearly-established post-arrest due process rights, the Court cannot say

---

be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence."). In Handy v. City of Sheridan, the Tenth Circuit affirmed this approach when it stated that

> [s]ome time ago the Supreme Court explained the division of constitutional functions among law enforcement, magistrates, and judges when an arrest is made pursuant to a warrant, and its discussion lends little support to the notion of law enforcement's duty to investigate for additional, potentially exculpatory information when existing evidence is found by a judicial officer to establish probable cause.

636 F. App'x 728, 739 (10th Cir. 2016)(unpublished). See also Brady v. Dill, 187 F.3d 104, 110 (1st Cir. 1999)(noting that Baker v. McCollan declined to impose on custodial officers a post-arrest duty to investigate claims of innocence.). Though a given law enforcement officer may have a moral obligation to pursue potentially exculpatory information, the Constitution does not impose an affirmative duty to continue an investigation past a finding of probable cause. See Peet v. City of Detroit, 502 F.3d at 565 (holding that there is no constitutional obligation to release a suspect from custody the moment police become aware of exculpatory evidence). Brady v. Dill, 187 F.3d 104, 110 (1st Cir. 1999)("[The plaintiff's] major premise -- that the police must unilaterally release a person detained pursuant to a facially valid warrant directing his arrest if they conclude that he is innocent -- is too much of a stretch."). Notably, these cases are factually distinct from those where the officer is aware or should be aware of obviously exculpatory evidence and deliberately or recklessly fails to secure the release a detained arrestee, discussed above and infra at n.40.

soundly that a law enforcement officer violates the Constitution by failing to act the moment the

officer receives exonerating information.[41]

---

[41]As discussed above, several Courts of Appeals outside the Tenth Circuit have recognized a constitutional violation when law enforcement officers deliberately disregard evidence that would exonerate a detainee. For example, the United States Court of Appeals for the Sixth Circuit determined that two sheriff's deputies may have violated an inmate's Fourteenth Amendment due process rights by ignoring obvious exculpatory evidence:

> Gray was imprisoned for 41 days. It is conceded that he is not the person named in the warrant pursuant to which he was incarcerated. There is no dispute that Fuerst and Ussery were in possession of a photograph that bore virtually no resemblance to Gray, as well as a physical description detailing certain permanent scars that Gray did not have. . . . Absent sufficient proof to the contrary . . . the trier of fact could find that the failure by Fuerst and Ussery to ascertain that they were holding the wrong person violated Gray's due-process rights.

Gray v. Cuyahoga Cty. Sheriff's Dep't, 150 F.3d 579, 582-83 (6th Cir. 1998). More recently the Sixth Circuit declared that a plaintiff "had a clearly established constitutional right to be free from continued detention after officers should have known that he was not the person named in the warrant." Seales v. City of Detroit, Mich., 724 F. App'x 356, 366 (6th Cir. 2018). The Second Circuit reached a similar conclusion in Russo v. City of Bridgeport:

> [W]e hold that . . . Russo [was constitutionally protected] from a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence. The Bridgeport police officers retained sole custody of the videotape evidence -- and stored it in an improper manner -- for a full 68 days after Russo alerted them that examining the pictures of the perpetrator for tattoos could exonerate Russo. They did this after intentionally misstating that the robber *had* tattoos.

479 F.3d 196, 208 (2d Cir. 2007)(Calabresi, J.)("Russo had a clearly-established constitutional right to be free from prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence in a manner which "shocks the conscience.") These Courts of Appeals recognize a clearly-established constitutional right against continued imprisonment when investigating officers ignore exonerating evidence. The Court would be inclined to recognize the same right here if the facts indicated that Ganley was detained when Jojola realized his error, that Jojola knew or should have known that Ganley was detained, and that Jojola deliberately or recklessly failed to act on information that could have secured Ganley's release. But these are not the facts before the Court. Here, Ganley was not detained, and the Constitution does not recognize a right to be free from criminal charges or investigation; Jojola's mere negligence does not shock the conscience.

## II. THE COURT DENIES THE RULE 56(d) MOTION, BECAUSE THE REQUESTED DISCOVERY IS NOT NECESSARY TO DEFENDANT AGAINST THE MSJ.

In the Rule 56(d) Motion, Ganley argues that he needs discovery to adequately defend against the MSJ. See Rule 56(d) Motion at 1-2. Specifically, Ganley wants to depose Jojola, Torbett, and Burt about their investigation into the Ganley Checks. See Rule 56(d) Motion at 1-2. According to Ganley, it is not fair for the Court to consider Jojola's sworn statements in the Jojola Aff. without giving Ganley the chance to "test" those statements by questioning Jojola and the other investigators about what Jojola knew and when. Rule 56(d) Motion at 10. Furthermore, Ganley contends that, based on his information and belief, Jojola did not tell the whole truth about what investigators told him about the investigation. See Rule 56(d) Motion at 10-11. The Court denies the Rule 56(d) Motion. Ganley's § 1983 claims and his state tort claims survive the MSJ only if Ganley shows that there was no probable cause for arresting Ganley. Ganley does not identify the specific probable facts that he anticipates discovering in these depositions, so the Court cannot soundly say that the requested discovery is necessary for Ganley to defend against the MSJ.

Starting with Ganley's § 1983 claim, Ganley argues that Jojola violated Ganley's Fourth Amendment rights by knowingly or recklessly including false statements and/or omitting critical information in the Warrant Aff. See Complaint, ¶, at 11-12. Ganley also contends that Jojola was "objectively unreasonable" when he "chose not to complete his investigation on the grounds that he did not have time." Complaint ¶ 40, at 8.

The Defendants, in their MSJ, contend that Ganley's Fourth Amendment claim fails, because Jojola is protected by qualified immunity. See MSJ at 1-2. Specifically, the Defendants argue that Jojola did not include false statements in the Warrant Aff. or omit information that, if included in the Warrant Aff., would have vitiated probable cause. See MSJ at 11-15. The

Defendants add that, even after curing the Warrant Aff. of its alleged problems, the affidavit would still establish probable cause. See MSJ at 13, 15. The Defendants also argue that Jojola's investigation was sufficient to not violate the Fourth Amendment. See MSJ at 16-17.

To determine whether Ganley's requested discovery is necessary to defend against the MSJ, the Court must first identify what Ganley needs to do to defeat the MSJ. Qualified immunity does not protect Jojola if there was probable cause for Ganley's arrest. Ganley can establish that there was no probable cause by showing that Jojola made false statements and material omissions in the Warrant Aff., and that an affidavit with those problems cured does not establish probable cause. See Puller v. Baca, 781 F.3d 1190, 1197 (10th Cir. 2015). Relatedly, he could also show that Jojola's own probable cause determination, based on what he learned in the investigation, was unreasonable. See Romero v. Fay, 45 F.3d at 1477-78. Ganley will also need to demonstrate that Jojola's constitutional violation was clearly established.

Ganley's requested discovery is not necessary to defend against the MSJ. The Defendants disagree that Jojola made false statements, but further discovery is not necessary to resolve this issue, because removing or clarifying the alleged false or misleading statements and inserting the ostensibly exculpatory information, would not vitiate probable cause for Ganley's arrest. Removing the Warrant Aff.'s linguistically problematic reference to "verifying" that Ganley was the man in the surveillance video, clarifying Jojola's progress -- or lack thereof -- investigating the check's fingerprint, and mentioning that another investigator remarked that it was not clear whether Ganley was the perpetrator or a victim, nonetheless lays out a fact pattern establishing probable cause for Ganley's arrest. The Warrant Aff. so amended asserts that someone stole checks from mailboxes, altered them to list different payees, and then cashed those checks. See Warrant Aff. at 1. It establishes that someone cashed a check that had been altered to list Ganley

as the payee and that the bank teller wrote down a license number that belonged to Ganley. See Warrant Aff. at 1. It states that, at one point in the investigation, an investigator was not sure whether four people -- including Ganley -- whose names had been fraudulently listed as stolen checks' payees were offenders or victims of the criminal schemes. See Burt Report at 1. It states that Jojola compared Ganley's MVD photograph with surveillance footage of a man cashing a check and that Jojola concluded that Ganley was the man in the surveillance footage. MSJ ¶ 13, at 5; Jojola Aff. ¶ 13, at 2. It states that the check's true owner did not know Ganley and did not give Ganley permission to cash the check. See Warrant Aff. at 1. It states that the check has a fingerprint and a signature on it, but that neither the fingerprint nor the signature had been analyzed to see if they match Ganley's fingerprint and signature. See MSJ Response ¶ 8, at 4; Warrant Aff. at 1. Such a warrant affidavit establishes "something 'more than a bare suspicion,'" Puller v. Baca, 781 F.3d at 1200, that Ganley cashed the check, and that there is a "substantial probability," Taylor v. Meacham, 82 F.3d at 1562, that Ganley committed the crime. See supra § I, at 88-90. Consequently, Ganley has not demonstrated that he was arrested without probable cause.

Ganley also contends more generally that he believes Jojola lied about his investigation's timeline and what other investigators told him. See Affidavit of Nicole W. Moss Requesting Limited Discovery to Respond to Motion for Qualified Immunity ¶ 22, at 5 (dated January 18, 2018), filed January 18, 2018 (Doc. 35-1)("Moss Aff."). To the extent that Ganley argues that Jojola made false statements or deliberate omissions besides the ones he specifically identified, the Court cannot undergo the above exercise amending the warrant affidavit and testing the amended version for probable cause. Instead, the Court must consider whether Ganley's requested discovery could uncover proof of other misleading statements or omissions which might vitiate probable cause. Ganley wants to depose Jojola about his investigation. See Moss Aff. ¶ 22, at 5.

Nicole W. Moss states that Ganley alleges that Jojola made false statements in the arrest warrant, and those statements' truth depends on what Jojola knew and did at the time he issued the Warrant Aff. See Moss Aff. ¶ 22, at 6. Ms. Moss also states that Ganley "is informed and believes that" the Jojola Aff. contains false statements regarding the investigation's timeline and what other investigators told him. Moss Aff. ¶ 22, at 6. Ms. Moss states that Ganley wants to "test[]" Jojola's assertions in a deposition and question Jojola about his statements in the October 19, 2016, "during which Defendant Jojola made statements that will tend to establish genuine issues of material fact about the manner in which he concluded his investigation." Moss Aff. ¶ 22, at 6-7. In other words, Ganley argues that, to respond to the MSJ, he must depose Ganley about his investigation: (i) to illuminate whether Jojola's statements in the Warrant Aff. are false, as Ganley alleges they are; (ii) to determine whether other Warrant Aff. statements are false; and (iii) to question Jojola about his statements at the October 19, 2016 meeting, because those questions may establish genuine issues of material fact relating to the investigation.

Ganley need not depose Jojola about his investigation to determine the truth or falsity of the Warrant Aff. statements which Ganley contends are false. As the Court demonstrated above, there is still probable cause even after removing those allegedly false statements and including what Ganley contends should be included.

If Jojola lied about other things -- e.g., what the postal inspectors told him -- then correcting those falsities could change whether there is probable cause. Ganley does not explain about what Jojola may be lying, and the Court cannot see how their statements might change whether there is probable cause. Even disregarding what the postal inspectors told him, there is still a stolen check altered to list Ganley as the payee, the surveillance footage, the driver's license number belonging to Ganley, the MVD photograph, and Jojola's opinion that Ganley's MVD

photograph shows the same guy as in the surveillance footage. That evidence alone is enough to establish a substantial probability that Ganley was the culprit. Although the Court recognizes the difficulty in taking one side's affidavit at face value at this stage, Ganley's assertion -- that Ganley "is informed and believes that there are statements in the [Jojola Aff.] that are not true, particularly regarding the timeline of the investigation and what the other law investigative personnel told him" -- is too general to support granting a rule 56(d) motion. A rule 56(d) motion must identify not only the discovery, but the "probable facts" in that discovery that the movant needs. <u>Price ex rel. Price v. W. Res., Inc.</u>, 232 F.3d at 783. <u>See</u> <u>Burke v. Utah Transit Auth. & Local 382</u>, 462 F.3d at 1264 ("While the appellants' affidavit briefly lists the additional discovery they believe necessary, it fails to do so with any specificity, and with any hint of what facts such discovery is expected to unearth." (citing <u>Price ex rel. Price v. W. Res., Inc.</u>, 232 F.3d at 783)). Saying that Ganley "is informed and believes" that Jojola lied in describing his conversations with other investigators does not identify the probable facts that a deposition may reveal, because it does not indicate about what Ganley suspects Jojola lied. Ganley's third request -- to question Jojola about his statements at the October 19, 2016, meeting -- suffers from the same problem, in that Ganley does not explain what comments specifically he imagines "will tend to establish genuine issues of material fact relating to the investigation" nor explain how those comments are necessary to help Ganley defend against the MSJ. Moss Aff. ¶ 22, at 6.

Ganley also wants to depose Torbett and Burt about what they told Jojola about the investigation. <u>See</u> Moss Aff. ¶ 22, at 7. Ganley asserts that he "is informed and believes that Defendant is representing or misstating what those individuals told him and what information and documents they gave him." Moss Aff. ¶ 22, at 7-8. Again, Ganley identifies the discovery -- the deposition -- but not the specific probable facts that the depositions may reveal nor how those facts

will help Ganley defeat the MSJ. It is possible that depositions could reveal evidence that, if disclosed in the Warrant Aff., would vitiate probable cause, but Ganley does not state or even hint what that evidence might be. See Lewis v. Ft. Collins, 903 F.2d at 758 ("Rule 56[(d)] is not a license for a fishing expedition . . . .").

Ganley also wants to depose Jojola regarding his training and experience investigating identity theft and check fraud and whether he has faced complaints, discipline, or lawsuits relating to his work on such investigations. See Moss Aff. ¶ 22, at 7. Ganley asserts that he "is informed and believes that Defendant Jojola has a habit of issuing warrants for the wrong suspect and that he conducts unreasonably poor investigations and makes misleading statements in his warrant affidavits to obtain warrants." Moss Aff. ¶ 22, at 7. Ganley explains that, if these habits are true, "then it strengthens Plaintiff's assertions of municipal liability because the City has potentially allowed or adopted a custom or practice of conduct that leads to civil rights violations." Moss Aff. ¶ 22, at 7. The Court will not grant the Rule 56(d) Motion for this purpose, for the reason that the Defendants do not move for summary judgment on Ganley's municipal liability claim. See MSJ at 25 (asking the Court to dismiss the Complaint's Counts I and II); Complaint ¶¶ 55-57, at 11 (asserting "supervisory and municipal liability claims" as Count III). Consequently, deposing Jojola about his training and experience is not necessary to defend against the MSJ.

The analysis is different for Ganley's tort claims, because qualified immunity is a creature of federal law -- and therefore does not apply to state tort claims. See Todd v. Montoya, 877 F. Supp. 2d 1048, 1103 (D.N.M. 2012)(Browning, J.)("[Q]ualified immunity does not apply to Todd's claims under the NMTCA." (citing Romero v. Sanchez, 1995-NMSC-028, ¶ 25, 895 P.2d 212, 218)). In the end, however, the question boils down to whether Jojola had probable cause to submit the Warrant Aff., because, under New Mexico law, "[a]n officer who has probable cause

to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d 6, 10 (citing State v. Johnson, 1996-NMSC-075, ¶ 16, 122 N.M. 696, 930 P.2d 1148). A New Mexico court,

> may issue a warrant for arrest upon an indictment or a sworn written statement of the facts showing probable cause for issuance of a warrant. The showing of probable cause shall be based upon substantial evidence, which may be hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished.

N.M. R. Crim. P. 5-208(D). New Mexico's probable cause requirement is rooted in Article II, § 10 of the New Mexico Constitution (requiring a "written showing of probable cause, supported by oath or affirmation" for any search and seizure warrants). See N.M. R. Crim. P. 5-208 committee commentary. Probable cause in New Mexico "'means a reasonable ground for belief of guilt,'" and "'exists where the facts and circumstances within the knowledge of the officers, based on reasonably trustworthy information, is sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed.'" State v. Snedeker, 1982-NMSC-085, ¶ 21, 657 P.2d 613, 617 (quoting State v. James, 1978-NMCA-046, ¶ 13, 579 P.2d 1257, 1261, overruled on other grounds by State v. Cervantes, 1979-NMCA-029, ¶ 24, 593 P.2d 478, 484). The Supreme Court of New Mexico has stated that, to establish probable cause, "(1) only a probability of criminal conduct need be shown; (2) there need be less vigorous proof than the rules of evidence require to determine guilt of an offense; (3) common sense should control; (4) great deference should be shown by courts to a magistrate's determination of probable cause." State v. Snedeker, 1982-NMSC-085, ¶ 22, 657 P.2d 613, 617 (quoting State v. Bowers, 1974-NMCA-135, ¶ 6, 529 P.2d 300, 302).

Thus the question is whether Ganley's discovery requests -- <u>i.e.</u>, deposing Jojola, Torbett, and Burt -- would help Ganley show that Jojola lacked probable cause. In the qualified immunity analysis, the Court need look only to whether the affidavit -- cured of its misleading statements or omissions -- establishes probable cause; here, the question is whether Jojola had probable cause to seek Ganley's arrest. It is possible that those depositions could reveal information that, if included in the Warrant Aff., would vitiate probable cause. As the Court ruled above, however, Ganley states that he has information and believes that Jojola lied about what investigators told him, but Ganley does not identify or hint the probable facts that a deposition may reveal, because he does not indicate what he suspects Jojola lied about. <u>See</u> <u>Lewis v. Ft. Collins</u>, 903 F.2d at 758 ("Rule 56[(d)] is not a license for a fishing expedition . . . .").

## III. THE COURT DISMISSES GANLEY'S SUPERVISORY AND MUNICIPAL LIABILITY CLAIM.

In his Complaint, Ganley asserts "supervisory and municipal liability claims," alleging that Jojola's "actions constituted a custom, practice, and policy of deliberate indifference to the rights of Plaintiff and other citizens which affirmatively and proximately caused Plaintiff's injuries." Complaint ¶ 56, at 11. The Defendants do not move for summary judgment on the municipal liability claim. <u>See</u> MSJ at 25 (asking the Court to dismiss the Complaint's Counts I and II); Complaint ¶¶ 55-57, at 11 (asserting "supervisory and municipal liability claims" as Count III).

Nonetheless, the Court's determinations on Ganley's Fourth and Fourteenth Amendment claims compels the Court to dismiss Ganley's supervisory and municipality claim as well. When "suing a county under section 1983 for the actions of one of its officers," a plaintiff in the Tenth Circuit must show that: (i) "a municipal employee committed a constitutional violation"; and (ii) "a municipal policy or custom was the moving force behind the constitutional deprivation." <u>Myers</u>

v. Oklahoma County Bd. of County Comm'rs, 151 F.3d at 1318 (citing Monell, 436 U.S. at 694). The Court concludes, supra § II, that Jojola did not violate Ganley's constitutional rights. Consequently, because Ganley cannot get past step one on his supervisory and municipality claim, the Court must dismiss it.

## IV.    THE COURT REMANDS GANLEY'S STATE CLAIMS.

In his Complaint, Ganley asserts two counts based on federal claims: (i) that Jojola violated his Fourth and Fourteenth Amendment rights, see Complaint at ¶¶ 36-44, 7-9; and (ii) that the City of Albuquerque deprived Ganley of his Fourth, Fifth, and Fourteenth Amendment rights, see Complaint ¶¶ 55-57, at 11, because Jojola's "actions constituted a custom, practice, and policy of deliberate indifference" to constitutional rights, see Complaint ¶ 56, at 11. Ganley also asserts one count based on state tort claims. See Complaint ¶ 47, at 9-10. The Court concludes that Jojola did not violate Ganley's constitutional rights. See supra § II. Consequently, the Court rules in favor of the Defendants and dismisses both federal claims. See supra §§ II, III. Only the state claims remain; they present no federal question, see 28 U.S.C. § 1331, and there is no contention that the parties are diverse or that the amount in controversy exceeds $75,000.00, see 28 U.S.C. § 1332; Response at 23 (Ganley asking that, if the Court dismisses his federal claims, to remand the state claims); Tr. at 12:2-8 (Nixon)(stating that the Defendants would not object to the Court remanding Ganley's state claims if the Court dismisses his federal claims). The Tenth Circuit has indicated a strong preference for the district courts to decline to exercise supplemental jurisdiction over state claims after federal claims are gone. See Smith v. City of Enid By & Through Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." (citing 28 U.S.C. § 1367(c)(3); Ball v. Renner, 54 F.3d 664, 669 (10th Cir.1995)). Consequently, the

Court declines to exercise jurisdiction over Ganley's state claims, and will remand them to the County of Bernalillo, Second Judicial District Court, State of New Mexico.

**IT IS ORDERED** that: (i) Defendants Eric Jojola and City of Albuquerque's Motion for Summary Judgment on Qualified Immunity and Other Grounds, filed December 21, 2017 (Doc. 32), is granted; (ii) the requests in Plaintiff John Ganley's Motion for a Continuance of the Motion for Summary Judgment to Permit Discovery Pursuant to Rule 56(d) and Affidavit, filed January 1, 2018 (Doc. 35), are denied; (iii) Counts I and III in Ganley's First Amended Complaint for Damages for Violation of Civil Rights and Tort Claims, filed August 8, 2017 (Doc. 22), are dismissed with prejudice; and (iv) Ganley's remaining state claims are remanded to the County of Bernalillo, Second Judicial District Court, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Nicole Moss
The Law Office of Nicole W. Moss
Albuquerque, New Mexico

--and--

Marshall J. Ray
Law Offices of Marshall J. Ray LLC
Albuquerque, New Mexico

     _Attorneys for the Plaintiff_

Jessica Lynn Nixon
Office of the City Attorney
Albuquerque, New Mexico

*Attorney for the Defendants*